Oliver J. H. Stiefel, OSB # 135436
(503) 227-2212 │ oliver@crag.org
Erin E. Hogan-Freemole, OSB # 212850
(503) 234-0788 │ erin@crag.org
Meriel L. Darzen, OSB # 113645
(503) 525-2725 │ meriel@crag.org
CRAG LAW CENTER
3141 E. Burnside St.
Portland, Oregon 97214
Fax: (503) 296-5454

   *Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## MEDFORD DIVISION

| | |
|---|---|
| **OREGON WILD**, an Oregon nonprofit corporation; and **WILDEARTH GUARDIANS**, a New Mexico nonprofit corporation;<br><br>      Plaintiffs,<br><br>   v.<br><br>**UNITED STATES FOREST SERVICE**, **MICHAEL RAMSEY**, in his official capacity as Lakeview Ranger District Ranger; **JEANNETTE WILSON**, in her official capacity as Silver Lake Ranger District Ranger; **RANDY MOORE**, in his official capacity as Chief of the U.S. Forest Service; and **THOMAS VILSACK**, in his official capacity as Secretary of Agriculture,<br><br>      Defendants. | Case No. 1:22-cv-01007<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br>(5 U.S.C. § 706(2))<br><br>(Environmental Matters – National Environmental Policy Act and Administrative Procedure Act) |

**GLOSSARY OF TERMS**

| | |
|---|---|
| Agency | United States Forest Service |
| APA | Administrative Procedure Act |
| CE | Categorical Exclusion |
| CE-6 | 36 C.F.R. § 220.6(e)(6) |
| CEQ | Council on Environmental Quality |
| Defendants | All named Defendants |
| EA | Environmental Assessment |
| EIS | Environmental Impact Statement |
| Forest | Fremont-Winema National Forest |
| Forest Service | United States Forest Service |
| Girdling | A method of killing trees without cutting them down. This method is often used to create "snags," which are standing, dead trees that provide important habitat for a variety of wildlife. |
| Impact or Effect | Used synonymously to describe ecological, aesthetic, historic, cultural, economic, social, or health consequences of an action, whether direct, indirect, or cumulative. "Direct" effects are caused by an action and occur at the same time and place. "Indirect" effects are caused by an action and are later in time or farther removed in distance. "Cumulative" effects result from the incremental effect of an action when added to other past, present, and reasonably foreseeable future actions. |
| Logging | Any silvicultural method employed for the purpose of cutting down trees. Logging can be accomplished through commercial or noncommercial means, and can involve a variety of techniques including "thinning," "clearcutting," etc. Logging operations can involve felling trees, skidding felled trees to landings, building and maintaining roads, hauling logs on roads, and other associated activities. |
| NEPA | National Environmental Policy Act |
| Plaintiffs | All named Plaintiffs |
| Projects | South Warner, Baby Bear, Bear Wallow |

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—1

## NATURE OF ACTION

1.      Plaintiffs Oregon Wild and WildEarth Guardians (collectively, "Wild") bring this challenge under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706, to the final administrative actions of the United States Forest Service, Michael Ramsey, Jeanette Wilson, Randy Moore, and Thomas Vilsack (collectively, "Forest Service," "agency," or "Defendants").

2.      In approving the South Warner Project, the Bear Wallow Project, and the Baby Bear Project (collectively, the "Projects") on the Fremont-Winema National Forest ("Forest"), Defendants acted arbitrarily, capriciously, and contrary to the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321–4370h. Wild also brings an as-applied challenge under NEPA to the categorical exclusion ("CE") under which each of the Projects was approved.

3.      The Projects all authorize "commercial thinning," a type of logging whereby merchantable trees are cut and removed from the forest for their commercial value. In total, the Projects authorize commercial thinning on up to 29,000 acres, or about 45 square miles. For the large-scale commercial logging operations authorized by the Projects, the Forest Service did not prepare an Environmental Impact Statement ("EIS"), or even a less intensive Environmental Assessment ("EA") to review the Projects' environmental effects pursuant to NEPA. Instead, the agency approved all three Projects pursuant to a CE.

4.      CEs apply to categories of small, low-impact, and routine actions that the Forest Service has determined—in notice and comment rulemaking—pose no significant environmental effects either individually or cumulatively, and therefore require no further analysis under an EIS or EA. The agency approved the Projects pursuant to a CE applicable to "timber stand and/or wildlife habitat improvement" activities. 36 C.F.R. § 220.6(e)(6) ("CE-6"). Wild challenges the Forest Service's reliance on CE-6 to authorize the Projects' commercial logging operations.

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—2

5.      First, CE-6 is inapplicable to the Projects. The Forest Service failed to articulate a rational explanation as to why CE-6 permits projects of the type and scale of the Projects, each of which involve thousands of acres of commercial logging operations. The Forest Service was required to prepare EISs or EAs, which would force the agency to take the required "hard look" at—and publicly disclose—the Projects' environmental impacts, consider alternatives, solicit informed public comments, and fulfill the agency's other obligations under NEPA.

6.      Second, in the alternative, if CE-6 does permit the Forest Service to approve the Projects' commercial logging operations, then CE-6 itself violates NEPA and its implementing regulations, 40 C.F.R. §§ 1500–1508 (2019). As applied to commercial logging operations like those authorized by the Projects, the Forest Service acted arbitrarily, capriciously, and in excess of its authority in promulgating CE-6 because the agency never made the required findings that commercial logging operations cause no individually or cumulatively significant environmental effects. Moreover, an interpretation of "no cumulatively or individually significant effect" as permitting commercial logging operations on thousands of acres—with no upper limit—flatly contradicts the language and purpose of NEPA and its implementing regulations, and is inconsistent with the Forest Service's CE regulatory regime—in which the agency has promulgated CEs specifically for commercial logging purposes, all with acreage caps.

7.      Wild respectfully requests that this Court vacate the Projects' approvals of commercial logging operations, declare such operations beyond the scope of CE-6, and remand to the Forest Service for preparation of EISs or EAs containing full and fair analyses of the Projects' environmental impacts. In the alternative, if the Projects do fall within the scope of CE-6, Wild respectfully requests that this Court hold unlawful and set aside CE-6 as applied to commercial logging operations.

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

8.      If necessary, Wild intends to seek narrowly tailored injunctive relief during the pendency of this litigation to protect sensitive species and their habitats and other resources that are adversely affected by commercial logging operations.

9.      Should it prevail, Wild will seek attorneys' fees and costs pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412, and/or any other applicable authorities.

## **JURISDICTION AND VENUE**

10.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Wild's claims present a federal question, and 28 U.S.C. § 1346 because the United States is a defendant. A present, actual, and justiciable controversy exists between the parties. The requested relief for a declaratory judgment is proper under 28 U.S.C. § 2201, and the requested injunctive relief is proper under 28 U.S.C. § 2202.

11.      Wild has exhausted its administrative remedies by submitting scoping comments. The challenged agency action is subject to this Court's review under 5 U.S.C. §§ 702, 704, and 706. Defendants have waived sovereign immunity in this action pursuant to 5 U.S.C. § 702.

