Oliver J. H. Stiefel, OSB # 135436
(503) 227-2212 │ oliver@crag.org
Erin E. Hogan-Freemole, OSB # 212850
(503) 234-0788 │ erin@crag.org
Meriel L. Darzen, OSB # 113645
(503) 525-2725 │ meriel@crag.org
CRAG LAW CENTER
3141 E. Burnside St.
Portland, Oregon 97214
Fax: (503) 296-5454

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

### MEDFORD DIVISION

| | |
|---|---|
| **OREGON WILD**, an Oregon nonprofit corporation; and **WILDEARTH GUARDIANS**, a New Mexico nonprofit corporation;<br><br>    Plaintiffs,<br><br>    v.<br><br>**UNITED STATES FOREST SERVICE**, **MICHAEL RAMSEY**, in his official capacity as Lakeview Ranger District Ranger; **JEANNETTE WILSON**, in her official capacity as Silver Lake Ranger District Ranger; **RANDY MOORE**, in his official capacity as Chief of the U.S. Forest Service; and **THOMAS VILSACK**, in his official capacity as Secretary of Agriculture,<br><br>    Defendants. | Case No. 1:22-cv-01007-MC<br><br>**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT** |

## MOTION

Oregon Wild and WildEarth Guardians ("Plaintiffs" or "Wild") hereby submit their *Motion for Summary Judgment*. Pursuant to LR 7-1, the undersigned certifies that the Parties made a good faith effort to resolve the dispute but were unable to do so.

Wild challenges the final agency actions of the United States Forest Service, Michael Ramsey, Jeanette Wilson, Randy Moore, and Thomas Vilsack ("Defendants," "Forest Service," or "agency"). In approving the South Warner Project, the Bear Wallow Project, and the Baby Bear Project (collectively, the "Projects") on the Fremont-Winema National Forest ("Forest"), Defendants acted arbitrarily, capriciously, and contrary to the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321–4370h. In the alternative, Wild challenges, as applied, the categorical exclusion ("CE") under which the Projects were approved.

The Projects all authorize commercial logging operations across a collective total of approximately 29,000 acres (45 square miles). In contrast to non-commercial logging operations, commercial logging operations—especially across the large scale authorized here—can have significant environmental consequences including habitat modification and destruction, soil compaction, and degradation of water quality. Despite these potential impacts, the Forest Service did not analyze and publicly disclose such effects in an Environmental Impact Statement ("EIS"), or even a less intensive "Environmental Assessment ("EA"). Instead, the Forest Service approved the projects pursuant to a CE reserved for "timber stand and wildlife habitat improvement projects," 36 C.F.R. § 220.6(e)(6) ("CE-6"). CE-6 historically has been reserved for restoration projects that do not involve commercial logging operations; the Forest Service failed to articulate a rational explanation as to why CE-6 permits projects of the type and scale of the Projects, each of which involve thousands of acres of commercial logging.

MOTION FOR SUMMARY JUDGMENT—i

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

If, however, CE-6 does permit the type and scale of commercial logging operations authorized by the Projects, then CE-6 itself violates NEPA and its relevant implementing regulations, 40 C.F.R. §§ 1500–1508 (2019). CEs apply to small, low-impact, and routine actions that the Forest Service has determined—in notice and comment rulemaking—pose no significant environmental effects, either individually or cumulatively, and therefore require no further analysis under an EIS or EA. As applied to commercial logging operations like those authorized by the Projects, the Forest Service acted contrary to law and in excess of its statutory authority in promulgating CE-6 because the agency never made the required findings that commercial logging operations cause no individually or cumulatively significant environmental effects. Moreover, the Forest Service's interpretation of "no significant effect" as permitting commercial logging operations on thousands of acres —with no upper acreage limit—flatly contradicts the language and purpose of NEPA and its implementing regulations, and is inconsistent with the Forest Service's CE regulatory regime—in which the agency has promulgated acreage-capped CEs specifically for commercial logging purposes.

Wild respectfully requests that this Court vacate the Projects' approvals of commercial logging operations, declare such operations beyond the scope of CE-6, and remand to the Forest Service for preparation of EISs or EAs containing full and fair analyses of the Projects' environmental impacts. In the alternative, if the Projects do fall within the scope of CE-6, Wild respectfully requests that this Court hold unlawful and set aside CE-6 as applied to commercial logging operations. Specifically, Wild requests the following declaratory and injunctive relief:

1.    Declare the Forest Service has violated NEPA and its implementing regulations by failing to prepare either EAs or EISs for the Projects;

MOTION FOR SUMMARY JUDGMENT—ii

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

2.      Declare the Forest Service's final decisions approving the Projects are arbitrary, capricious, an abuse of discretion, not in accordance with law, and/or without observance of procedure required by law under the APA, 5 U.S.C. § 706(2)(A), (D);

3.      Declare that, to the extent commercial logging operations like those authorized by the Projects are permitted under CE-6, CE-6 itself violates NEPA and its implementing regulations, and the Forest Service acted contrary to law and in excess of its authority in promulgating CE-6;

4.      Partially vacate the final decisions approving the Projects and remand to the Forest Service for additional consideration;

5.      Vacate 36 C.F.R. § 220.6(e)(6) as applied to commercial logging operations;

6.      Issue preliminary and permanent injunctive relief prohibiting the Forest Service from authorizing implementation of the Projects' commercial logging operations until such time as the Forest Service can demonstrate compliance with the requirements of NEPA and the APA;

7.      Issue preliminary and permanent injunctive relief prohibiting the Forest Service from using CE-6 to authorize commercial logging operations;

8.       Award Plaintiffs their reasonable fees, costs, expenses, and disbursements, including reasonable attorneys' fees associated with this litigation pursuant to the Equal Access to Justice Act or other applicable statutes; and

9.      Grant such additional relief as the Court deems just and proper.

In support of this *Motion*, Wild respectfully refers this Court to the following *Memorandum in Support*, and the concurrently filed declarations of Doug Heiken, Chandra LeGue, and Chris Krupp, and *Request to Take Judicial Notice*.

MOTION FOR SUMMARY JUDGMENT—iii

# MEMORANDUM

## TABLE OF CONTENTS

MOTION.................................................................................................................. i

TABLE OF AUTHORITIES ................................................................................ III

GLOSSARY OF TERMS ................................................................................... VIII

PROJECT AREA MAPS ......................................................................................IX

INTRODUCTION ................................................................................................... 1

LEGAL FRAMEWORK AND STANDARD OF REVIEW ................................... 2

   I.   National Environmental Policy Act ................................................................ 2

   II.   Administrative Procedure Act ........................................................................ 3

FACTUAL AND ADMINISTRATIVE BACKGROUND ...................................... 4

   I.   Commercial Logging Operations May Cause Significant Environmental Impacts............ 4

   II.   The History and Development of Forest Service Logging-Related CEs Shows that CE-6 Never Was Intended for Large-Scale Commercial Logging. ............................................. 6

      A.   The Forest Service Originally Relied on a CE for "Low-Impact Silvicultural Activities." ...................................................................................... 6

      B.   The Forest Service Adopted CE-6 as Part of a 1991/1992 Rulemaking Package That Was Overturned in Part.................................................................. 7

      C.   In Response to Heartwood, the Forest Service Adopted a Series of New, Small-Scale Logging-Related CEs That Survived a Facial Challenge. ............................... 9

      D.   In a 2002–2003 Rulemaking, the Forest Service Adopted Another Logging-Related CE but the Ninth Circuit Enjoined It. ................................................. 10

      E.   In 2007–2008 Rulemaking, the Forest Service Codified Its NEPA Procedures but Made No Substantive Changes. .................................................. 12

      F.   In 2020 Rulemaking, the Forest Service Adopted a New CE Involving Commercial Logging and Determined It Must Be Capped at 2,800 Acres to Stay Below the Level of Significance.......................................................................... 13

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

III.  After Applying CE-6 to Noncommercial Commercial Logging for Nearly 30 Years, the Forest Service Reversed Course Around 2018. ............................................................... 14

   A.  The Forest Service Historically Reviewed and Approved Larger Scale Commercial Logging Projects Via EIS or EA, Or Kept Commercial Logging Below the Logging CEs' Acreage Caps. ................................................................................................. 14

   B.  The Forest Service Began Expanding the Use of CE-6 Around 2018. .......................... 15

   C.  In a Six-Month Timeframe, the Forest Approved Three Large-Scale Commercial Logging Projects Under CE-6. .................................................................................. 16

ARGUMENT .............................................................................................................................. 19

   I.  This Court Has Jurisdiction: Wild Has Standing, and Both the Project Challenges and the As-Applied Challenge to CE-6 Are Ripe for Review. ...................................................... 20

   II.  CE-6 Does Not Apply to Projects of This Type and Scale. ............................................. 21

   A.  The Type—And Scale—of a Project Dictates Whether It is Eligible for a CE. ........... 22

   B.  Under No Reasonable Interpretation Does CE-6 Permit the Type and Scale of Commercial Logging Operations Approved by the Projects. ....................................... 24

   III.  The Forest Service's Application of CE-6 to Commercial Logging Operations Like Those Authorized by the Projects Violates NEPA and Its Implementing Regulations. ............... 27

   A.  In Adopting CE-6, the Forest Service Did Not Find that Commercial Logging Operations Do Not Cause Individually or Cumulatively Significant Impacts. ............ 27

   B.  Wild's As-Applied Challenge to CE-6 Is Not Time-Barred. ........................................ 34

CONCLUSION ........................................................................................................................... 35

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

# TABLE OF AUTHORITIES

## Cases

*Alaska Ctr. for the Env't v. U.S. Forest Serv.*,
   189 F.3d 851 (9th Cir. 1999) ........................................................................ 3, 21

*All. for the Wild Rockies v. Weber*,
   979 F. Supp. 2d 1118 (D. Mont. 2013) .......................................................... 14

*Blue Mts. Biodiversity Project v. Blackwood*,
   161 F.3d 1208 (9th Cir. 1998) ........................................................................ 26

*Cal. Sea Urchin Comm'n v. Bean*,
   828 F.3d 1046 (9th Cir. 2016) ........................................................................ 35

*California v. Block*,
   690 F.2d 753 (9th Cir. 1982) .......................................................................... 33

*Cedars-Sinai Medical Ctr. v. Shalala*,
   125 F.3d 765 (9th Cir. 1997) .......................................................................... 34

*Ctr. for Biological Diversity v. U.S. Forest Serv.*,
   349 F.3d 1157 (9th Cir. 2003) ........................................................................ 28

*Churchill County v. Norton*,
   276 F.3d 1060 (9th Cir. 2001) ........................................................................ 28

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
   401 U.S. 402 (1971) .......................................................................................... 4

*Clinch Coal. et al. v. U.S. Forest Serv. et al.*,
   No. 2:21-cv-00003-JPJ-PMS (W.D. Va.) ................................................ 13, 34

*Colo. Wild v. U.S. Forest Serv.*,
   435 F.3d 1204 (10th Cir. 2006) ................................................................ 10, 30

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
   140 S. Ct. 1891 (2020) ....................................................................................... 4