12.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because the Project areas are located within this District. Defendants maintain an office in this District. Plaintiffs Oregon Wild and WildEarth Guardians maintain offices in this District.

13.      This case is properly filed in the Medford Division pursuant to Local Rule 3-2 because a substantial part of the Project area, and Defendants' offices where the decisions were signed, are located in Lake County. A substantial part of the events or omissions giving rise to this claim occurred, and the property that is subject to this action is situated in Lake and Klamath Counties.

///

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—4

## PARTIES

**Plaintiffs**

14.    Plaintiff OREGON WILD is a nonprofit corporation with approximately 20,000 members and supporters throughout the state of Oregon and the Pacific Northwest. Oregon Wild is headquartered in Portland, Oregon and maintains field offices in Bend, Eugene, and Enterprise, Oregon. Oregon Wild's mission is to protect and restore Oregon's wildlands, wildlife, and waters as an enduring legacy. Oregon Wild's wilderness, old-growth forest, and clean rivers/watersheds programs protect pristine drinking water, unparalleled recreation opportunities, and vital fish and wildlife habitat across Oregon.

15.    Plaintiff WILDEARTH GUARDIANS is a nonprofit organization dedicated to protecting and restoring the wildlife, wild places, wild rivers, and health of the American West. WildEarth Guardians has 7,990 members and more than 187,000 supporters across the western states and maintains an office in Portland, Oregon.

16.    Plaintiffs and their members, supporters, and staff regularly visit and enjoy the Forest, including the Project areas, and intend to do so again in the near future. Members, supporters, and staff appreciate the aesthetics of the Forest, including its waters and wildlife, and use the area to engage in recreational, professional, scientific, and spiritual activities such as hunting, hiking, camping, fishing, photography, watershed research, and wildlife observation.

17.    Plaintiffs have organizational interests in the proper and lawful management of the Forest. Plaintiffs and their members, supporters, and staff have actively participated in the Projects' administrative processes.

18.    Plaintiffs and their members, supporters, and staff would sustain injury to their aesthetic, educational, recreational, professional, spiritual, and scientific interests if the Projects

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—5

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

proceed as authorized. Plaintiffs and their members, supporters, and staff have concrete plans to return to the proposed Project areas. Unless this Court grants the requested relief, Plaintiffs and their members, supporters, and staff will be adversely and irreparably harmed by the Projects.

19.    Plaintiffs and their members, supporters, and staff would sustain injury to aesthetic, educational, recreational, professional, spiritual, and scientific interests if the Forest Service is permitted to authorize commercial logging operations under CE-6. Unless this Court grants the requested relief, Plaintiffs and their members, supporters, and staff will be adversely and irreparably harmed by the application of CE-6 to commercial logging operations.

**Defendants**

20.    Defendant the UNITED STATES FOREST SERVICE is an agency within the United States Department of Agriculture entrusted with the management of our national forests. The Forest Service is headquartered in Washington, D.C., and it has nine regions across the country. The national forests of Oregon are in Region 6. All or a significant portion of the actions and omissions alleged in this Complaint occurred in Region 6.

21.    Defendant MICHAEL RAMSEY is the District Ranger for the Lakeview Ranger District of the Forest, where all or a significant portion of the South Warner Project activities would occur. Mr. Ramsey is the responsible official for the South Warner Project, and he signed the Decision Memorandum, constituting the final administrative action. As District Ranger, Mr. Ramsey has the responsibility to ensure that all projects on the Lakeview Ranger District are consistent with applicable laws and regulations. Wild brings this action against Mr. Ramsey in his official capacity.

22.    Defendant JEANNETTE WILSON is the District Ranger for the Silver Lake Ranger District of the Forest, where all or a significant portion of the Bear Wallow and Baby

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—6

Bear Project activities would occur. Ms. Wilson is the Responsible Official for the Bear Wallow and Baby Bear Projects, and she signed the Decision Memoranda, constituting the final administrative actions. As District Ranger, Ms. Wilson has the responsibility to ensure that all projects on the Silver Lake Ranger District are consistent with applicable laws and regulations. Wild brings this action against Ms. Wilson in her official capacity.

23.    Defendant RANDY MOORE is the Chief of the Forest Service. Under a predecessor Chief, the Forest Service promulgated the CE challenged in this case. As Chief, Mr. Moore has the responsibility to ensure that all regulations promulgated by the Forest Service are consistent with applicable laws and regulations. Wild brings this action against Mr. Moore in his official capacity.

24.    Defendant THOMAS VILSACK is the Secretary of Agriculture. Under a predecessor Secretary, the Forest Service promulgated the CE challenged in this case. As Secretary, Mr. Vilsack has the responsibility to ensure that all regulations promulgated by all Agriculture Department agencies, including the Forest Service, are consistent with applicable laws and regulations. Wild brings this action against Mr. Vilsack in his official capacity.

## **LEGAL BACKGROUND**

### **National Environmental Policy Act**

25.    Congress enacted NEPA to "declare a national policy which will encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man; [and] to enrich the understanding of the ecological systems and natural resources important to the Nation." 42 U.S.C. § 4321.

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

26.    To achieve these aims, NEPA and its implementing regulations set forth procedures designed to (1) ensure that federal agencies take a "hard look" at the environmental consequences of their proposed actions, and (2) foster meaningful public participation.

27.    NEPA requires all agencies of the federal government to prepare a "detailed statement" for all "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). Commonly known as the Environmental Impact Statement or EIS, the detailed statement must describe, *inter alia*, the adverse environmental impact of the proposed action and alternatives to the proposed action. *Id.*

28.    The Council on Environmental Quality ("CEQ") promulgated regulations implementing NEPA. 42 U.S.C. § 4342 (establishing CEQ); 40 C.F.R. §§ 1500–1508 (2019) (CEQ's NEPA regulations). CEQ modified the NEPA regulations by final rule on July 16, 2020, 40 C.F.R. §§ 1500–1508 (2021), but has since rescinded portions of the 2020 modifications, effective May 20, 2022. 87 Fed. Reg. 23,453 (April 20, 2022).

29.    CEQ regulations direct federal agencies to identify in their NEPA procedures certain categories of actions that normally do not require an EIS or an EA, which is a concise public document which briefly provides sufficient evidence and analysis for determining whether to prepare an EIS or a finding of no significant impact. 40 C.F.R. § 1507.3(b)(1)(iii) (2019); *id.* § 1508.9(a)(1) (2019). These categories of actions are called CEs, which are "category[ies] of actions which do not individually or cumulatively have a significant effect on the human environment and which have been found to have no such effect by a federal agency in implementation of these regulations." 40 C.F.R. § 1508.4 (2019)

30.    The Forest Service promulgated a series of regulatory CEs, including CE-6, in 1992. *See* 57 Fed. Reg. 43,180 (Sept. 18, 1992) (establishing categories); 73 Fed. Reg. 43,084

*Crag Law Center
3141 E Burnside St.
Portland, OR 97214
Tel. (503) 227-2212*

(July 24, 2008) (placing established categories under Forest Service NEPA regulations at 36 C.F.R. Part 220).