*Envtl. Def. Ctr. v. Bureau of Ocean Energy Mgmt.*,
   36 F.4th 850 (9th Cir. 2022) ........................................................................... 21

*Envtl. Protection Information Ctr. v. Carlson*,
   968 F.3d 985 (9th Cir. 2020) ..................................................................... passim

MEMORANDUM ISO MOTION FOR SUMMARY JUDGMENT—III

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

*Forestkeeper v. Tidwell*,
    847 F. Supp. 2d 1217 (E.D. Cal. 2012)........................................................ 20, 21, 34

*Forestkeeper v. U.S. Forest Serv.*,
    No. 1:21-cv-0141-DAD-BAM, 2021 U.S. Dist. LEXIS 192443 (E.D. Cal. Oct. 5, 2021) 24, 25

*Friends of the Earth v. Laidlaw*,
    528 U.S. 167 (2000)................................................................................... 20

*Hart v. Massanari*,
    266 F.3d 1155 (9th Cir. 2001) .................................................................. 23

*Heartwood, Inc. v. U.S. Forest Serv.*,
    73 F. Supp. 2d 962 (S.D. Ill. 1999), *aff'd*, 230 F.3d 947 (7th Cir. 2000) ........................ passim

*Heartwood, Inc. v. U.S. Forest Serv.*,
    230 F.3d 947 (7th Cir. 2000) ................................................................... 9

*High Sierra Hikers Ass'n v. U.S. DOI*,
    848 F. Supp. 2d 1036 (N.D. Cal. 2012) ................................................... 28

*Los Padres ForestWatch v. U.S. Forest Serv.*,
    25 F.4th 649 (9th Cir. 2022) ................................................................... 15, 16

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992).................................................................................. 20

*Lujan v. Nat'l Wildlife Fed'n*,
    497 U.S. 871 (1990).................................................................................. 21

*Maceren v. Dist. Dir., Immigration & Naturalization Serv.*,
    509 F.2d 934 (9th Cir. 1974) ................................................................... 31

*Mt. Cmtys. for Fire Safety v. Elliott*,
    25 F.4th 667 (9th Cir. 2022) ................................................................... passim

*Norfolk Energy, Inc. v. Hodel*,
    898 F.2d 1435 (9th Cir. 1990) ................................................................. 31

*NRDC v. U.S. EPA*,
    857 F.3d 1030 (9th Cir. 2017) ................................................................. 28

*Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*,
    18 F.3d 1468 (9th Cir. 1994) ................................................................... 4

MEMORANDUM ISO MOTION FOR SUMMARY JUDGMENT—IV

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

*Ohio Forestry Ass'n v. Sierra Club*,
    523 U.S. 726 (1998) ............................................................................................ 35

*Robertson v. Methow Valley Citizens Council*,
    490 U.S. 332 (1989) ....................................................................................... 2, 32

*Sierra Club v. Bosworth*,
    510 F.3d 1016 (9th Cir. 2007) ...................................................................... passim

*Steamboaters v. Fed. Energy Regulatory Com.*,
    759 F.2d 1382 (9th Cir. 1985) ........................................................................... 28

*Summers v. Earth Island Inst.*,
    555 U.S. 488 (2009) ........................................................................................... 35

*United Keetoowah Band of Cherokee Indians in Okla. V. FCC*,
    933 F.3d 728 (D.C. Cir. 2019) ........................................................................... 31

*United States v. Kwai Fun Wong*,
    135 S. Ct. 1625 (2015) ....................................................................................... 34

*West v. Sec'y of the Dep't of Transp.*,
    206 F.3d 920 (9th Cir. 2000) ................................................................. 22, 23, 33

*Wild Va. v. CEQ*,
    No. 21-1839, 2022 U.S. App. LEXIS 35456 (4th Cir. Dec. 22, 2022) ................... 2

*WildEarth Guardians v. Mont. Snowmobile Ass'n.*,
    790 F.3d 920 (9th Cir. 2015) ............................................................................. 32

*Wildlands v. Warnock*,
    570 F. Supp. 3d 983 (D. Or. 2021) ...................................................... 22, 24, 25

*Wind River Mining Corp. v. United States*,
    946 F.2d 710 (9th Cir. 1991) ............................................................................. 35

**Statutes**

5 U.S.C. § 706 ............................................................................................. iii, 4, 18, 19

16 U.S.C. § 691 ........................................................................................................... 3

28 U.S.C. § 2401 ................................................................................................. 34, 35

42 U.S.C. § 4321 ......................................................................................................... 2

42 U.S.C. § 4332 ..................................................................................................... 2, 3

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

42 U.S.C. § 4342 .......................................................................................................... 2

42 U.S.C. § 4344 .......................................................................................................... 2

**Rules**

Local Rule 7-1 ............................................................................................................... i

**Regulations**

36 C.F.R. § 220.6 ................................................................................................. passim

40 C.F.R. § 1500.1 ................................................................................................. 2, 33

40 C.F.R. § 1501.4 ........................................................................................................ 3

40 C.F.R. § 1501.5 ........................................................................................................ 3

40 C.F.R. § 1507.1 ........................................................................................................ 2

40 C.F.R. § 1507.3 ................................................................................................. 3, 28

40 C.F.R. § 1508.4 ........................................................................................... 3, 26, 29

40 C.F.R. § 1508.8 ........................................................................................................ 3

40 C.F.R. § 1508.27 ............................................................................................... 3, 11

**Other Authorities**

50 Fed. Reg. 26,078 (June 24, 1985) ........................................................................... 7

54 Fed. Reg. 9,073 (March 3, 1989) ............................................................................ 7

56 Fed. Reg. 19,718 (April 29, 1991) .......................................................................... 7

57 Fed. Reg. 43,180 (Sept. 18, 1992) ...................................................................... 2, 7

67 Fed. Reg. 77,038 (Dec. 16, 2002) ......................................................................... 10

68 Fed. Reg. 1026 (Jan. 8, 2003) ................................................................................. 9

68 Fed. Reg. 33,814 (June 5, 2003) ........................................................................... 10

68 Fed. Reg. 44,598 (July 29, 2003) ............................................................................ 9

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

73 Fed. Reg. 43,084 (July 24, 2008) ........................................................................... 12

84 Fed. Reg 27,544 (June 13, 2019) ...................................................................... 12, 13

85 Fed. Reg. 43,304 (July 16, 2020) ............................................................................. 2

85 Fed. Reg. 73,620 (Nov. 19, 2020) ...................................................................... 13, 34

87 Fed. Reg. 23,453 (April 20, 2022) ........................................................................... 2

MEMORANDUM ISO MOTION FOR SUMMARY JUDGMENT—VII

## GLOSSARY OF TERMS

| | |
|---|---|
| Agency | United States Forest Service |
| APA | Administrative Procedure Act |
| Board foot | A unit of measurement for a piece of lumber 12"x12"x1" (144 cubic inches). One million board feet is equivalent to roughly 200 logging trucks' worth of timber. |
| CE | Categorical Exclusion |
| CE-6 | 36 C.F.R. § 220.6(e)(6) |
| CEQ | Council on Environmental Quality |
| Defendants | All named Defendants |
| EA | Environmental Assessment |
| EIS | Environmental Impact Statement |
| Forest | Fremont-Winema National Forest |
| Forest Service | United States Forest Service |
| Girdling | A method of killing trees without cutting them down. This method is often used to create "snags," which are standing, dead trees that provide important habitat for a variety of wildlife. |
| Impact or Effect | Used synonymously to describe ecological, aesthetic, historic, cultural, economic, social, or health consequences of an action, whether direct, indirect, or cumulative. "Direct" effects are caused by an action and occur at the same time and place. "Indirect" effects are caused by an action and are later in time or farther removed in distance. "Cumulative" effects result from the incremental effect of an action when added to other past, present, and reasonably foreseeable future actions. |
| Logging | Any silvicultural method employed for the purpose of cutting down trees. Logging can be accomplished through commercial or noncommercial means, and can involve a variety of techniques including "thinning," "clearcutting," etc. Logging operations can involve felling trees, skidding felled trees to landings, building and maintaining roads, hauling logs on roads, and other associated activities. |
| NEPA | National Environmental Policy Act |
| Plaintiffs | All named Plaintiffs |
| Projects | South Warner, Baby Bear, and Bear Wallow Projects |
| Wild | All named Plaintiffs |

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

# PROJECT AREA MAPS

**South Warner**



*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

**Baby Bear**



**Bear Wallow**



MEMORANDUM ISO MOTION FOR SUMMARY JUDGMENT—X

## INTRODUCTION

This is a classic case of agency overreach. The Council on Environmental Quality ("CEQ") regulations provide for the use of CEs, which allow agencies to bypass NEPA's analytical and public engagement requirements only under narrow circumstances. If (1) CEs are reserved for small, low-impact, and routine activities, and (2) the Forest Service has found only that small, acreage-limited commercial logging operations are appropriate for CEs, then how can the agency apply a CE to large-scale commercial logging operations on thousands of acres? The agency cannot, and this Court has two pathways to reach this conclusion.

First, under no reasonable interpretation does CE-6, promulgated for "timber stand and/or wildlife habitat improvement" activities, apply to projects of the type and scale authorized here, which involve from 3,000 to 16,000 acres of commercial logging. While the Ninth Circuit upheld the approvals of two projects authorizing relatively small amounts of commercial logging under CE-6, the Projects here dwarf those projects and the acreage caps of every other CE applicable to commercial logging. This case, therefore, is more akin to *Environmental Protection Information Center v. Carlson ("EPIC"), 968 F.3d 985 (9th Cir. 2020),* in which the court held that an extensive commercial logging project could not be approved under a CE of limited scope.

Second, if CE-6 is interpreted to allow commercial logging of the type and scale authorized here, then CE-6 itself is unlawful. When promulgating CE-6, the Forest Service never found that commercial logging under CE-6—let alone operations of the scale authorized by the Projects here—would have no individually or cumulatively significant environmental impacts, as is required under CEQ regulations and governing caselaw. *See Sierra Club v. Bosworth, 510 F.3d 1016 (9th Cir. 2007).* Without this predicate finding, the application of CE-6 to commercial logging operations like those at issue here is unlawful.

MEMORANDUM ISO MOTION FOR SUMMARY JUDGMENT—1

## LEGAL FRAMEWORK AND STANDARD OF REVIEW

### I.    National Environmental Policy Act

Congress enacted NEPA to "promote efforts which will prevent or eliminate damage to the environment and biosphere and * * * to enrich the understanding of the ecological systems and natural resources important to the Nation." 42 U.S.C. § 4321. To this end, NEPA and its implementing regulations set forth "action-forcing" procedures designed to (1) ensure agencies take a "hard look" at the environmental effects of a proposed action, and (2) foster meaningful public participation. *See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349–50 (1989).[1] Through NEPA, Congress also established the CEQ to develop national policies to promote environmental quality. 42 U.S.C. § 4342; *id.* § 4344(4); 40 C.F.R. § 1500.1. "All agencies of the federal government shall comply with [CEQ] regulations." 40 C.F.R. § 1507.1.[2]

To comply with NEPA, federal agencies must prepare a "detailed statement" for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). Commonly known as the EIS, the detailed statement must describe, *inter alia*, the adverse environmental impacts of the proposed action and alternatives to it. *Id.*; *see also id.* § 4332(2)(E). If the significance of a proposed action is uncertain, an agency may prepare a less-rigorous EA, a concise public document that briefly describes the proposal and examines reasonable alternatives. 40 C.F.R. §§ 1501.4(b), 1508.9; *see also* 40 C.F.R. § 1501.5(a) (2021).