31.     CE-6 encompasses "timber stand and/or wildlife habitat improvement activities that do not include the use of herbicides or do not require more than 1 mile of low standard road construction." 36 C.F.R. § 220.6(e)(6).

32.     Other Forest Service CEs apply specifically to logging projects and expressly contemplate an acreage-limited commercial component, including 36 C.F.R. § 220.6(e)(12), (14), and (25).

33.     36 C.F.R. § 220.6(a) provides that the Forest Service shall categorically exclude a proposed action from further analysis and documentation in an EIS or EA "only if there are no extraordinary circumstances related to the proposed action" and if it is within a category established by the Secretary or Chief.

34.     In addition to the regulatory CE's, Congress has established CEs for Forest Service projects implementing restoration treatments to address insects and disease, hazardous fuels reduction, and restoration of mule deer and sage grouse habitat. *See* 16 U.S.C. § 691. These statutory CEs are subject to a series of qualifications and limitations, such as a cap on project size (between 3,000 and 4,500 acres) and development through a collaborative process.

**Administrative Procedure Act**

35.     The APA confers a right of judicial review on any person adversely affected by agency action within the meaning of a relevant statute. 5 U.S.C. § 702. Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in court are subject to judicial review. 5 U.S.C. § 704.

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

36.     Upon review under the APA, a court shall hold unlawful and set aside agency

action, findings, and conclusions found to be: Arbitrary, capricious, an abuse of discretion, or

otherwise not in accordance with law; in excess of statutory jurisdiction, authority, or limitations,

or short of statutory right; or without observance of procedure required by law. 5 U.S.C.

§ 706(2)(A), (C), (D).

## FACTUAL BACKGROUND

### Logging Operations

37.     As compared to noncommercial activities like prescribed burning and

precommercial thinning, commercial logging operations cause more significant environmental

impacts.

38.     For example, commercial logging ordinarily targets larger trees. Such trees have

higher commercial value than smaller trees, but when left in the forest provide invaluable

ecosystem benefits including storing carbon and providing habitat for birds and other wildlife.

39.     To facilitate commercial logging, the Forest Service (and/or timber sale

contractors) conducts associated activities such as using heavy equipment to create and utilize

landings (where logs and equipment are placed and temporarily stored) and skid trails (the routes

where logs are dragged to landings), as well as roadwork and log hauling on primitive roads.

40.     Combined, these commercial logging operations can cause significant

environmental effects, including disturbing soils, causing erosion into streams, destroying or

degrading wildlife habitat, releasing stored carbon, modifying fire behavior, spreading invasive

weeds, degrading scenery, interfering with recreation, and more.

41.     In contrast, noncommercial activities often are carried out using hand tools and do

not involve the creation and utilization of log landings and skid trails, thereby creating fewer

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—10

impacts like noise disturbance and soil compaction. Even where heavy equipment is used to fell

trees for noncommercial purposes, the logs are left in the forest and thus continue to provide

habitat and other values.

42.    Forest Service projects often are developed to achieve multiple purposes. For

example, a project designed with the primary purpose of "timber stand improvement" also may

further the purposes of providing wood products to local mills and securing timber sale receipts

to fund other Forest Service activities like restoration. The Forest Service often labels such latter

purposes as "incidental" to a project's primary purpose, but in practice, these purposes can

dictate the scope of a project and influence its environmental impacts.

43.    When commercial logging operations are involved, a project inherently will have

more significant environmental impacts, regardless of the project's primary purpose.

**CE-6 and the Forest Service's Logging-Related CEs**

***1991/1992 Rulemaking***

44.    On April 29, 1991, the Forest Service issued a Notice of proposed revisions to its

NEPA policies and procedures. 56 Fed. Reg. 19,718 (Apr. 29, 1991). The proposed revisions

included new and expanded direction for excluding certain categories of action from

documentation in an EA or EIS.

45.    As relevant here, the Forest Service sought to replace an existing CE for "low-

impact silvicultural activities," which included a variety of activities such as harvest, salvage,

thinning, planting, and site preparation that were limited in size and duration.

46.    Regarding the previous CE for low-impact silvicultural activities, environmental

organizations had petitioned the Forest Service to: (a) Amend the CE to describe specific and

objectively identifiable categories of actions to be excluded from environmental documentation;

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

(b) prohibit the categorical exclusion of timber sales involving more than 25 thousand board feet[1] or more than one acre; and (c) immediately stay the CE's application to timber sales of more than 25 thousand board feet or more than one acre until final agency action on the petition.

47.    In response, the Forest Service issued an interim directive to limit timber salvage, thinning, and harvesting to less than 100 thousand board feet or less or to areas of less than 10 acres. 54 Fed. Reg. 9073 (March 3, 1989). The Forest Service intended this interim directive to guide timber harvests on national forest land until more comprehensive revisions could be made to the agency's NEPA procedures.

48.    The proposed rule expanded the previous CE and divided it into four separate categories: Proposals to harvest or salvage timber which remove one million board feet or less of merchantable wood products, require one mile or less of new road construction, and assure regeneration of harvested or salvaged areas, where required ("proposal 1"); proposals to thin merchantable timber from overstocked stands which require one mile or less of new road construction ("proposal 2"); proposals to artificially regenerate areas to native tree species, including needed site preparation not involving the use of pesticides ("proposal 3"); and proposals to improve vegetation or timber conditions using approved silvicultural or habitat management techniques, not including the use of herbicides, which have little potential for soil movement, loss of soil productivity, water and air quality degradation, or impact on sensitive resource values ("proposal 4").

---

[1] One board foot is 12"x12"x1" (144 cubic inches). One million board feet is equivalent to roughly 200 logging trucks' worth of timber.

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—12

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

49.    The Forest Service explained that proposal 1 (related to timber harvest or salvage) was intended to address the petition for rulemaking concerning the previous CE for low-impact silvicultural activities.

50.    In response to the petition's first two requests, the Forest Service identified its proposed rules' intent as making the categories more specific and objectively identifiable. The agency also stated that the suggestion to limit categorically excluded timber sales to 25 thousand board feet or one acre was unreasonably conservative and had not been adopted.

51.    Instead, proposal 1 would apply to proposals to harvest or salvage timber which remove one million board feet or less of merchantable wood products, require one mile or less of new road construction, assure regeneration of harvested or salvaged areas where required, and are consistent with Forest land and resource management plans. The Forest Service asserted that these activities have little potential for soil movement, loss of soil productivity, water and air degradation, or impact on sensitive resource values. The Forest Service further stated that the agency had prepared hundreds of EAs for projects with these characteristics and always found them to have no significant environmental effects.

52.    On September 18, 1992 the Forest Service announced its adoption of the final revised NEPA rules, modified to reflect public comment on the proposal. 57 Fed. Reg. 43,180 (Sept. 18, 1992). The agency noted that the revisions to its CE rules had generated the greatest number of comments.

53.    In response to a comment regarding the use of the term, "routine," the Forest Service stated that its intent was that only routine actions with no extraordinary circumstances should be within the categories for exclusion. Accordingly, the final rule removed the term

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—13

"routine" from each category and examples and instead placed it as a criterion applicable to all categorically excluded actions.