---

[1] Cases have been cleaned up, with internal citations omitted, unless otherwise noted.

[2] The CEQ regulations remained virtually unchanged since their adoption in 1978. *See Wild Va. v. CEQ*, No. 21-1839, 2022 U.S. App. LEXIS 35456 (4th Cir. Dec. 22, 2022). CEQ modified the NEPA regulations in 2020, and then rescinded some of the modifications in 2022. *See* 85 Fed. Reg. 43,304 (July 16, 2020); 87 Fed. Reg. 23,453 (April 20, 2022). The Forest Service promulgated CE-6 in 1992, under the 1978 version of the regulations. *See infra* pp. 6–8; the Projects at issue here were authorized under that CE, which incorporates the 1978 regulations' definitions and limitations. This brief therefore refers to the original version of the regulations unless otherwise noted.

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

Agencies also may adopt CEs for certain categories of actions

which do not individually or cumulatively have a significant effect on the human environment and which have been found to have no such effect in procedures adopted by a federal agency in implementation of [CEQ] regulations (§ 1507.3) and for which, therefore, neither an [EA] nor an [EIS] is required.

40 C.F.R. §§ 1507.3, 1508.4. "Categorical exclusions, by definition, are limited to situations where there is an insignificant or minor effect on the environment." *Alaska Ctr. for the Env't v. U.S. Forest Serv.*, 189 F.3d 851, 859 (9th Cir. 1999); *see also* 40 C.F.R. §§ 1508.8 (defining "effects"), 1508.27 (defining "significantly").

Pursuant to this authority, the Forest Service has adopted a series of CEs. CE-6, 36 C.F.R. § 220.6(e)(6), under which the agency approved the Projects, applies to "timber stand and/or wildlife habitat improvement activities." Other Forest Service CEs apply specifically to commercial logging projects and expressly impose an acreage limit. *See id.* § 220.6(e)(12), (13), (14), (25) (imposing limitations of 70, 250, 250, and 2,800 acres, respectively).[3]

In addition to the regulatory CEs, Congress has established CEs to address insects and disease, reduce hazardous fuels, and restore wildlife habitat. *See* 16 U.S.C. § 691. These statutory CEs also contain acreage limitations (between 3,000 and 4,500 acres), as well as other restrictions such as mandatory development through a collaborative process. *Id.*

## II.    Administrative Procedure Act

Plaintiffs' claims are reviewed pursuant to the APA, 5 U.S.C. § 706(2). The Ninth Circuit endorses the use of Rule 56 summary judgment motions to resolve such claims. *See Nw.*

---

[3] Forest Service regulations also set forth criteria applicable to all CEs. 36 C.F.R. § 220.6(a) provides that a proposed action may be categorically excluded from further analysis and documentation in an EIS or EA "only if there are no extraordinary circumstances related to the proposed action." 36 C.F.R. § 220.6(b) directs the Forest Service to consider a series of "resource conditions" to determine whether extraordinary circumstances exist, including federally listed threatened or endangered species, municipal watersheds, and wilderness areas.

MEMORANDUM ISO MOTION FOR SUMMARY JUDGMENT—3

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

*Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471–72 (9th Cir. 1994).

Agency actions must be "set aside" if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; or without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (C), (D). Under this standard of review, a court must assess whether the decision was "based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971). Judicial review of agency action is limited to the grounds that the agency invoked when it took the action. *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1907 (2020).

## FACTUAL AND ADMINISTRATIVE BACKGROUND

Wild challenges CE-6 as applied to commercial logging operations, which are associated with a range of significant impacts, especially when carried out on a large scale. Until recently, the Forest Service did not use CE-6 for such activities, instead preparing EAs or EISs or relying on other CEs which, unlike CE-6, expressly permit commercial logging—but on limited acreages. Also unlike CE-6, these logging CEs were promulgated in rulemakings where the agency specifically found that the acreage-capped commercial operations would have no significant effects; in cases where the agency failed to support its findings, courts invalidated the improperly promulgated CEs. The Forest Service never made—much less supported—a finding that commercial logging on the scale of the Projects has only insignificant effects.

## I.    Commercial Logging Operations May Cause Significant Environmental Impacts.

Commercial logging operations—especially on the scale authorized by the Projects—are associated with a host of significant environmental impacts.

By its nature, commercial logging targets larger trees than precommercial thinning or prescribed burning, which remove smaller trees of no commercial value. PAR_1759 (defining

MEMORANDUM ISO MOTION FOR SUMMARY JUDGMENT—4

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

"commercial thinning"), 1778 (defining "precommercial thinning").[4] Commercial logging—including commercial thinning—removes larger, fire-resistant trees, which may make forests less resilient to climate change and more vulnerable to climate-driven fires, SWAR_4074–79, 4088–89, 4109, while releasing large amounts of stored atmospheric carbon. SWAR_4123, 10993, 11131. Commercial logging also degrades the impacted areas' value as climate refugia, SWAR_4559, 9653, 10993, 11015, 11131, and wildlife habitat. SWAR_118, 2454, 4123–24, 11564, 11568; PAR_2292, 2310. While precommercial thinning and low-intensity burns affect the understory, commercial logging reduces canopy cover, leading to hotter, drier conditions on the forest floor, impacting forest ecology, fire risk, and stream health. SWAR_4088–89, 4109.

One fundamental aspect of commercial logging with potentially significant consequences is that trees of merchantable size are removed using heavy equipment and transported for sale, whereas noncommercial management activities leave the felled and standing dead trees in place or burn them on site. Snags and downed logs create "structural complexity," characteristic of old-growth forests and critically important for both upland and riparian wildlife habitat. SWAR_2891–95, 4061, 5290–91. Commercial logging removes trees that would otherwise provide these important habitat components. SWAR_4587, 5292, 5352, 5090.

The process of removing logs during commercial operations also has environmental impacts beyond tree felling. Commercial logging is typically done with heavy equipment and necessitates the creation of landings (where logs are temporarily stored), and skid trails (used to drag logs to landings). SWAR_93; PAR_607, 623. Transporting the logs for processing creates

---

[4] Citations to the Administrative Record ("AR") are to the five records Defendants lodged in this case: (1) South Warner ("SWAR_"); (2) Baby Bear ("BBAR_"); (3) Bear Wallow ("BWAR_"); (4) Policy ("PAR_"); and (5) Supplemental ("SAR_"). Leading zeros from the Bates-stamped page numbers are omitted.

MEMORANDUM ISO MOTION FOR SUMMARY JUDGMENT—5

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

heavy equipment traffic on forest roads, which often must be reopened or reconstructed. PAR_212, 272, 1546. Heavy equipment compacts or displaces forest soils; dragging logs and creating skid trails causes further damage—one survey of commercial logging projects on the Forest found that a 40% detrimental soil disturbance level was typical. SWAR_27, 93, 5514, 6968; PAR_244, 383, 391, 584, 587. Heavy equipment traffic on logging roads contributes to erosion and water pollution. SWAR_14, 21, 1105; PAR_543, 1546. Invasive species, which colonize disturbed areas such as timber sales, are often spread by logging trucks and heavy equipment. SWAR_280; PAR_2113, 2263. Logging can degrade wilderness values, impair recreation opportunities, and harm wildlife. SWAR_2192; PAR_473, 508–510, 532.

Noncommercial management activities, in contrast, generally require less heavy machinery, and, importantly, felled or burned trees are generally left on site to provide habitat rather than being removed—skid trails, landings, and logging trucks are not necessary, and structural complexity is maintained. SWAR_8430–46. Thus, when projects have multiple purposes—for example, a project may aim to both reduce fuel loads and supply timber—the addition of a commercial component creates different and more extensive environmental impacts than would occur from solely noncommercial management activities. *See* PAR_587.

## II.    The History and Development of Forest Service Logging-Related CEs Shows that CE-6 Never Was Intended for Large-Scale Commercial Logging.

### A.    The Forest Service Originally Relied on a CE for "Low-Impact Silvicultural Activities."

Pursuant to CEQ regulations, the Forest Service promulgated a number of CEs, which were originally contained in the Forest Service Handbook's guidance on NEPA implementation.

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

*See* 50 Fed. Reg. 26,078 (June 24, 1985) (Ex. 1).[5] One of these categories applied to proposals

for "Low-impact silvicultural activities that are limited in size and duration and that primarily

use existing roads and facilities, such as firewood sales, salvage, thinning, and small harvest cuts;

site-preparation; and planting and seeding." *Id.* at 5.

In 1987, environmental groups petitioned the Forest Service to amend its CEs, asking that

the agency (1) more specifically describe the relevant actions and (2) prohibit and immediately

cease the categorical exclusion of "timber sales involving more than 25,000 board feet or more

than one acre." SAR_8 (56 Fed. Reg. 19,718 (April 29, 1991)). In response, the agency issued an

interim directive to limit timber salvage, thinning, and harvesting to 100,000 board feet or less,

or to areas of less than 10 acres. SAR_3–5 (54 Fed. Reg. 9,073 (March 3, 1989)).

**B.      The Forest Service Adopted CE-6 as Part of a 1991/1992 Rulemaking
         Package That Was Overturned in Part.**

In 1991, the Forest Service issued a proposed rule that included new and expanded CEs.

SAR_7–10. In response to the environmental groups' petition, the Forest Service proposed

replacing its "low-impact silvicultural activities" CE with separate, narrower categories,

including a CE for timber sales of up to one million board feet. SAR_8. The Forest Service

rejected the suggested 25,000-board-foot cap as "unreasonably conservative," stating that it had

"prepared environmental assessments on hundreds of timber sales which have these

characteristics and ha[d] always found them to have no significant environmental effects."

SAR_10. The agency offered no further support for its proposed CEs.

---

[5] Some of the Federal Register volumes with the Forest Service's CE rulemaking are
included in the Administrative Record. Those not included have been attached as exhibits to the
Declaration of Oliver J. H. Stiefel, filed herewith, for the Court's convenience.

MEMORANDUM ISO MOTION FOR SUMMARY JUDGMENT—7

On September 18, 1992, the Forest Service announced its adoption of the final revised

NEPA rules, modified to reflect public comment on the proposal. PAR_3165 (57 Fed. Reg.

43,180 (Sept. 18, 1992)). Notably, the Forest Service reduced the scope of its proposed timber

harvest CE in response to public concern regarding the impacts of logging. PAR_3170. The final

rule adopted three categories of "low-impact silvicultural activities":

- CE-4, applicable to: Timber harvest which removes 250,000 board feet or less of merchantable wood products or salvage which removes 1,000,000 board feet or less of merchantable wood products; which requires one mile or less of low standard road construction; and assures regeneration of harvested or salvaged areas, where required.