54.     Based on input from the public, the Forest Service reduced the scope of proposal 1. The agency stated that in consideration of a wide divergence of views and concern of several respondents regarding the visual effects of logging, it had reduced the size of timber harvests of live trees suitable for this category to 250,000 board feet or less of merchantable wood products.

55.     In the final rule, the Forest Service stated that it had reorganized the categories for low-impact silvicultural activities to improve clarity. Specifically, proposals 1 (timber harvest or salvage) and 2 (thinning of merchantable timber) were subsumed into a single category. The agency did not provide any explanation or analysis regarding the reorganization.

56.     The final rule adopted three categories of low-impact silvicultural activities.

57.     CE-4 applies to: Timber harvest which removes 250,000 board feet or less of merchantable wood products or salvage which removes 1,000,000 board feet or less of merchantable wood products; which requires one mile or less of low standard road construction; and assures regeneration of harvested or salvaged areas, where required. Examples include, but are not limited to:

    a.    Harvesting 60,000 board feet of merchantable timber from 100 acres, including the construction of one-half mile of additional roads.

    b.    Salvaging an estimated volume of 750,000 board feet of merchantable wood products timber from dead or dying trees, including the construction of one mile of access road from an area that is generally flat with good drainage.

    c.    Thinning (FSM 2431 and 2470.5) an estimated 200,000 board feet of timber from over-stocked timber stands, which requires construction of one-quarter mile of additional access road.[2]

---

[2] "FSM" is the Forest Service Manual.

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—14

58.     CE-5 applies to: Regeneration of an area to native tree species, including site

preparation which does not involve the use of herbicides or result in vegetation type conversion.

Examples include but are not limited to:

    a.     Planting seedlings of superior trees in a progeny test site to evaluate
        genetic worth.

    b.     Planting trees or mechanical seed dispersal of native tree species following
        a fire, flood, or landslide.

59.     CE-6 applies to: Timber stand and/or wildlife habitat improvement activities

which do not include the use of herbicides or do not require more than one mile of low standard

road construction. Examples include, but are not limited to:

    a.     Girdling trees to create snags.

    b.     Thinning or brush control to improve growth or to reduce fire hazard
        including the opening of an existing road to a dense timber stand.

    c.     Prescribed burning to control understory hardwoods in stands of southern
        pine.

    d.     Prescribed burning to reduce natural fuel build-up and improve plant
        vigor.

### *Heartwood Decision*

60.     On September 28, 1999, a district judge held unlawful and set aside CE-4.

*Heartwood, Inc. v. U.S. Forest Serv.*, 73 F. Supp. 2d 962 (S.D. Ill. 1999).

61.     The court found that the Forest Service had failed to provide any rationale for

why this magnitude of timber sales (250,000 board feet for live-tree harvest and 1,000,000 board

feet for salvage) would not have a significant effect on the environment. The court also found

that the Forest Service had failed to adequately explain or provide support for its position that

timber harvests of this magnitude would not have cumulatively significant effects on the

environment.

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—15

62.    The court issued a nationwide injunction barring the Forest Service from applying CE-4.

63.    There was no similar challenge to CE-6, which remained in effect.[3]

**2003 Rulemaking in response to Heartwood**

64.    On January 8, 2003, in response to *Heartwood*, the Forest Service gave notice and requested comments on proposed revisions to its directives for implementing NEPA. 68 Fed. Reg. 1,026 (Jan. 8, 2003). The agency proposed adding three CEs applicable to small-scale timber harvesting projects. The Forest Service explained that the proposed new categories were much more specific and limited in scope than the CE invalidated by *Heartwood*.

65.    The Forest Service also stated that it now believed acreage to be a more useful measure than timber volume, which it had used to define the previous logging CEs, as acreage is easily delineated and quantified for purposes of developing a proposal.

66.    The final rule adopting the new Forest Service CEs was published on July 29, 2003. 68 Fed. Reg. 44,598 (July 29, 2003). The Forest Service added three new categories.

67.    "CE-12," now codified at 36 C.F.R. § 220.6(e)(12), allows harvest of live trees not to exceed 70 acres with no more than one-half mile of temporary road construction. The purpose of this category is to allow low-impact silvicultural treatments through timber harvest. Examples include, but are not limited to, thinning of overly dense stands of trees to improve the health and vigor of the remaining trees, and removing individual trees for forest products or fuelwood. After reviewing similar projects while developing the rule, the Forest Service

_____

[3] Plaintiffs also challenged the *process* by which the new CEs were adopted, including CE-6. Specifically, they claimed that the adoption of the new CEs required preparation of an EA or EIS. The district court rejected this claim and the Seventh Circuit affirmed. *Heartwood, Inc. v. U.S. Forest Serv.*, 230 F.3d 947 (7th Cir. 2000).

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—16

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

increased the acreage from its initially proposed 50 acres to 70 acres, which the agency explained would better reflect the acreage of the reference projects.

68.    "CE-13," now codified at 36 C.F.R. § 220.6(e)(13), allows the salvage of dead and/or dying trees not to exceed 250 acres with no more than one-half mile of temporary road construction. This CE allows salvage harvest in areas where trees have been severely damaged by forces such as fire, wind, ice, insects, or disease and still have some economic value as a forest product.

69.    "CE-14," now codified at 36 C.F.R. § 220.6(e)(14), allows commercial and noncommercial felling and removal of any trees necessary to control the spread of insects and disease on no more than 250 acres with no more than one-half mile of temporary road construction. This CE allows the Forest Service to apply harvest methods to control insects and disease before they spread to adjacent healthy trees.

70.    In developing these CEs, the Forest Service reviewed the effects of 154 projects with actions similar to those allowed in the three new categories. Based on post-implementation field review, the Forest Service concluded that the projects' environmental impacts were not "significant" for NEPA purposes.

71.    The Forest Service also explained that approximately 300 projects had been implemented using the now-vacated CE-4. These projects involved approximately 8,200 acres of green tree harvest (in total) and approximately 41,100 acres of salvage (in total). Review of these projects further supported the agency's conclusion that the new CEs would not result in individually or cumulatively significant impacts.

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

72.     On January 18, 2006, the Tenth Circuit Court of Appeals rejected a facial

challenge to CE-13. *Colo. Wild v. U.S. Forest Serv.*, 435 F.3d 1204 (10th Cir. 2006). The court

held that the Forest Service had adequately supported its conclusions and decision in the record.

### *2002–2003 Hazardous Fuels Reduction Rulemaking*

73.     On December 16, 2002, the Forest Service and other agencies gave notice of and

requested comment on a proposal to promulgate two new CEs, including one applying to

hazardous fuels reduction activities such as thinning overstocked stands and brush. 67 Fed. Reg.

77,038 (Dec. 16, 2002).

74.     Activities permitted under the proposed fuels CE included commercial or

precommercial tree thinning. The proposed fuels CE contained a number of stipulations, but did

not include an acreage cap.

75.     On June 5, 2003, the Forest Service published a final rule which, *inter alia*, added

the two new CEs. 68 Fed. Reg. 33,814 (June 5, 2003). The new fuels CE ("CE-10") explicitly

permitted commercial logging.