- CE-5, now codified at 36 C.F.R. § 220.6(e)(5), applicable to: Regeneration of an area to native tree species, including site preparation which does not involve the use of herbicides or result in vegetation type conversion.

- CE-6, now codified at 36 C.F.R. § 220.6(e)(6), applicable to: Timber stand and/or wildlife habitat improvement activities that do not include the use of herbicides or do not require more than 1 mile of low standard road construction. Examples include, but are not limited to:
  - Girdling trees to create snags;
  - Thinning or brush control to improve growth or to reduce fire hazard including the opening of an existing road to a dense timber stand;
  - Prescribed burning to control understory hardwoods in stands of southern pine; and
  - Prescribed burning to reduce natural fuel build-up and improve plant vigor.

In 1999, a district judge held unlawful and set aside CE-4. *Heartwood, Inc. v. U.S. Forest*

*Serv.*, 73 F. Supp. 2d 962, 976 (S.D. Ill. 1999), *aff'd*, 230 F.3d 947 (7th Cir. 2000).

Environmental plaintiffs claimed CE-4 violated the requirement that categorically excluded

actions have no significant environmental impacts and the court agreed, concluding that the

Forest Service had "not provide[d] any rationale for why this magnitude of timber sales would

not have a significant effect on the environment." *Id.* at 975. The record contained no evidence to

support the 250,000-board-feet limit beyond a reference to the agency's "expertise and prior

experience with timber sales having 'these characteristics.'" *Id.* According to the court:

MEMORANDUM ISO MOTION FOR SUMMARY JUDGMENT—8

> That is not sufficient. The FS does not identify nor detail the characteristics to which it refers[.] In addition, the FS does not provide any documentation nor evidence regarding the details of these prior harvests nor the FS' analysis of their environmental effects upon which they based their opinion.

*Id.* Indeed, as the court noted, the record contained recommendations from agency personnel that CE-4 be capped at 100,000 board feet. *Id.* at 976. The Forest Service had failed to address this recommendation and "to adequately address or provide support for its position that the timber harvests of these magnitude [sic] would not have cumulative effects on the environment." *Id.*[6] The court therefore invalidated CE-4 and enjoined its use. *Id.* at 980.[7]

**C.    In Response to *Heartwood*, the Forest Service Adopted a Series of New, Small-Scale Logging-Related CEs That Survived a Facial Challenge.**

On July 29, 2003, in response to *Heartwood*, the Forest Service promulgated three new CEs applicable to small-scale logging projects. 68 Fed. Reg. 44,598, 44,599 (July 29, 2003) (Ex. 5). The new categories were intended to be much more specific and "limited in scope" than the CE invalidated by *Heartwood*. 68 Fed. Reg. 1026, 1,027 (Jan. 8, 2003) (Ex. 3).

- CE-12, now codified at 36 C.F.R. § 220.6(e)(12), allows harvest of live trees not to exceed 70 acres with no more than one-half mile of temporary road construction. Examples include, but are not limited to, thinning of overly dense stands of trees to improve the health and vigor of the remaining trees.

- CE-13, now codified at 36 C.F.R. § 220.6(e)(13), allows the salvage of dead and/or dying trees not to exceed 250 acres with no more than one-half mile of temporary road construction.

- CE-14, now codified at 36 C.F.R. § 220.6(e)(14), allows commercial and noncommercial felling and removal of any trees necessary to control the spread of insects and disease on no more than 250 acres with no more than one-half mile of temporary road construction.

---

[6] As a point of reference, Baby Bear (by far the **smallest** of the Projects) is projected to yield a net 10,940,798 board feet—nearly 44 times the live-tree harvest volume cap rejected in *Heartwood*. BBAR_186 (expressing estimated volume in "MBF," or 1,000 board feet).

[7] Plaintiffs also challenged the **process** by which the new CEs were adopted, arguing that the Forest Service was obligated to prepare an EA or EIS. The district court and the Seventh Circuit rejected this claim. *Heartwood, Inc. v. U.S. Forest Serv.*, 230 F.3d 947 (7th Cir. 2000).

MEMORANDUM ISO MOTION FOR SUMMARY JUDGMENT—9

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

The Forest Service explained that it now believed acreage to be a more useful measure than timber volume, which it had used to define CE-4. 68 Fed. Reg. at 1,027 (Ex. 3). To develop acreage caps, the agency reviewed all 306 logging projects performed under CE-4 in 1998. *Id.* at 1028. The agency also randomly selected and reviewed 154 logging projects that were (1) approved under CE-4; (2) approved under an EA or EIS but fit within CE-4's requirements; or (3) were otherwise small in scope. *Id.* These data were used to define the type and scale of actions that would not result in individually or cumulatively significant impacts.

On January 18, 2006, the Tenth Circuit rejected a facial challenge to CE-13. *Colo. Wild v. U.S. Forest Serv.*, 435 F.3d 1204 (10th Cir. 2006). Environmental plaintiffs challenged both the Forest Service's methodology in establishing CE-13's 250-acre limit and the substantive conclusion that these projects would not have a significant impact. The court disagreed, holding that the Forest Service had adequately supported its decision in the record. *Id.* at 1216–22.

### D. In a 2002–2003 Rulemaking, the Forest Service Adopted Another Logging-Related CE but the Ninth Circuit Enjoined It.

On June 5, 2003, the Forest Service published a final rule adopting a new CE related to fuels reduction activities and post-fire rehabilitation projects. 68 Fed. Reg. 33,814 (June 5, 2003) (Ex. 4). In support of the new CE, the Forest Service stated that it had "repeatedly conducted NEPA analyses for hazardous fuels reduction and fire rehabilitation projects using the best available science," and based on this experience had concluded that these actions do not individually or cumulatively have a significant effect on the human environment. *Id.* at 33,820.

The new CE, "CE-10," allowed prescribed burning and the mechanical removal of combustible vegetation, including through both commercial and precommercial thinning. *Id.* at 33,824. While the proposed rule had not imposed an acreage limitation, 67 Fed. Reg. 77,038,

MEMORANDUM ISO MOTION FOR SUMMARY JUDGMENT—10

77,040–41 (Dec. 16, 2002) (Ex. 2), the final rule capped mechanical treatment projects at 1,000 acres and prescribed burns at 4,500 acres. (Ex. 4).

Environmental plaintiffs challenged CE-10 on the grounds that, *inter alia*, it inappropriately included activities that have significant effects, and that the underlying data did not support CE-10's promulgation. *Bosworth*, 510 F.3d at 1021–22. The Ninth Circuit agreed.

The court determined that the Forest Service had failed to adequately assess the CE's potential significance. *Id.* at 1027–32. In particular, the agency failed to perform a programmatic cumulative impacts analysis prior to promulgating the CE, noting that the analysis was "of critical importance in a situation such as here, where the categorical exclusion is nationwide in scope and has the potential to impact a large number of acres." *Id.* at 1028. The record revealed "potential significant effects, such as effects on soil and water quality from mechanical treatments, thinning operations, fire rehabilitation activities, and temporary road construction," but the Forest Service arbitrarily concluded—without conducting a "global cumulative impacts analysis"—that effects would be "localized, temporary, and of minor magnitude." *Id.* at 1029. This conclusion was particularly unsupportable where "multiple [CE-10] projects are located in close proximity," because "the effects on soil and water quality could no longer be said to be localized or of minor magnitude[.]" *Id.*

The Forest Service also failed to adequately assess uncertainty and controversy, two factors agencies must consider when determining an action's significance. *Id.* at 1030 (citing 40 C.F.R. § 1508.27). Several state and federal agencies had raised "substantial questions as to whether the project would cause significant environmental harm and expressed serious concerns about the uncertain risk, size, nature, and effects of actions under the CE" which the Forest

MEMORANDUM ISO MOTION FOR SUMMARY JUDGMENT—11

Service had failed to address. *Id.* The court held that the agency must adequately respond to the public and scientific controversy surrounding the impacts of the CE. *Id.*

Finally, the court held that the Forest Service had improperly relied on data it had collected **after** announcing its intent to promulgate CE-10 as a post-hoc rationale for its predetermined decision. *Id.* The Ninth Circuit explained that this was impermissible, as "postdecision information may not be advanced as a new rationalization either for sustaining or attacking an agency's decision." *Id.* Such post-hoc examination of data "would frustrate the fundamental purpose of NEPA." *Id.*

### E.   In 2007–2008 Rulemaking, the Forest Service Codified Its NEPA Procedures but Made No Substantive Changes.

In 2008 the Forest Service moved its NEPA procedures, including the agency's CEs, from the Forest Service Manual and Forest Service Handbook to the Code of Federal Regulations, where they are now codified at Title 36, Part 220. SAR_51 (73 Fed. Reg. 43,084 (July 24, 2008)). The agency stated that the move "should not change the judicial interpretation of [the Forest Service's NEPA] procedures." SAR_52.

In response to negative public comment regarding codification of CEs, the Forest Service stated that it was simply moving existent categories "established following public review and comment." SAR_58. It "[did] not add any new categories, nor [did] it substantively alter existing requirements regarding extraordinary circumstances. The Department [of Agriculture] did not propose any changes to the categorical exclusions or associated requirements and does not believe any changes are warranted in this final rule." *Id.* The Forest Service did not consider new information, make new findings, or announce new policies regarding any of its CEs.

MEMORANDUM ISO MOTION FOR SUMMARY JUDGMENT—12

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

**F.      In 2020 Rulemaking, the Forest Service Adopted a New CE Involving Commercial Logging and Determined It Must Be Capped at 2,800 Acres to Stay Below the Level of Significance.**

With the stated goal of "increasing efficiency of environmental analysis," 83 Fed. Reg. 302 (Jan. 3, 2018) (Ex. 8), the Forest Service on June 13, 2019, issued a proposed rule revising its NEPA regulations and adding several new CEs. 84 Fed. Reg 27,544 (June 13, 2019) (Ex. 10). One proposed category, "CE-25," would cover "projects that include restoration activities to improve forest health and resiliency to disturbances and to improve terrestrial and aquatic habitat and other watershed conditions" on up to 7,300 acres, including up to 4,200 acres of "commercial or non-commercial timber harvest activities." *Id*. at 27,549. The agency stated that it based the proposal on a random sample of 68 projects completed under EAs. *Id.*

On November 19, 2020, the Forest Service finalized its amended NEPA regulations. 85 Fed. Reg. 73,620 (Nov. 19, 2020) (Ex. 11).[8] The 2020 final rule included a modified CE-25 (now codified at 36 C.F.R. § 220.6(e)(25)). Based on a review conducted by agency scientists, the Forest Service reduced the size cap from 7,300 to 2,800 acres, which the agency found "better reflects the average size of projects from the sampled EAs, and also aligns with average acreages of specific activities in the sampled EA data set for which some commenters had concerns regarding the degree of impacts (such as commercial timber harvest)." *Id.* at 73,628.