76.     The Forest Service's proposed draft of CE-10 had not included an acreage limit

for hazardous fuels projects. In response to public comment, the agency in the final rule elected

to limit hazardous fuels reduction activities using mechanical methods to 1,000 acres or smaller.

### **Bosworth** *Decision*

77.     On December 5, 2007, the Ninth Circuit Court of Appeals held unlawful and set

aside CE-10. *Sierra Club v. Bosworth*, 510 F.3d 1016 (9th Cir. 2007).

78.     The Court concluded that the Forest Service had failed to properly assess the

significance of activities included in the category, failed to support its conclusions with evidence

in the record, and thus failed to demonstrated that it had made a reasoned decision to promulgate

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—18

CE-10 based on relevant factors and information. Accordingly, the court held that the promulgation of CE-10 was arbitrary and capricious.

79.    Critical to the court's decision was the Forest Service's failure to demonstrate, with reference to the administrative record, that commercial logging of up to 1,000 acres had only insignificant impacts.

80.    The court permanently enjoined the Forest Service from using CE-10 to authorize any project not initiated prior to October 2004.

***2007/2008 Rulemaking***

81.    On August 16, 2007, the Forest Service gave notice that it was preparing to move its NEPA-implementing procedures from the Forest Service Manual and Forest Service Handbook to the Code of Federal Regulations. With respect to CEs, the Forest Service explained that the new regulations would incorporate the implementing language from the Forest Service Handbook. The headings would be changed to be more explanatory, but the content would remain the same. 72 Fed. Reg. 45,998 (Aug. 16, 2007).

82.    On July 24, 2008, the Forest Service issued a final rule codifying its NEPA procedures, moving them from the Forest Service Manual to the Code of Federal Regulations. 73 Fed. Reg. 43,084 (July 24, 2008).

83.    The majority of the implementing procedures remained intact, including CE-6, CE-12, CE-13, and CE-14. The 2008 rule did not add any new CEs, change any existing CEs, or modify any relevant definitions or requirements.

84.    No additional findings or data were provided to support the existing CEs.

///

///

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—19

*2020 Rulemaking*

85.    On June 13, 2019, the Forest Service requested comments on proposed revisions to its NEPA regulations, including the addition of several new CEs. 84 Fed. Reg 27,544 (June 13, 2019). One of the proposed categories applied to "ecosystem restoration and/or resilience activities." *Id.* at 27,557 (later codified as "CE-25"). Activities authorized under this proposed CE to improve ecosystem health, resilience, and other watershed conditions could not exceed 7,300 treated acres. Commercial and noncommercial timber harvest activities were permitted, but only in combination with at least one additional restoration activity, and the commercially logged area could not exceed 4,200 of the total acreage.

86.    Following the public comment period, the Forest Service convened a group of agency scientists to review the body of literature submitted in public comments specific to the proposed CE-25. The agency reviewed publicly submitted information, relevant science, and the original project data on which the limitations in the proposed rule were based.

87.    In developing CE-25, the Forest Service reviewed a random selection of 68 projects from over 718 projects completed under EAs from fiscal years 2012 to 2016. The agency stated that these were projects where all or a portion of proposed activities could be covered under the new CE-25. The median of net commercial and noncommercial activities was 2,499 acres.

88.    On November 19, 2020, the Forest Service promulgated a final rule amending its NEPA regulations. 85 Fed. Reg. 73,620 (Nov. 19, 2020). The 2020 final rule included a modified CE-25, now codified at 36 C.F.R. § 220.6(e)(25), which allowed projects of up to 2,800 total acres, including commercial logging operations.

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

89.    The Forest Service published a "Supporting Statement" to summarize the administrative record and rationale for the establishment of the new CEs.

90.    In responding to the comments on the 2020 rule, the Forest Service specifically addressed comments related to CE-25's acreage limit. The final rule lowered the total acreage to 2,800 acres, based on review of information submitted in public comments, a science review, and a review of project data.

91.    The Forest Service stated that it had determined that CE-25 comprises a category of actions that normally do not have significant effects on the human environment, based on reviewing previously implemented actions, benchmarking other Federal agencies' CEs, working with subject matter experts and scientists, reviewing public comments, and examining the history and use of certain existing CEs. Specific quantifiable limitations (*e.g.*, acreage) are included in CEs to limit the amount of proposed disturbance and ensure that environmental effects are kept below the level of significance.

92.    On January 8, 2021, a coalition of plaintiffs filed a complaint challenging, *inter alia*, the promulgation of CE-25. *The Clinch Coal., et al. v. U.S. Forest Serv., et al.*, No. 2:21-cv-00003-JPJ-PMS (W.D. Va.). The case is pending.

93.    In response to the lawsuit, on May 21, 2021, the Acting Deputy Chief of the Forest Service issued guidance to Regional Foresters regarding the use of CEs. The guidance instructed that engagement with Regional and Washington Office NEPA staff during initial proposal development was required for a project proposing to use CE-25.

94.    The guidance amounted to a litigation hold, with the effect of restricting, if not halting, the use of CE-25.

///

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—21

*Application of CE-6 and the Forest Service's Logging CEs*

95.    For nearly thirty years after CE-6 was promulgated in 1992, the Forest Service used it to authorize only noncommercial projects.

96.    When the agency chose to authorize commercial logging pursuant to a CE rather than an EA or EIS, it would invoke one of the CEs discussed above which expressly authorize commercial operations.

97.    For example, in 2015, another forest within Region 6 approved the Birds Track Springs Fuels Reduction project, which included 1,218 acres of precommercial thinning, 8,851 acres of prescribed burning, and 60 acres of commercial thinning. The Forest Service invoked CE-6 for the precommercial thinning and prescribed burning, and CE-12—which permits up to 70 acres of commercial timber harvest—for the commercial thinning.

98.    Had the Forest Service interpreted CE-6 to cover commercial thinning operations, it would not have needed to invoke CE-12.

99.    Similarly, when the Forest Service chose to authorize projects with purposes related to "timber stand and/or wildlife habitat improvement," it did so via EIS or EA when those projects involved more than 70 acres of commercial logging.

100.    For example, in 2006, the Fremont-Winema National Forest approved the Burnt Willow Project, a project geographically proximate to the South Warner Project area. The Burnt Willow Project authorized 3,200 acres of commercial thinning. One stated purpose of the project was to reduce excess vegetation in order to increase vigor, health, and growth rates in the forest ecosystem, or, in other words, "timber stand improvement." The Forest Service reviewed the project's potential environmental effects in an EA.

*Crag Law Center
3141 E Burnside St.
Portland, OR 97214
Tel. (503) 227-2212*

101.    On December 21, 2018, President Trump issued Executive Order 13855:

"Promoting Active Management of America's Forests, Range-lands, and Other Federal Lands to

Improve Conditions and Reduce Wildfire Risk." EO 13855 instructed the Forest Service to use

"all applicable categorical exclusions set forth in law or regulation for fire management,

restoration, and other management projects in forests, rangelands, and other Federal lands when

implementing the requirements of the National Environmental Policy Act."