On January 8, 2021, a coalition of plaintiffs filed a complaint challenging, *inter alia*, the promulgation of CE-25. *The Clinch Coal. et al. v. U.S. Forest Serv. et al.*, No. 2:21-cv-00003-JPJ-PMS (W.D. Va.). The case is pending. In response to the lawsuit, on May 21, 2021, the Forest Service issued guidance instructing responsible officials to "engage with Regional and

---

[8] The final rule was developed pursuant to the CEQ's amended NEPA regulations, 40 C.F.R. § 1501.4 (2021).

MEMORANDUM ISO MOTION FOR SUMMARY JUDGMENT—13

Washington Office NEPA staff" prior to scoping proposals for CE-25 projects. SAR_73–74. This restricted, if not entirely halted, the use of CE-25. *Id.*; *see also* SWAR_2933. This guidance was in place during the scoping period for the Projects at issue here. *See* SWAR_3643–44; BBAR_126–29; BWAR_1997–2000 (Scoping Letters for South Warner, Baby Bear, and Bear Wallow dated July 28, Sept. 1, and Sept. 22, 2021, respectively).

### III. After Applying CE-6 to Noncommercial Logging for Nearly 30 Years, the Forest Service Reversed Course Around 2018.

#### A. The Forest Service Historically Reviewed and Approved Larger Scale Commercial Logging Projects Via EIS or EA, Or Kept Commercial Logging Below the Logging CEs' Acreage Caps.

For nearly thirty years, the Forest Service applied CE-6 to noncommercial activities.[9] For example, the agency used CE-6 for 3,650 acres of hand-trimming one- to five-inch diameter trees. *All. for the Wild Rockies v. Weber*, 979 F. Supp. 2d 1118, 1122–23 (D. Mont. 2013). On the other hand, commercial logging projects with stated purposes related to "timber stand and/or wildlife habitat improvement" were authorized under an EIS, EA, or one of the logging CEs like CE-12, which permits commercial logging on up to 70 acres. *See, e.g.*, PAR_3323–3532; SWAR_172–395, 1219–1591, 1658–1773, 3297–99, 4002–03, 11616, 12357. For example, the Forest approved the 2006 Burnt Willow project, which included 3,200 acres of commercial thinning, after analysis in an EA. PAR_3349–3509. Its stated purposes included reducing excess vegetation to increase tree vigor and health—in other words, "timber stand improvement." PAR_3324; *see also* Ex. 9 (using CE-12 for 70 acres of commercial thinning to increase wildlife

---

[9] The Administrative Record contains one 2014 example of a 2,280-acre "restoration thinning and prescribed fire project" in New Mexico, authorized under CE-6, which included some commercial thinning. PAR_3533–536. The Record contains no information about how (or indeed, if) that project was implemented, and this appears to be an isolated case; no pre-2018 examples from Forest Service Region 6 (Oregon and Washington) appear in the Record. The Record contains no information as to how that project was relied on by Defendants.

MEMORANDUM ISO MOTION FOR SUMMARY JUDGMENT—14

*Crag Law Center
3141 E Burnside St.
Portland, OR 97214
Tel. (503) 227-2212*

forage and reduce fuels); Ex. 6 (using CE-12 for 67 acres of commercial thinning to "maintain[] * * * forest health, tree productivity, fuels hazard mitigation, and timber value").

Tellingly, when the Forest Service chose to include commercial logging in a "timber stand and/or wildlife habitat improvement" project, it would not authorize the commercial activities under CE-6. For a 2015 project, the agency applied CE-6 to 1,218 acres of precommercial thinning and 8,851 acres of prescribed burning, and CE-12 to 60 acres of commercial thinning. Ex. 7. If the Forest Service had understood CE-6 to encompass commercial thinning, there would have been no need to invoke CE-12, nor to conform to its acreage limit.

### B.    The Forest Service Began Expanding the Use of CE-6 Around 2018.

Over the last four years, in keeping with a "mov[ement] towards shorter NEPA," the Forest Service has begun to use CE-6 to authorize commercial logging projects. SWAR_2937.

In 2018, President Trump issued an executive order instructing federal agencies to, *inter alia*, "[s]treamline agency administrative and regulatory processes and policies" by "using all applicable categorical exclusions * * * for fire management, restoration, and other management projects in forests." SAR_68–69. The Forest Service began to emphasize "streamlining" NEPA review and to utilize CEs whenever possible. *See* SWAR_1787–88, 2937; SAR_71–72.

That year, the Los Padres National Forest in California invoked CE-6 for two fuel-reduction projects which incorporated commercial thinning. *See Mt. Cmtys. for Fire Safety v. Elliott, 25 F.4th 667 (9th Cir. 2022)* (Cuddy project); *Los Padres ForestWatch v. U.S. Forest Serv., 25 F.4th 649, 652 (9th Cir. 2022)* (Tecuya project). The Cuddy project consisted of thinning and burning on 1,200 acres to "improve resilience of these stands to insect and drought-related mortality" and "make the stands more resilient to wildfire." PAR_3542–43. Within this area, commercial thinning would occur on up to 601 acres. *Mt. Cmtys., 25 F.4th at 673*. The

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

1,626-acre Tecuya project approved similar activities, including commercial thinning on 1,020 acres, to increase the forest's resilience to fire, disease, and insects. PAR_3562, 3565–67.[10]

Environmental groups challenged both projects, arguing, *inter alia*, that the text of CE-6 does not encompass commercial logging, as the term "thinning" applies only to cutting small trees with no commercial value. *Mt. Cmtys.*, 25 F.4th at 674; *Los Padres*, 25 F.4th at 654, 661. In a split opinion, the Ninth Circuit rejected this argument, ruling that CE-6 "does not limit activity by tree age or size" and thus "unambiguously allows the Forest Service to thin trees, including larger commercially viable ones, to reduce fire hazard." *Mt. Cmtys.*, 25 F.4th at 672, 677.[11]

### C.    In a Six-Month Timeframe, the Forest Approved Three Large-Scale Commercial Logging Projects Under CE-6.

The Forest also began moving to "shorter NEPA." At the end of 2021, it invoked CE-6 for a series of commercial logging projects which dwarf those at issue in *Mountain Communities* and *Los Padres*. The South Warner, Baby Bear, and Bear Wallow Projects authorize a collective total of 29,000 acres of commercial logging and associated activities; while similar projects had previously been analyzed in an EA or EIS, Defendants approved the Projects pursuant to CE-6, with minimal environmental analysis and opportunity for public involvement.

#### 1.    The South Warner Project Authorizes 16,000 acres of Commercial Logging Operations.

On December 27, 2021, Defendant Ramsey signed a Decision Memorandum approving the South Warner Project. SWAR_12111. The Project involves thinning large and small trees,

---

[10] Defendants included in the record documents from the Cuddy and Tecuya projects, but it is unclear whether or how the agency relied on these documents in approving the Projects.

[11] The *Los Padres* case does not analyze the applicability of CE-6 to commercial logging, merely noting that the issue had been addressed in *Mountain Communities*. 25 F.4th at 661. Plaintiffs here joined a coalition of environmental organizations in filing amici briefs in support of petitions for *en banc* review of these decisions. The petitions were denied.

MEMORANDUM ISO MOTION FOR SUMMARY JUDGMENT—16

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

prescribed fire, juniper cutting, aspen/mountain mahogany/meadow enhancement, stream restoration, and commercial sale of merchantable forest products. SWAR_12099–104. At issue in this case is Defendants' authorization of 16,000 acres of commercial thinning and attendant logging activities such as road reconstruction. SWAR_12100.

The Forest Service issued the South Warner Project Scoping Notice on June 28, 2021. SWAR_3643–46. The four-page Notice provided only a cursory description of the project location, purpose, and proposed activities. *Id.* Wild timely submitted scoping comments, emphasizing that the Forest Service cannot, by law, approve a project of South Warner's scale using a CE. SWAR_3656–3759.[12] Wild also flagged the lack of information provided in the Notice, which prohibited meaningful engagement because the Forest Service did not disclose the location of commercial thinning units, the specific logging prescriptions for each unit, or the miles of roads that would be used and degree of repair or reconstruction needed for hauling operations. SWAR_3690. Without this information, the Forest Service could not adequately analyze—and the public could not provide meaningful feedback on—the Project's impacts on wildlife habitat, carbon storage, water quality, and more. The Forest Service provided no further public comment opportunities. SWAR_12110 (detailing public involvement).

Defendant Ramsey found the South Warner Project categorically excluded from documentation in an EIS or EA, relying instead on CE-6 and CE-18.[13] SWAR_12107–08. Projects approved via CE are exempt from the Forest Service's administrative objection process, 36 C.F.R. Part 218, which is intended to help resolve conflicts before they reach the courts. The

---

[12] Other commenters expressed similar concerns. SWAR_3930 ("The South Warner Project is simply far too large and involves too much timber harvesting (and possibly too much road building) activity to qualify as a CE.").

[13] Wild does not challenge the use of CE-18, 36 C.F.R. § 220.6(e)(18).

MEMORANDUM ISO MOTION FOR SUMMARY JUDGMENT—17

Forest Service's issuance of the Decision Memorandum and decision not to prepare an EIS or EA therefore constitute final agency action subject to judicial review. 5 U.S.C. § 706(2).

> ### 2. Baby Bear and Bear Wallow Collectively Allow Approximately 13,000 Acres of Commercial Logging in Adjacent Project Areas.

On May 6, 2022, Defendant Wilson signed Decision Memoranda approving the Baby Bear and Bear Wallow Projects. BWAR_2897–2919. Though the two projects were separately analyzed and approved, the two project areas are adjacent; the southeastern boundary of the Bear Wallow Project area shares a border with the northern border of the Baby Bear project area. *See* BWAR_2789, 2906, 2918. The Forest Service did not explain its rationale for analyzing and approving the Projects separately. *See* BWAR_2897–2919 (failing to explain separate decisions). The Projects both involve thinning, meadow and riparian treatments, and prescribed fire. BWAR_2898–900, 2909–12. At issue in this case are the 3,000 acres of commercial thinning authorized by the Baby Bear project, the 10,000 acres of commercial thinning authorized by the Bear Wallow project, and the activities associated with such commercial thinning such as road reconstruction and log hauling. *See* BWAR_2898, 2909.

The Forest Service issued the Scoping Notices for Baby Bear and Bear Wallow on September 1, 2021, and September 22, 2021, respectively. BBAR_127; BWAR_1998. Like the South Warner Notice, the Baby Bear and Bear Wallow Notices are short (four and three pages, respectively), with little to no detail regarding the location and extent of project activities and their potential environmental impacts. *See* BBAR_127–29; BWAR_1998–2000. The Forest Service also failed to analyze or disclose the cumulative effects of the Projects despite their proximity and shared border. *See id.*; *see also* BWAR_2896–2919 (failing to disclose or analyze projects' proximity). Wild timely submitted comments on both projects, once again emphasizing that they are not suitable for a CE because they entail too much commercial logging.

MEMORANDUM ISO MOTION FOR SUMMARY JUDGMENT—18

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

BBAR_139–78, 684–98; BWAR_2395–2420, 2821–34. Again, no further opportunity for public

comment was provided. *See* BWAR_2904, 2916 (detailing extent of public involvement).