102.    Upon information and belief, in or around 2018, the Forest Service began having

internal discussions regarding the use of CE-6 to authorize projects involving commercial

logging operations.

103.    In or around 2018, the Forest Service began approving projects involving

commercial logging operations under CE-6 on an ad hoc basis. The Forest Service did not

conduct new rulemaking, make new findings, or announce a change in official agency policy.

**The Forest**

104.    The 2.3-million-acre Fremont-Winema National Forest is located in south-central

Oregon. It ranges from the Cascade Range in the west to the Warner Mountain Range in the east.

105.    Lying within the rain shadow created by the Cascades, the Forest contains mature

stands of drought-tolerant tree species such as juniper and ponderosa pine, although abundant

stands of white fir occur at higher elevations. The Forest is home to more than 300 species of

fish and wildlife.

///

///

///

///

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—23

**The Projects**

*South Warner*

106.    On June 28, 2021, the Lakeview Ranger District of the Fremont-Winema National Forest issued a Scoping Notice on the proposed South Warner Project. The Forest Service requested public comment by July 19, 2021.

107.    The four-page Scoping Notice provided a cursory description of the project location, purpose, and proposed actions. The Scoping Notice did not mention whether the Forest Service planned to review the South Warner Project under an EIS, EA, or CE.

108.    On July 19, 2021, Plaintiff Oregon Wild timely submitted scoping comments.

109.    On July 19, 2021 Plaintiff WildEarth Guardians timely submitted scoping comments.

110.    In these comments, Wild emphasized that the Forest Service cannot, by law, approve a project of South Warner's proposed size and scope using a CE. Wild noted that the proposal appeared to be both a "black box"—because, other than noting the possible acreage of the proposed treatments, the Forest Service did not disclose any specifics about the treatments' time, place, or manner—and a "blank check"—because the agency would not define the where, when, and how of the project until after the NEPA process was complete.

111.    No further information was provided to the public during the administrative process.

112.    When the Forest Service prepares an EIS or EA, it releases to the public supporting documents including reports prepared by specialists on topics such as hydrology, wildlife, and botany. No such reports were provided during the South Warner administrative process.

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—24

113.    There were no other formal opportunities for public comment.

114.    On December 27, 2021, Defendant Ramsey signed a Decision Memorandum approving the South Warner Project.

115.    The South Warner Project area spans 69,567 acres of national forestland in Lake County, Oregon. The Project is located southeast of the town of Lakeview, northeast of Goose Lake, and southwest of Hart Mountain National Antelope Refuge in the Warner Mountains, which extend from Abert Rim across the border into Northern California.

116.    The South Warner Decision Memorandum authorizes thinning of large and small trees, prescribed fire, juniper cutting, aspen/mountain mahogany/meadow enhancement, culvert replacement and/or removal, stream restoration, and commercial sale of merchantable forest products.

117.    Commercial thinning is authorized on up to 16,000 acres. Operations will involve heavy equipment to, *inter alia*, fell merchantable trees, skid them to landings, and load them onto logging trucks.

118.    The South Warner Decision Memorandum does not provide any site-specific information about the location of the commercial thinning units, how many trees would be cut or an estimate of the board feet of timber produced, or the specific logging prescriptions for each unit. This is information the Forest Service ordinarily develops and discloses to the public when it prepares an EIS or EA.

119.    In addition to commercial thinning, the South Warner Decision Memorandum authorizes road maintenance and repair to facilitate the hauling of logs along forest roads. Hundreds if not thousands of logging trucks' worth of timber will be felled and removed from the forest.

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

120.    The South Warner Decision Memorandum does not identify how many miles of roads would be used for the Project, or the extent of maintenance and repair that would be required to make the primitive forest roads suitable for extended use by logging trucks and heavy equipment. This is information the Forest Service normally develops and discloses to the public when it prepares an EIS or EA.

121.    The South Warner Decision Memorandum discloses potential "project effects" in three pages. For a project of this magnitude—including 16,000 acres of commercial thinning—the Forest Service ordinarily discloses and considers project effects over dozens, if not hundreds of pages in an EIS or EA.

122.    Defendant Ramsey found the South Warner Project categorically excluded from documentation in an EIS or EA. Defendant Ramsey determined that two CEs were applicable: CE-6, 36 C.F.R. § 220.6(e)(6); and CE-18, 36 C.F.R. § 220.6(e)(18).[4]

123.    The South Warner Project's commercial logging operations may have a significant environmental effect. The Forest Service in notice and comment rulemaking never has found that commercial operations of the type and scale authorized by the South Warner Project do not individually or cumulatively have a significant effect on the human environment.

124.    The Forest Service's issuance of the South Warner Project Decision Memorandum constitutes final agency action subject to judicial review pursuant to the APA, 5 U.S.C. § 706(2).

///

///

---

[4] CE-18 authorizes the restoration of wetlands, streams, riparian areas or other water bodies by removing, replacing, or modifying water control structures. Wild does not challenge the use of CE-18 for such activities in the South Warner Project.

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—26

*Baby Bear*

125.    On September 1, 2021, the Silver Lake Ranger District of the Fremont-Winema National Forest issued a Scoping Notice for the proposed Baby Bear Project. The Forest Service requested public comment by September 22, 2021.

126.    The three-page Scoping Notice provided a cursory description of the project location, purpose, and proposed actions. The Scoping Notice stated that the Forest Service might use CE-6 to approve the Project.

127.    On September 22, 2021, Plaintiff Oregon Wild timely submitted scoping comments.

128.    On March 24, 2022 Plaintiff WildEarth Guardians timely submitted scoping comments.

129.    Wild's comments explained that Baby Bear is too big of a project for a CE and urged the Forest Service to conduct a more thorough analysis of the proposal's impacts.

130.    The Forest Service did not provide any further information to the public during the administrative process. There were no other formal opportunities for public comment.

131.    On May 6, 2022, Defendant Wilson signed a Decision Memorandum approving the Baby Bear Project.

132.    The Baby Bear Project area spans 4,774 acres of national forestland in Lake and Klamath Counties, Oregon. Nearby public attractions include Fort Rock State Park and Hole in the Ground, both notable volcanic features of central Oregon.

133.    The Baby Bear Decision Memorandum authorizes silviculture treatments, aspen treatments, meadow and riparian treatments, and prescribed burning.

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

134.    Silviculture treatments would include commercial thinning on up to 3,000 acres. Operations will involve heavy equipment to, *inter alia*, fell merchantable trees, skid them to landings, and load them onto logging trucks.

135.    The Baby Bear Decision Memorandum does not provide any site-specific information about the location of the commercial thinning units or the specific logging prescriptions for each unit.

136.    In addition to commercial thinning, the Baby Bear Decision Memorandum authorizes road maintenance and repair to facilitate the hauling of logs along forest roads. Hundreds if not thousands of logging trucks' worth of timber will be felled and removed from the forest.

137.    The Baby Bear Decision Memorandum does not identify how many miles of roads would be used for the Project, or the extent of maintenance and repair that would be required to make the primitive forest roads suitable for extended use by logging trucks and heavy equipment.