Defendant Wilson applied CE-6 to categorically exclude the Baby Bear and Bear Wallow

Projects from documentation in an EIS or EA. BWAR_2903, 2915. The issuance of the Decision

Memoranda for the two Projects and the decision not to prepare an EIS or EA constitute final

agency action subject to judicial review. 5 U.S.C. § 706(2).

## ARGUMENT

Under NEPA, a federal agency must disclose and consider the environmental significance

of a proposed action. This assessment may come at one of two stages: (1) when reviewing and

approving a specific project through an EIS or EA; or, (2) if a project is approved under a CE,

upon promulgation of that CE by making reasonable and supported findings that the relevant

activities do not individually or cumulatively cause significant effects. Here, however, the Forest

Service failed to do either, and thus the environmental significance of the large-scale commercial

logging approved by the Projects has never been disclosed and evaluated as required by NEPA.

In this section, after confirming this Court's jurisdiction, Wild argues that the Forest

Service violated NEPA at the first stage because it improperly relied on CE-6 and failed to assess

the Projects' impacts and significance in an EIS or EA. In the alternative—and to the extent this

Court finds that the Forest Service properly relied on CE-6—Wild next argues that CE-6 itself is

unlawful as applied to commercial logging operations like those authorized by the Projects

because the Forest Service in rulemaking never found—and could not reasonably find—that such

activities do not individually or cumulatively cause significant effects.

I.      **This Court Has Jurisdiction: Wild Has Standing, and Both the Project Challenges and the As-Applied Challenge to CE-6 Are Ripe for Review.**

Plaintiffs Oregon Wild and WildEarth Guardians have standing because they are nonprofit organizations whose missions and members' interests are harmed by the Forest Service's actions and whose injuries would be redressed by a favorable decision.

"[E]nvironmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons for whom the aesthetic and recreational values of the area will be lessened by the challenged activity." *Friends of the Earth v. Laidlaw*, 528 U.S. 167, 183 (2000). Plaintiffs' members, supporters, and staff use and enjoy the Forest, and their interests are harmed by the Projects and the application of CE-6. Plaintiffs' members, supporters, and staff engage in a variety of personal and professional recreational, scientific, and spiritual purposes on the Forest and particularly within the South Warner, Baby Bear, and Bear Wallow project areas. *See* Heiken Decl. ¶¶ 12, 18–22; LeGue Decl. ¶¶ 3, 7–11; Krupp Decl. ¶¶ 10–14. The interests of Plaintiffs' members, supporters, and staff would be irreparably damaged by the Projects and application of CE-6 but redressed by the remedy requested. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 572–73 n.7 (1992); *Forestkeeper v. Tidwell*, 847 F. Supp. 2d 1217, 1231 (E.D. Cal. 2012); Heiken Decl. ¶¶ 12, 23–24; LeGue Decl. ¶¶ 14–15; Krupp Decl. ¶¶ 4–5, 13–15.[14]

Plaintiffs' claims also are ripe for review. The Forest Service issued final decisions approving the Projects in December 2021 (South Warner) and May 2022 (Baby Bear and Bear Wallow), and plans to begin implementation in 2023. *See* ECF9 at 3. The Project challenges are ripe because (1) delayed review would cause hardship to Wild as implementation is imminent;

---

[14] Plaintiffs have organizational standing because their members have standing; the interests at stake are germane to Plaintiffs' purposes; and neither the claim asserted nor the relief requested requires participation of individual members in the lawsuit. *See Friends of the Earth*, 528 U.S. at 181; *see also* Heiken Decl. ¶¶ 3, 11–22; LeGue Decl. ¶¶ 5–11; Krupp Decl. ¶¶ 4–5.

MEMORANDUM ISO MOTION FOR SUMMARY JUDGMENT—20

(2) judicial intervention would not interfere with further administrative action because there will be none; and (3) no further factual development would be beneficial. *See Envtl. Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 870 (9th Cir. 2022). As the Projects anchor Wild's as-applied challenge to CE-6, that claim is ripe for the same reasons. *See id.*; *see also Forestkeeper*, 847 F. Supp. 2d at 1234 (stating that rule challenge ripens when rule is applied so as to harm plaintiff's interests) (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990)).

## II.    CE-6 Does Not Apply to Projects of This Type and Scale.

Extensive commercial logging operations of the type and scale authorized by the Projects—involving between 3,000 and 16,000 acres of commercial thinning together with an indeterminate amount of roadwork and other logging activities—are inconsistent with CE-6. The Forest Service's reliance on CE-6 and failure to prepare an EIS, or even a less-intensive EA, was arbitrary, capricious, and contrary to NEPA. *See Alaska Ctr. for the Env't*, 189 F.3d at 857 ("An agency's determination that a particular action falls within one of its categorical exclusions is reviewed under the arbitrary and capricious standard.").

Defendants may argue that the Projects' commercial logging operations are sanctioned by *Mountain Communities*, which held that CE-6 may be applied to commercial thinning because its plain language does not limit the age or size of trees to be cut, *i.e.*, CE-6 is not limited to the thinning of precommercial saplings. *See Mt. Cmtys.*, 25 F.4th at 672, 677. That holding, however, must be cabined by the scale of the commercial logging at issue—only 601 acres. Here, the South Warner Project authorizes more than 26 times, the Baby Bear Project five times, and the Bear Wallow Project more than 16 times the acreage of the Cuddy project. *See id.* at 673; SWAR_12100; BWAR_2898, 2909. The type **and scale** of the Projects at issue in this case are simply incompatible with CE-6. To hold otherwise would permit an end-run around NEPA.

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

**A.    The Type—*And Scale*—of a Project Dictates Whether It is Eligible for a CE.**

Courts consider two primary factors when deciding whether a project fits under a given

CE: Type and scale. *See EPIC*, 968 F.3d at 990–91. Whether the type of a project fits under a CE

depends on the project's consistency with the plain language of the CE and/or whether it is

similar in character to the examples provided. *See id.*; *see also Mtn. Cmtys.*, 25 F.4th at 676–78;

*West v. Sec'y of the Dep't of Transp.*, 206 F.3d 920, 928 (9th Cir. 2000). A project's scale is also

determinative, because the "rationale for a CE is that a project that will have only a minimal

impact on the environment should be allowed to proceed without an EIS or and [sic] EA." *EPIC*,

968 F.3d at 990; *see also Wildlands v. Warnock*, 570 F. Supp. 3d 983, 991 (D. Or. 2021)

(focusing, *inter alia*, on project's "immense scale" to conclude that plaintiffs demonstrated a

likelihood of success on claim that project did not fit under a CE). The *Mountain Communities*

case is instructive as to the type of projects CE-6 allows, but project scale also must be taken into

account. As to scale, *EPIC* is more closely on point because, unlike *Mountain Communities*, the

project at issue in *EPIC* was an "extensive commercial logging project" akin to the Projects here.

The crux of *Mountain Communities* was whether "CE-6 limits timber stand improvement

activities by age or size of trees (*i.e.*, whether CE-6 limits thinning to only precommercial

saplings)." 25 F.4th at 675. The court held that it did not. Specifically, the court singled out one

of CE-6's examples—"thinning or brush control to improve growth or to reduce fire hazard

including the opening of an existing road to a dense timber stand." *Id*. The court further focused

on the term "thinning" and considered whether there was any evidence that the term was

restricted to precommercial, as opposed to commercial thinning. *Id.* at 676. Based on the "plain

meaning" of "thinning," the court held that CE-6 allows for thinning of commercially viable

trees. *Id.* at 674.

MEMORANDUM ISO MOTION FOR SUMMARY JUDGMENT—22

The dissenting judge in *Mountain Communities* warned of the consequences of overlooking a project's scale, and the implications for future cases. But the hypotheticals posed by the dissenting judge were simply not tied to the facts of the case. *See id.* at 691 ("Although the Project in this case will involve approximately 600 acres of commercial logging, the majority's interpretation allows the Forest Service to commercially log trees without first preparing an EA or an EIS over many more acres than that—whether that be 1,000, 6,000, or even many more acres.") (Stein, J., dissenting). Thus, although not explicitly factored into the majority's analysis, the Cuddy project's small scale must be considered a necessary fact bound up in the court's judgment. *See* [*Hart v. Massanari*, 266 F.3d 1155, 1170–71 (9th Cir. 2001)](#) ("In determining whether it is bound by an earlier decision, a court considers not merely the reason and spirit of cases but also the letter of particular precedents. This includes not only the rule of law announced, **but also the facts giving rise to the dispute**[.]") (emphasis added).[15]

Indeed, that is the only reading of *Mountain Communities* that is consistent with predecessor Ninth Circuit cases like *EPIC* and *West*. At issue in *EPIC* was a project authorizing the felling and removal of hazard trees along hundreds of miles of forest roads within the footprint of a recent fire. [968 F.3d at 988](#). Specifically, the Ninth Circuit considered whether the CE for road "repair and maintenance," 36 C.F.R. § 220.6(d)(4) ("CE(d)(4)"), could be applied to commercial logging operations along hundreds of miles of Forest roads targeting trees—some of which posed no imminent hazard—across 4,700 acres. *Id.* at 990. The court held it could not.

The court evaluated the language of CE(d)(4) and its list of examples, deciding that "a CE of such limited scope cannot reasonably be interpreted to authorize a [Project that] allows

---

[15] The Tecuya project at issue in the related *Los Padres* case involved only 1,020 acres of commercial thinning. [25 F.4th at 661](#); PAR_3566, 3565–67.

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

commercial logging of large trees up to 200 feet away from either side of hundreds of miles of Forest Service roads." *Id.*; *see also West*, 206 F.3d at 928 (rejecting use of CE to approve extensive highway construction where "none of the examples listed [in the CE] approache[d] the magnitude of this project"). It was the "**type and scale** of the project at issue in [*EPIC*] which prevented it from being authorized pursuant to [CE(d)(4)] and mandated further NEPA environmental analysis." *Forestkeeper v. U.S. Forest Serv.*, No. 1:21-cv-0141-DAD-BAM, 2021 U.S. Dist. LEXIS 192443, at *14 (E.D. Cal. Oct. 5, 2021) (emphasis added); *see also Wildlands*, 570 F. Supp. 3d at 989 ("*EPIC* applies to the overall scale of the project[.]").

The *Mountain Communities* court had no occasion to consider whether a **large-scale** commercial logging project would fit under CE-6. The *EPIC* court, which **did** consider project scale, decided that CE(d)(4) is inapplicable to an "extensive commercial logging project." 968 F.3d at 990. In the CE context, the type of a project plus its scale is the relevant equation for deciding whether a it fits under a given CE.

   **B.    Under No Reasonable Interpretation Does CE-6 Permit the Type and Scale of Commercial Logging Operations Approved by the Projects.**

Considering their type and scale, the Projects here clearly cannot fit under CE-6. This is confirmed by caselaw and the regulatory history and overall purpose of CEs.

As to project type, CE-6 applies to "timber stand and/or wildlife habitat improvement activities," with examples including "girdling trees to create snags," "thinning or brush control to improve growth or to reduce fire hazard including the opening of an existing road to a dense timber stand," and "prescribed burning." 36 C.F.R. § 220.6(e)(6)(i)–(iv). The *Mountain Communities* court decided that the example referencing "thinning" encompassed commercial as well as pre-commercial thinning. As discussed above, however, that alone does not resolve the inquiry because a project's scale also must be taken into account.