138.    The Baby Bear Decision Memorandum discloses "project effects" in three pages. For a project of this magnitude—including 3,000 acres of commercial thinning—the Forest Service ordinarily discloses and considers project effects over dozens, if not hundreds of pages in an EIS or EA.

139.    Defendant Wilson found the Baby Bear Project categorically excluded from documentation in an EIS or EA. Defendant Wilson determined that CE-6, 36 C.F.R. § 220.6(e)(6), was applicable to the Project.

140.    The Baby Bear Project's commercial logging operations may have a significant environmental effect. The Forest Service in notice and comment rulemaking never has found that

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—28

commercial operations of the type and scale authorized by the Baby Bear Project do not individually or cumulatively have a significant effect on the human environment.

141.    The Forest Service's issuance of the Baby Bear Decision Memorandum constitutes final agency action subject to judicial review pursuant to the APA, 5 U.S.C. § 706(2).

***Bear Wallow***

142.    On September 22, 2021, the Silver Lake Ranger District of the Fremont-Winema National Forest issued a Scoping Notice for the proposed Bear Wallow Project. The Forest Service requested public comment by October 13, 2021.

143.    The three-page Scoping Notice provided a cursory description of the project location, purposes, and proposed activities. The Scoping Notice stated that the Forest Service might use CE-6 to approve the Project.

144.    On October 13, 2021, Plaintiff Oregon Wild timely submitted scoping comments.

145.    On March 24, 2022 Plaintiff WildEarth Guardians timely submitted scoping comments.

146.    Wild's comments explained that Bear Wallow does not fit any CE category because it entails too much commercial logging and road construction, both of which can have significant environmental impacts. Wild noted that the Forest Service has adopted specific acreage limits for logging CEs, and observed that the Forest Service's tactic of simply relabeling a logging project as "stand and habitat improvement" to evade these acreage limitations violates NEPA.

147.    The Forest Service did not provide any further information to the public during the administrative process. There were no other formal opportunities for public comment.

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—29

148.    On May 6, 2022, Defendant Wilson signed a Decision Memorandum approving the Bear Wallow Project.

149.    The Project area spans 17,200 acres of national forestland in Lake and Klamath Counties, Oregon.

150.    The Bear Wallow Project area is directly adjacent to the Baby Bear Project area. The southeastern boundary of the Bear Wallow Project area shares a border with the northern border of the Baby Bear Project area.

151.    The Bear Wallow Project and the Baby Bear Project share the same stated purpose. The two projects authorize the same treatments. In fact, the two DMs are nearly identical, except for the projects' names and geographic descriptions.

152.    Neither Decision Memoranda discusses the two projects' cumulative effects.

153.    The Bear Wallow Decision Memorandum authorizes silviculture treatments, aspen treatments, meadow and riparian treatments, and prescribed burning.

154.    Silviculture treatments would include commercial thinning on up to 10,000 acres. Operations will involve heavy equipment to, *inter alia*, fell merchantable trees, skid them to landings, and load them onto logging trucks.

155.    The Bear Wallow Decision Memorandum does not provide any site-specific information about the location of the commercial thinning units or the specific logging prescriptions for each unit.

156.    In addition to commercial thinning, the Bear Wallow Decision Memorandum authorizes road maintenance and repair to facilitate the hauling of logs along forest roads. Hundreds if not thousands of logging trucks' worth of timber will be felled and removed from the forest.

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—30

157.    The Bear Wallow Decision Memorandum does not identify how many miles of roads would be used for the Project, or the extent of maintenance and repair that would be required to make the primitive forest roads suitable for extended use by logging trucks and heavy equipment.

158.    The Bear Wallow Decision Memorandum discloses "project effects" in three pages. For a project of this magnitude—including 10,000 acres of commercial thinning—the Forest Service ordinarily discloses and considers project effects over dozens, if not hundreds of pages in an EIS or EA.

159.    Defendant Wilson found the Bear Wallow Project categorically excluded from documentation in an EIS or EA. Defendant Wilson determined that CE-6, 36 C.F.R. § 220.6(e)(6), was applicable to the Project.

160.    The Bear Wallow Project's commercial logging operations may have a significant environmental effect. The Forest Service in notice and comment rulemaking never has found that commercial operations of the type and scale authorized by the Bear Wallow Project do not individually or cumulatively have a significant effect on the human environment.

161.    The Forest Service's issuance of the Bear Wallow Decision Memorandum constitutes final agency action subject to judicial review pursuant to the APA, 5 U.S.C. § 706(2).

**Recent CE-6 Litigation**

162.    On February 12, 2022, the Ninth Circuit Court of Appeals issued a split decision in *Mountain Communities for Fire Safety v. Elliott*, 25 F.4th 667 (9th Cir. 2022). The panel majority held that the Forest Service's approval of the Cuddy Valley Project via CE-6 was not arbitrary and capricious because CE-6 unambiguously allows the Forest Service to thin trees

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—31

without having to conduct an EIS or EA. The Cuddy Valley Project authorized commercial thinning on up to 601 acres of forest.[5]

163.    The dissent noted that under the majority's interpretation of CE-6, the Forest Service could approve commercial thinning projects over a potentially unlimited number of acres.

164.    On March 21, 2022, the appellants filed a petition for rehearing *en banc*.

165.    On March 31, 2022, a coalition of conservation organizations, including the plaintiffs here, submitted an *amici curiae* brief supporting *en banc* review. That same day, an *amici curiae* brief was submitted by two law professors, also supporting *en banc* review.

166.    On April 4, 2022, the panel ordered the government to file a response to the petition for rehearing *en banc*. The government filed its response in opposition to the petition on May 31, 2022.

167.    On June 10, 2022, a regional trade organization, American Forest Resource Council, submitted an *amicus curiae* brief in opposition to the petition.

168.    On June 21, 2022, the petition for rehearing *en banc* was denied.

## FIRST CLAIM FOR RELIEF
### (NEPA and APA Compliance)

169.    Wild re-alleges and incorporates all preceding paragraphs herein by reference.

170.    Federal agencies may avoid preparing an EIS or EA only when the proposed action is "categorically excluded" from further NEPA review. Categorical exclusions apply only

---

[5] A related case involved a challenge to the Forest Service's reliance on CE-6 for the Tecuya Ridge Project, which involved approximately 1,000 acres of commercial thinning. The Ninth Circuit decided it was bound by the *Mountain Communities* case and rejected the CE-6 challenge, but remanded on other grounds. *Los Padres ForestWatch v. U.S. Forest Serv.*, 25 F.4th 649 (9th Cir. 2022).

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—32

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

to activities which an agency has found do not individually or cumulatively have a significant effect on the human environment.

171.    36 C.F.R. § 220.6(e)(6) applies to projects involving "timber stand and/or wildlife habitat improvement" activities. Examples include activities like girdling trees to create snags, thinning or brush control to improve growth, and prescribed burning.

172.    Extensive commercial logging operations of the type and scale authorized by the Projects—involving between 3,000 and 16,000 acres of commercial thinning and an indeterminate amount of roadwork and other logging activities—are inconsistent with 36 C.F.R. § 220.6(e)(6).