MEMORANDUM ISO MOTION FOR SUMMARY JUDGMENT—24

As to project scale, the magnitude of the South Warner, Baby Bear, and Bear Wallow

Projects dwarfs that of the projects at issue in *Mountain Communities* and *Los Padres*.

| Project | Scale of Commercial Thinning | Times Bigger Than Cuddy (*Mtn. Cmtys.*) | Times Bigger Than Tecuya (*Los Padres*) |
|---------|------------------------------|------------------------------------------|------------------------------------------|
| Cuddy | 601 acres | N/A | N/A |
| Tecuya | 1,020 acres | 1.6 | N/A |
| Baby Bear | 3,000 acres | 5 | 3 |
| Bear Wallow | 10,000 acres | 16 | 10 |
| South Warner | 16,000 acres | 26 | 16 |

To facilitate logging, an indeterminate number of road miles will need to be reconstructed

or repaired and then used for hauling operations. *See, e.g.*, SWAR_11324 (271.35 "proposed

miles" of roads in the South Warner project area, not including temporary roads); 3931 (noting

that similar large-scale projects on the Forest have required more than 20 miles of temporary

road construction). Skid trails and landings—associated with "increased soil impacts,"

SWAR_2879—will be constructed and utilized across hundreds, if not thousands of acres.[16]

In sum, these are "extensive commercial logging projects," authorizing 3,000 to 16,000

acres of commercial logging. *Cf. EPIC*, 968 F.3d at 990 (labeling 4,700-acre project as

"extensive"); *Forestkeeper*, 2021 U.S. Dist. LEXIS 192443, at *2, *14 (same for 2,193-acre

project); *Wildlands*, 570 F. Supp. 3d at 989 n.2 (same for project "at least twice the acreage of

the project in *EPIC*," *i.e.*, 9,400 acres). They are thus inappropriate for a CE of limited scope.[17]

---

[16] None of these necessary features of large-scale commercial logging projects were addressed by the *Mountain Communities* court.

[17] The issue of whether another type of CE-6 project with fewer impacts than commercial logging—for instance, precommercial thinning, *see supra* pp. 5–6—could be carried out over a larger scale is not before this Court but is instructive. To wit: The relationship between type and scale can be seen as inversely proportional—a project authorizing activities with minimal impacts could be carried out on a larger scale, while a project authorizing activities with greater impacts must be conducted on a more limited scale.

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

The regulatory history also supports the view that the scale of these Projects is inconsistent with CE-6. CE-6 was promulgated pursuant to a new regulatory regime that replaced a CE for "low-impact silvicultural activities" that were "limited in size and duration," including "thinning * * * of less than 100,000 board feet or less than 10 acres[.]" SAR_4; *see also supra* pp. 6–8. CE-4, promulgated in the same rulemaking as CE-6, authorized "250,000 board feet or less of merchantable wood products," or "salvage which removes 1,000,000 board feet or less of merchantable wood products." PAR_3194; *see also supra* pp. 7–9. Project scale indisputably was seen as a limiting factor. In this regulatory context, it would be highly incongruous to interpret CE-6 to allow commercial logging projects of **unlimited** scale.

Finally, NEPA's touchstone inquiry is whether a project may cause "significant" impacts. *Blue Mts. Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1212 (9th Cir. 1998). Only classes of actions an agency has ex ante "found" will have no significant effect may be excluded from analysis in an EA or EIS. 40 C.F.R. § 1508.4. As discussed in detail below, the Forest Service has never made such a determination with regard to extensive commercial logging operations like those authorized here. *See infra* pp. 27–31. Indeed, for all of the logging-related CEs, a board-foot or acreage cap was deemed necessary to limit impacts below the level of significance. *See supra* pp. 7–13; *see also* *Mtn. Cmtys.*, 25 F.4th at 691 ("[S]uch acreage limits are designed to ensure that a categorically exempted project's impact does not have a 'significant effect on the human environment.'") (Stein, J., dissenting). And courts have twice enjoined logging-related CEs because the agency failed to rationally explain how projects with acreage caps much lower than the projects here would not cause significant environmental impacts. *See Heartwood*, 73 F. Supp. 2d at 977; *Bosworth*, 510 F.3d at 1033–34.

MEMORANDUM ISO MOTION FOR SUMMARY JUDGMENT—26

Given their scale, the Projects would "manifestly have a significant effect on the environment"; to permit them under CE-6 would "contravene[] the very purpose of NEPA." *Mtn. Cmtys.*, 25 F.4th at 691 (Stein, J., dissenting). While the limited size of the project in *Mountain Communities* made the dissenting judge's warnings conjectural in that case, those warnings have manifested here. Even if CE-6 permits some commercial thinning, the **large-scale** commercial logging operations authorized by the Projects does not align with any of CE-6's examples; CE-6 cannot be reasonably interpreted to allow thousands of acres of commercial logging.

**III.    The Forest Service's Application of CE-6 to Commercial Logging Operations Like Those Authorized by the Projects Violates NEPA and Its Implementing Regulations.**

If *Mountain Communities* is read to permit commercial logging projects under CE-6 without regard to their scale, then CE-6 itself is fatally flawed and the Forest Service cannot rely on it for the Projects here. Under NEPA and CEQ regulations, agencies may adopt CEs for certain categories of activities, but only after first determining that such activities have no significant impacts. Here, however, the Forest Service never made such a determination with respect to commercial logging operations under CE-6. And the agency repeatedly has found hard limits on the type and scale of commercial logging operations necessary to prevent significant impacts. Applying CE-6 to commercial logging over thousands of acres—indeed, potentially unlimited acres—stands the Forest Service's regulatory regime, the CEQ regulations, and the letter and spirit of NEPA on their heads.

**A.    In Adopting CE-6, the Forest Service Did Not Find that Commercial Logging Operations Do Not Cause Individually or Cumulatively Significant Impacts.**

**1.    The Forest Service Failed to Make the Requisite Determination.**

Only classes of actions an agency has "found" will have no significant effect, individually or cumulatively, may be excluded from analysis in an EA or EIS. 40 C.F.R.

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

§ 1508.4. The Forest Service promulgated CE-6 as part of a package of CEs designed to replace the previous "low impact silvicultural activities" CE. Nowhere in the rulemaking did the agency address commercial logging under CE-6, nor find its impacts insignificant. The agency only addressed commercial logging in the context of CE-4, and determined that a board-foot limit was a necessary precondition—and, ultimately, a court held that the record did not adequately support the conclusion that the limited logging permitted by CE-4 would have only insignificant effects. The agency therefore failed to make the requisite finding that application of CE-6 to commercial logging, let alone on the scale authorized by the Projects here, would cause no individually or cumulatively significant impacts. The failure to make this required finding, and provide rational support for it, renders CE-6 unlawful. *See Bosworth*, 510 F.3d at 1029; *Heartwood*, 73 F. Supp. 2d at 976.[18]

The CEQ's regulations define NEPA's terms and set forth specific requirements to ensure agency compliance. *See Churchill County v. Norton*, 276 F.3d 1060, 1072 (9th Cir. 2001). These regulations are "mandatory and binding on federal agencies." *Steamboaters v. Fed. Energy Regulatory Com*, 759 F.2d 1382, 1393 n.4 (9th Cir. 1985); *see also Ctr. for Biological Diversity v. U.S. Forest Serv.*, 349 F.3d 1157, 1166 (9th Cir. 2003) ("The procedures prescribed both in NEPA and the implementing regulations are to be strictly interpreted to the fullest extent possible in accord with the policies embodied in the Act."). The failure to comply with the CEQ regulations is thus more than a mere procedural violation—it violates NEPA itself.

---

[18] In other contexts, courts have held that failure to make a required finding renders an action unlawful. *NRDC v. U.S. EPA*, 857 F.3d 1030, 1039–42 (9th Cir. 2017) (vacating agency decision for failure to adequately support prerequisite finding); *High Sierra Hikers Ass'n v. U.S. DOI*, 848 F. Supp. 2d 1036, 1045 (N.D. Cal. 2012) (finding violation of Wilderness Act where agency failed to make requisite finding of necessity before authorizing activities in wilderness).

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

The CEQ regulations set forth the conditions for promulgation of a CE to be consistent with NEPA. Agencies are to identify certain classes of actions that normally do not require an EIS or EA. 40 C.F.R. § 1507.3(b)(2)(ii). The relevant class of actions must "have been found to have no [significant] effect in procedures adopted by a Federal agency in implementation of [CEQ] regulations." 40 C.F.R. § 1508.4; *Heartwood*, 73 F. Supp. 2d at 976 ("40 C.F.R. § 1508.4 allows [CEs] **only** for categories of actions that **have been found to not have** individual or cumulative effects on the environment.") (emphasis added); *Bosworth*, 510 F.2d at 1026.

Here, however, the Forest Service never made the required finding. When it promulgated CE-6, along with two other proposed categories of "low impact silvicultural activities," the agency stated that each activity had "little potential for soil movement, loss of soil productivity, water and air degradation or impact on sensitive resource values and is consistent with Forest land and resource management plans." SAR_9–10. With reference specifically to CE-4, permitting commercial timber harvest of up to 250,000 board feet requiring one mile or less of road construction, the agency pointed to its expertise and prior experience with timber sales with "these characteristics," stating it "always found them to have no significant environmental effects." SAR_8. It made no specific statements regarding CE-6, nor did it suggest that CE-6 activities might include commercial logging. *See id.*; *see also* PAR_3168 (explaining that "the limitation on the size of timber harvests" in CE-4 had been lowered, but not discussing CE-6).

On review, the *Heartwood* court specifically noted the lack of any evidence in the record to support the huge increase in the board feet limit from the prior 100,000 limit, other than oblique references to agency "expertise and prior experience," and found that "the 2 ½ times increase [to 250,000] in the harvest limit for live trees is a classic example of an arbitrary decision." 73 F. Supp. 2d at 976. It concluded:

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

> The [Forest Service] * * * provides absolutely no other rationale to the Court to explain how and why the agency arrived at these figures. In addition, the [Forest Service] does not provide any documentation nor evidence regarding the details of these prior harvests nor the [Forest Service's] analysis of their environmental effects upon which they based their opinion.

*Id.* If the Forest Service failed to make an adequate finding that increasing the scale of commercial logging operations from 100,000 to 250,000 board feet under CE-4 would have no significant environmental impacts, it would be absurd to conclude that the same rulemaking provides the necessary basis for the agency to apply CE-6 to **large-scale** commercial logging projects many times the size of CE-4. *See* BBAR_186 (Baby Bear, by far the smallest of the Projects, is 44 times larger by volume than the live-tree harvest limit of CE-4).