173.    Under no reasonable interpretation does 36 C.F.R. § 220.6(e)(6) permit the type and scale of commercial logging operations approved by the Projects. To the extent 36 C.F.R. § 220.6(e)(6) permits commercial thinning, it does not permit commercial thinning and associated activities on thousands of acres of national forestland.

174.    The Forest Service's failure to prepare an EIS or even an EA before approving the South Warner, Baby Bear, and Bear Wallow Projects violates NEPA, and is arbitrary, capricious, an abuse of discretion, in excess of statutory authority, not in accordance with and without observance of procedure required by law. 5 U.S.C. § 706(2).

## SECOND CLAIM FOR RELIEF
### (NEPA and APA Compliance)

175.    Wild re-alleges and incorporates all preceding paragraphs herein by reference.

176.    If CE-6 permits projects like South Warner (16,000 acres of commercial logging), Bear Wallow (10,000 acres of commercial logging), and Baby Bear (3,000 acres of commercial logging), then CE-6 violates NEPA and its implementing regulations.

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—33

177.    In its rulemaking, the Forest Service never made the required findings that commercial logging under CE-6 would have no individually or cumulatively significant impacts.

178.    Interpreting "no cumulatively or individually significant effect" as permitting commercial logging operations on thousands of acres—with no upper limit—flatly contradicts the language and purpose of NEPA and its implementing regulations, and is inconsistent with the Forest Service's CE regulatory regime—in which the agency has promulgated CEs specifically for commercial logging purposes, all with limited acreage caps.

179.    The Forest Service promulgated CE-6 in 1992 under NEPA regulations that defined CEs as "categor[ies] of actions which do not individually or cumulatively have a significant effect on the human environment." 40 C.F.R. § 1508.4 (2019). CEs only apply to categories of actions which the agency has "found to have no significant effect in procedures adopted" by the agency. *Id.*

180.    When promulgating CE-6, the Forest Service explained that CEs only apply to "routine actions." 57 Fed. Reg. at 43,184. Large-scale commercial logging operations are not "routine actions" as contemplated by the Forest Service's CE regulations.

181.    The Forest Service never found that commercial logging under CE-6—on any scale—would not individually or cumulatively have a significant effect on the human environment.

182.    Instead, the Forest Service has promulgated a series of logging-related CEs—including CE-4, CE-10, CE-12, CE-13, CE-14, and CE-25—that all include acreage caps.

183.    Of the logging-related CEs still in effect, one category specifically applies to "commercial thinning"; such activities cannot exceed 70 acres. 36 C.F.R. § 220.6(e)(12). Another applies to commercial "sanitation harvest"; such activities cannot exceed 250 acres. 36

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—34

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

C.F.R. § 220.6(e)(14). Another applies to "timber harvesting" to improve ecosystem health, resilience, and other watershed and habitat conditions; such activities cannot exceed 2,800 acres. 36 C.F.R. § 220.6(e)(25).

184.    The Forest Service based these acreage limitations on similar, previous projects which it had analyzed and determined caused no significant impacts.

185.    In contrast, the Forest Service never has produced any support for the environmental insignificance of projects involving larger-scale commercial logging operations. In fact, courts have rejected the agency's attempts to show that larger-scale commercial logging operations would have only insignificant impacts.

186.    The scale of the South Warner, Bear Wallow, and Baby Bear Projects dwarf the acreage limitations of the logging-related CEs.

187.    The South Warner Project authorizes commercial thinning on up to 16,000 acres—well beyond the size of any logging CE. The Bear Wallow Project authorizes commercial thinning on up to 10,000 acres—well beyond the size of any logging CE.

188.    While the Baby Bear Project's commercial thinning acreage (3,000) is close to (but higher than) the acreage allowed under CE-25 (2,800), the Forest Service did not apply CE-25 and instead relied on CE-6. Had the Forest Service employed CE-25, it would be bound by the requirements of that CE, such as the acreage cap and the requirement to have the project developed or refined through a collaborative process.

189.    By applying CE-6 to commercial logging operations like those authorized by the Projects, the Forest Service is unlawfully evading the acreage caps of its logging-related CEs.

190.    In 1992, when CE-6 was first developed, or 2008, when it was codified in the Code of Federal Regulations, Wild could have had no idea that the Forest Service planned to

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—35

apply CE-6 to commercial logging projects—especially given the promulgation of several CEs expressly for that purpose. It is not apparent from the regulatory language or the rulemaking record that such an application was contemplated. This as-applied challenge to CE-6 is within the statute of limitations because the specific applications of CE-6 that Wild challenges occurred in the last six years, 28 U.S.C. § 2401(a).

191.    The Forest Service's application of CE-6 to commercial logging operations, like those authorized by the Projects, violates NEPA and its implementing regulations, and is arbitrary, capricious, an abuse of discretion, in excess of statutory authority, not in accordance with and without observance of procedure required by law. 5 U.S.C. § 706(2).

## PRAYERS FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in favor of Plaintiffs and issue the following relief:

A.    Declare the Forest Service has violated the National Environmental Policy Act and its implementing regulations by failing to prepare either EAs or EISs for the South Warner, Bear Wallow, and Baby Bear Projects;

B.    Declare the Forest Service's issuance of the Decision Memoranda for the South Warner, Bear Wallow, and Baby Bear Projects is arbitrary, capricious, an abuse of discretion, not in accordance with, and/or without observance of procedure required by law under the APA, 5 U.S.C. § 706(2)(A), (D);

C.    Declare that, to the extent commercial logging operations like those authorized by the South Warner, Bear Wallow, and Baby Bear Projects are permitted under CE-6, CE-6 itself violates NEPA and its implementing regulations, and the Forest Service acted arbitrarily, capriciously, and in excess of its authority in promulgating CE-6;

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—36

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

D.      Partially vacate the Decision Memoranda and remand to the Forest Service for additional consideration;

E.      Vacate 36 C.F.R. § 220.6(e)(6) as applied to commercial logging operations;

F.      Issue preliminary and permanent injunctive relief prohibiting the Forest Service from authorizing implementation of the South Warner, Bear Wallow, and Baby Bear Project's commercial logging operations until such time as the Forest Service can demonstrate compliance with the requirements of the National Environmental Policy Act and the Administrative Procedure Act;

G.      Issue preliminary and permanent injunctive relief prohibiting the Forest Service from using CE-6 to authorize commercial logging operations;

H.      Award Plaintiffs their reasonable fees, costs, expenses and disbursements, including reasonable attorneys' fees associated with this litigation pursuant to the Equal Access to Justice Act or other applicable statutes; and

I.      Grant such additional relief as the Court deems just and proper.


DATED this 12th day of July, 2022.

Respectfully submitted,

s/ Oliver J. H. Stiefel
Oliver J. H. Stiefel, OSB # 135436
(503) 227-2212 │ oliver@crag.org
Erin E. Hogan-Freemole, OSB # 212850
(503) 234-0788│ erin@crag.org
Meriel L. Darzen, OSB # 113645
(503) 525-2725 │ meriel@crag.org
CRAG LAW CENTER
3141 E. Burnside St.
Portland, Oregon 97214
Fax: (503) 296-5454

*Attorneys for Plaintiffs*

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—37