*Bosworth* also benchmarks the requisite findings lacking in the CE-6 rulemaking. Specifically, an agency "must document that the action to be undertaken is insignificant." 510 F.3d at 1027. Even if the excluded actions' effects are "individually minor," the agency must ensure that they would not be "collectively significant." 510 F.3d at 1027–30. An agency must therefore "perform a programmatic cumulative impacts analysis," which "cannot merely consist of conclusory statements," when promulgating a CE. *Id.* at 1029. The rulemaking which produced CE-6 included no such analysis: The Forest Service did not document (or even assert) that commercial logging under CE-6 has no significant effect; it did not consider cumulative impacts, much less perform a rigorous programmatic analysis; and what analysis it **did** perform consisted largely of conclusory statements rather than detailed, quantitative information. *See Heartwood,* 73 F. Supp. 2d at 975 (discussing Forest Service's inadequate rulemaking record).

*Colorado Wild* further illustrates the bar the agency must clear to promulgate a NEPA-compliant CE. 435 F.3d at 1214–22. There, the agency had considered as part of the rulemaking record nearly 500 small-scale timber harvest projects that it determined had not caused significant impacts, and set acreage caps based on the mean acreages of the projects considered.

MEMORANDUM ISO MOTION FOR SUMMARY JUDGMENT—30

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

*Id.* at 1210–11. Nothing close to that level of analysis was present in the CE-6 rulemaking; there is simply no support **at all** for the application of CE-6 to commercial logging, much less on the scale of the Projects.

The Forest Service never made, much less supported, the required finding under 40 C.F.R. § 1508.4 that commercial logging under CE-6—which contains no acreage or volume cap—would cause no individually or cumulatively significant impacts. Thus, to the extent that CE-6 applies to commercial logging, the Forest Service lacked the authority to promulgate the rule. The application of CE-6 to the Projects therefore violates NEPA.

### 2. The Forest Service's Interpretation of NEPA Is Unreasonable.

If CE-6 permits the type and scale of commercial logging here, then the Forest Service necessarily interprets 40 C.F.R. § 1508.4's language regarding "categor[ies] of actions which do not individually or cumulatively have a significant effect on the human environment" to encompass large-scale commercial logging operations. This interpretation is manifestly unreasonable because it contradicts NEPA and its implementing regulations, and is inconsistent with the Forest Service's CE regulatory regime under which the agency has promulgated other, acreage-capped CEs specifically for commercial logging purposes.

"In discerning the meaning of regulatory language, [a court's] task is to interpret the regulation as a whole, in light of the overall statutory and regulatory scheme, and not to give force to one phrase in isolation." *Norfolk Energy, Inc. v. Hodel*, 898 F.2d 1435, 1442 (9th Cir. 1990). While Courts give the CEQ's interpretation of NEPA substantial deference, no such deference extends to other agencies. *United Keetoowah Band of Cherokee Indians in Okla. V. FCC*, 933 F.3d 728, 738 (D.C. Cir. 2019). Ultimately, "courts should reject interpretations which

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

produce an unjust, unreasonable, or absurd result." *Maceren v. Dist. Dir., Immigration & Naturalization Serv.*, 509 F.2d 934, 941 (9th Cir. 1974).

Interpreting 40 C.F.R. § 1508.4 to encompass large-scale commercial logging operations is flatly inconsistent with NEPA. When an agency applies a CE to a certain project, it bypasses important requirements that give effect to NEPA's lofty purpose and practical value. *See Robertson*, 490 U.S. at 350 (describing twin aims of NEPA: informed decisionmaking and meaningful public involvement). Thus, with a CE, the agency must complete the required analysis and disclosure at the rulemaking stage. *See Bosworth*, 510 F.3d at 1027–28; *see also* PAR_3697 (Forest Supervisor specifically instructing specialists to not complete "comprehensive effects analyses for CEs" because "there has already been a determination at higher levels of government that projects meeting the criteria for documentation in a Decision Memo do not cause significant [effects]"). Here, however, the Forest Service during rulemaking never made or disclosed any findings to support the assertion that large-scale commercial logging operations approved under CE-6 have no significant impacts. *See supra* pp. 27–31. Therefore, the application of CE-6 to such activities circumvents NEPA's two-fold purpose.

For one, applying CE-6 to the Projects means that 29,000 acres of commercial logging— authorized by the same Forest over a six-month timespan—was approved without the aid of detailed environmental review, undermining NEPA's purpose of "informed decisionmaking." *See WildEarth Guardians v. Mont. Snowmobile Ass'n.*, 790 F.3d 920, 927 (9th Cir. 2015) ("NEPA emphasizes the importance of coherent and comprehensive up-front environmental analysis to ensure informed decisionmaking[.]"). Perhaps most glaringly, the agency did not analyze the **cumulative** effects from the adjacent Baby Bear and Bear Wallow Projects. 40 C.F.R. §§ 1508.7, 1508.25. Indeed, there was specific direction from the Forest Supervisor **not** to

MEMORANDUM ISO MOTION FOR SUMMARY JUDGMENT—32

conduct such an analysis. PAR_3697. Under the Forest Service's flawed interpretation of 40

C.F.R. § 1508.4, the cumulative impacts of commercial logging under CE-6 will forever escape

review, an outcome fundamentally contrary to NEPA. *See Bosworth*, 510 F.3d at 1027.

Moreover, the Forest Service's approach similarly contravenes NEPA's corollary purpose

of public participation. *See* 40 C.F.R. § 1500.1(b); *California v. Block*, 690 F.2d 753, 770 (9th

Cir. 1982) (public comment procedures "are at the heart of the NEPA review process"). With a

CE, public comment opportunities and the flow of information between the agency and public

are severely circumscribed. *See West*, 206 F.3d at 930 n.14 (explaining that application of a CE

"preclude[s] the kind of public comment and participation NEPA requires in the EIS process");

SWAR_4058 (explaining that the South Warner scoping notice provided little information to

facilitate informed comment). Agencies must fully inform the public, through notice and

comment rulemaking, of a proposed CE's impacts **before** it is promulgated. *See* 40 C.F.R.

§ 1507.3; *Bosworth*, 510 F.3d at 1026–27. Without any ex-ante disclosure of—and opportunity

for comment on—the impacts of large-scale commercial logging, the application of CE-6 to

commercial logging projects cannot be squared with NEPA's public participation purpose. *See*

40 C.F.R. § 1500.1(b) ("[E]nvironmental information [must be made] available to public

officials and citizens before decisions are made and before actions are taken.").

Interpreting "no individually or cumulatively significant effect" as permitting large-scale

commercial logging also contradicts the Forest Service's own regulatory regime. In every

rulemaking addressing commercial logging, the agency always has determined that only small-

scale projects are permissible, with clearly delineated acreage caps a necessary condition. *See*

*supra* pp. 7–13. And even with quantified limits allowing only smaller-scale projects, courts still

MEMORANDUM ISO MOTION FOR SUMMARY JUDGMENT—33

have overturned logging CEs when the Forest Service failed to adequately demonstrate that projects of relatively small magnitude would have no significant impacts. *See supra* pp. 8–12.

Also instructive is the Forest Service's recent rulemaking, in which it failed to muster sufficient support for the proposition that commercial timber projects of over 2,800 acres have no significant impact. 85 Fed. Reg. at 73,627–28 (Ex. 11) (reducing CE-25 acreage limits from 7,300 to 2,800 to better reflect data in record). And, given the ongoing litigation, it is still unclear whether CE-25 will survive judicial review. *See Clinch Coal.*, No. 2:21-cv-00003-JPJ-PMS; *see also* SWAR_2933; SAR_73–74. The Projects here all exceed 2,800 acres—dramatically so in the cases of South Warner (by nearly six times) and Bear Wallow (by nearly four times). Against this regulatory backdrop, it is unreasonable for the Forest Service to take the position that commercial logging projects like these will not cause significant impacts.

CE-6 as applied to commercial logging operations on thousands of acres—with no upper limit—is unlawful because it is based on an unreasonable interpretation of NEPA and its implementing regulations, one that contradicts the statute and the agency's regulatory regime.

**B.      Wild's As-Applied Challenge to CE-6 Is Not Time-Barred.**

Defendants may argue that because CE-6 was promulgated in 1992, and codified in the Federal Register in 2008, any challenge to it is barred by the six-year statute of limitations. *See* 28 U.S.C. § 2401(a) (requiring civil action against the United States to be filed "within six years after the right of action first accrues"). However, Section 2401(a) is not jurisdictional. *See Cedars-Sinai Medical Ctr. v. Shalala*, 125 F.3d 765, 770 (9th Cir. 1997); *cf. United States v. Kwai Fun Wong*, 135 S. Ct. 1625 (2015). Traditional exceptions, such as equitable tolling, are therefore available. *See Forestkeeper*, 847 F. Supp. 2d at 1235. Moreover, the Ninth Circuit allows challenges to agency action beyond the six-year limit where the plaintiff (1) brings a

MEMORANDUM ISO MOTION FOR SUMMARY JUDGMENT—34

substantive challenge to an agency decision (2) as exceeding the agency's constitutional or statutory authority (3) within six years of the adverse application of the decision to the particular challenger. *Wind River Mining Corp. v. United States*, 946 F.2d 710, 715–16 (9th Cir. 1991); *see also Cal. Sea Urchin Comm'n v. Bean*, 828 F.3d 1046, 1050 (9th Cir. 2016).

In 1992, when CE-6 was first developed, or 2008, when it was codified in the Code of Federal Regulations, Wild could not have anticipated that the Forest Service planned to apply CE-6 to commercial logging projects, especially given the contemporaneous promulgation of several other CEs expressly for that purpose. It is not apparent from the regulatory language or the rulemaking record that such an application was contemplated. Even had Wild anticipated the issue, a facial challenge to CE-6's application to commercial logging operations would not have survived a host of defenses, including standing and ripeness. *See Summers v. Earth Island Inst.*, 555 U.S. 488, 497 (2009); *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 732 (1998). Wild's cause of action did not accrue until CE-6 was applied in a manner that harmed its interests; its as-applied challenge to CE-6 is not barred by the statute of limitations because the specific applications of CE-6 at issue occurred in the last six years, and Wild now challenges CE-6 as exceeding the Forest Service's authority to promulgate CEs. 28 U.S.C. § 2401(a). *Cal. Sea Urchin Comm'n*, 828 F.3d at 1050.

## CONCLUSION

For all of the foregoing reasons, Wild respectfully asks this Court to grant its *Motion for Summary Judgment*, hold unlawful and partially set aside the Projects—or, in the alternative, hold unlawful and set aside CE-6 as applied to commercial logging operations—and remand to the agency to comply with NEPA.

MEMORANDUM ISO MOTION FOR SUMMARY JUDGMENT—35

DATED this 25th day of January, 2023.


Respectfully submitted,

s/ Oliver J. H. Stiefel
Oliver J. H. Stiefel, OSB # 135436
(503) 227-2212 │ oliver@crag.org
Erin E. Hogan-Freemole, OSB # 212850
(503) 234-0788 │ erin@crag.org
Meriel L. Darzen, OSB # 113645
(503) 525-2725 │ meriel@crag.org
CRAG LAW CENTER
3141 E. Burnside St.
Portland, Oregon 97214
Fax: (503) 296-5454

*Attorneys for Plaintiffs*

MEMORANDUM ISO MOTION FOR SUMMARY JUDGMENT—A