IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

OREGON WILD and WILDEARTH
GUARDIANS,

        Plaintiffs,

v.

UNITED STATES FOREST SERVICE,
MICHAEL RAMSEY, JEANNETTE
WILSON, RANDY MOORE, and
THOMAS VILSACK,

        Defendants.

Case No. 1:22-cv-01007-MC

**OPINION & ORDER**

**MCSHANE, Judge**:

        Plaintiffs Oregon Wild and WildEarth Guardians bring this action for declaratory and injunctive relief against Defendant the U.S. Forest Service and Defendants Michael Ramsey, Jeannette Wilson, Randy Moore, and Thomas Vilsack in their official capacities. Plaintiffs allege that Defendants violated the Administrative Procedure Act ("APA") and the National Environmental Policy Act ("NEPA") in approving three commercial logging projects in the Fremont-Winema National Forest under a categorical exclusion known as CE-6. Compl. ¶ 1–2, ECF No. 1. Plaintiffs contend that the three projects, which authorize between 3,000 and 16,000 acres of commercial tree thinning, do not qualify for the exclusion. Additionally, Plaintiffs challenge the validity of CE-6 itself as applied to commercial logging operations. *Id.* ¶ 2.

1 – OPINION AND ORDER

Plaintiffs ask the Court to vacate the projects' approvals of commercial logging operations, declare such operations beyond the scope of CE-6, and remand to the agency for a full analysis of the projects' environmental impacts consistent with NEPA. *Id.* ¶ 7. Alternatively, Plaintiffs ask the Court to hold unlawful and set aside CE-6 as applied to commercial logging operations. *Id.* Plaintiffs and Defendants filed Motions for Summary Judgment on the claims in this case. ECF Nos. 16, 24. Because Defendants did not violate the APA or NEPA, and because Plaintiffs' challenge of CE-6 is time-barred, Plaintiffs' Motion for Summary Judgment (ECF No. 16) is DENIED and Defendants' Cross-Motion for Summary Judgment (ECF No. 24) is GRANTED.[1]

## BACKGROUND

NEPA "requires that federal agencies perform environmental analysis before taking any 'major Federal actions significantly affecting the quality of the human environment.'" *Env't Prot. Info. Ctr. v. Carlson ("EPIC")*, 968 F.3d 985, 987 (9th Cir. 2020) (quoting *Ctr. for Biological Diversity v. Salazar*, 706 F.3d 1085, 1094 (9th Cir. 2013)). Rather than dictating particular substantive results, NEPA establishes only procedural requirements to ensure that an agency carefully considers "detailed information concerning significant environmental impacts" in reaching its decision. *Id.* at 988 (quoting *Winter v. Nat. Res. Def.* Council, 555 U.S. 7, 23 (2008). An agency can comply with NEPA in three ways: by preparing an Environmental Impact Statement ("EIS"), by preparing an Environmental Assessment ("EA"), or through a categorical exclusion ("CE"). *Id.*

---

[1] Plaintiffs' Request for Judicial Notice, ECF No. 17, is granted for exhibits 1–5, 8, and 10–11 as they consist of excerpts from the Federal Register. *See* 44 U.S.C. § 1507 ("The contents of the Federal Register shall be judicially noticed."). Plaintiff's request as to exhibits 6–7 and 9 is denied because Plaintiffs failed to establish their relevance.

An EIS is required for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). If the significance of the effects of a proposed action is unknown, the agency instead prepares an EA to determine the effects of the proposed action. 40 C.F.R. § 1508.9.[2] The use of a CE is permitted for "actions which do not individually or cumulatively have a significant effect on the human environment and which have been found to have no such effect." *EPIC*, 968 F.3d at 988 (quoting 40 C.F.R. § 1508.4). An agency does not have to prepare an EIS or EA for actions that fall under a CE. *Id.*

The categorical exclusion at issue in this case, CE-6, allows for

> [t]imber stand and/or wildlife habitat improvement activities that do not include the use of herbicides or do not require more than 1 mile of low standard road construction. Examples include, but are not limited to:
>
> (i) Girdling trees to create snags;
> (ii) Thinning or brush control to improve growth or to reduce fire hazard including the opening of an existing road to a dense timber stand;
> (iii) Prescribed burning to control understory hardwoods in stands of southern pine; and
> (iv) Prescribed burning to reduce natural fuel build-up and improve plant vigor.

36 C.F.R. § 220.6(e)(6).

In December 2021 and May 2022, the Forest Service approved the South Warner Project, Baby Bear Project, and Bear Wallow Project ("the Projects") located in the Fremont-Winema National Forest under CE-6. SWAR 12097–111; BWAR 2897–2919. The purpose of the South Warner Project, which encompasses 69,567 acres, is wildlife habitat restoration. SWAR 12097. The Forest Service identified several species in the project area that would benefit from certain restoration activities, such as maintaining old trees and developing larger trees for bald eagles to

---

[2] Plaintiffs note that the Council on Environmental Quality ("CEQ") regulations were recently modified in 2020 and 2022. Pls.' Mot. Summ. J. 2., ECF No. 16. The Court will defer to Plaintiffs' reliance on the 1978 version of the regulations that were in place prior to those modifications.

3 – OPINION AND ORDER

nest, providing open habitat preferred by woodpeckers, improving riparian area conditions for yellow rail and western pond turtle to breed and nest, and promoting biodiversity and ecosystem function to improve foraging habitat and benefit monarch butterflies and other pollinators. *Id.* The Forest Service also expressed concern about the overpopulation of conifer trees in the area, creating negative impacts on other tree species and their habitats due to increased competition for resources, as well as the area's high risk for severe wildfires due to decades of fire suppression. *Id.* To achieve the Forest Service's goal of habitat restoration and address concerns regarding conifer overcrowding and wildfire risk, the Forest Service proposed a number of activities, including small tree thinning, prescribed burning, juniper cutting, meadow enhancement, stream restoration, and commercial sale of merchantable forest products. SWAR 12099–104. Of the 69,567 acres involved in South Warner, Defendants authorized 16,000 acres of commercial tree thinning. SWAR 12100.

The purpose of the Baby Bear Project, which encompasses 4,774 acres, is to improve forest stand conditions and wildlife habitat. BWAR 2897–98. The Forest Service found that the Baby Bear area has more than a sustainable amount of conifer trees, primarily lodgepole pine. BWAR 2897. Encroachment of the lodgepole pine stands "has resulted in an overcrowded stand, making this stand type highly susceptible to insect and disease as well as wildfire." *Id.* The Forest Service also identified concerns with fuel loading and wildlife habitats in the area. The primary species of concern is the mule deer, with known migration routes through the Baby Bear area. *Id.* Conifer trees have encroached meadow and riparian habitat areas, reducing plant diversity and forage availability. *Id.* These areas are important to mule deer, as well as elk, bear, bobcat, bats, and pollinator species. *Id.* The Forest Service cited to local research and wildlife habitat modeling showing that a large portion of the mule deer summer range in the area have

"low predicted mule deer use." *Id.* The research suggested reducing canopy cover by 40% and creating a forest edge to provide a more suitable habitat for the mule deer. BWAR 2897–98. To improve wildlife habitat and increase forest resilience, the Baby Bear Project proposed tree thinning and prescribed burning. BWAR 2898. For the overpopulated lodgepole pine stands specifically, the project's targeted thinning densities were set to reduce the risk of mountain pine beetle outbreaks and remove trees heavily infected with dwarf mistletoe. BWAR 2898–99. Of Baby Bear's 4,774 acres, the Forest Service authorized up to 3,000 acres of commercial thinning. BWAR 2898.

The Bear Wallow Project area is directly north of the Baby Bear Project area, with Baby Bear's northern border meeting a portion of Bear Wallow's southern border. BBAR 0035. The two projects have similar purposes and proposed activities. The Bear Wallow Project encompasses 17,200 acres, with an aim to improve forest stand conditions and wildlife habitat. BWAR 2908–09. Similar to Baby Bear, the Bear Wallow area has more conifer trees, primarily lodgepole pine, than ecologically sustainable. BWAR 2908. Conifer encroachment has left lodgepole pine stands highly susceptible to insect, disease, and wildfire. *Id.* The entire area is also high-risk for severe wildfires due to decades of consistent fire suppression. *Id.* Also like the Baby Bear area, mule deer are a primary species of concern here. Mule deer have known migration routes through the Bear Wallow area, but local research suggests that a large portion of the project area has low predicted mule deer use. BWAR 2909. Additionally, aspen stands in this area and meadow and riparian habitats have been encroached by conifer trees, in turn reducing plant diversity and forage availability. *Id.* As the Forest Service explained, "[a]spen stands are considered biodiversity hotspots." BWAR 2910. They are important for foraging and reproducing for several species, including elk, mule deer, bear, bobcat, bats, pollinators,

5 – OPINION AND ORDER

migratory birds, raptors, woodpeckers, and many cavity-nesting birds. BWAR 2908–10. To improve wildlife habitat conditions and increase forest resilience, the Forest Service proposed thinning and prescribed burning. BWAR 2909. Along with thinning of overpopulated lodgepole pine stands, the Bear Wallow Project would remove encroaching conifers among aspen stands to increase aspen regeneration and plant diversity for certain wildlife species. BWAR 2910–11. Of the 17,200 acres involved in Bear Wallow, the Forest Service authorized up to 10,000 acres of commercial thinning. BWAR 2909.

The Forest Service issued scoping notices for each project and Plaintiffs responded with comments, raising concerns regarding the scale of the projects and the Forest Services' authority to rely on a categorical exclusion for such large projects. SWAR 3643–46, 3656–3759, 4057–4127; BBAR 127, 139–78, 684–98; BWAR 1998, 2395–2420, 2821–34. The Forest Service reviewed public comments and ultimately approved the Projects under CE-6. Because the Forest Service approved the Projects under a categorical exclusion, it did not prepare an EIS or EA for any of the Projects. Instead, the Forest Service evaluated the enumerated resource conditions under 36 C.F.R. § 220.6(b)[3] and determined that no extraordinary circumstances existed that would warrant preparation of an EIS or EA and preclude the use of a categorical exclusion. For example, the Forest Service evaluated the potential effects of the Baby Bear and Bear Wallow Projects on the gray wolf, a federally listed endangered species, as well as the monarch butterfly,

---

[3] Resource conditions that should be considered in determining whether extraordinary circumstances related to a proposed action warrant further analysis and documentation in an EA or an EIS are:
    (i) Federally listed threatened or endangered species or designated critical habitat, species proposed for Federal listing or proposed critical habitat, or Forest Service sensitive species;
    (ii) Flood plains, wetlands, or municipal watersheds;
    (iii) Congressionally designated areas, such as wilderness, wilderness study areas, or national recreation areas;
    (iv) Inventoried roadless area or potential wilderness area;
    (v) Research natural areas;
    (vi) American Indians and Alaska Native religious or cultural sites; and
    (vii) Archaeological sites, or historic properties or areas.
36 C.F.R. § 220.6(b).

a candidate species for federal listing. BWAR 2901–03, 2913–15. A biological assessment revealed that the project may affect, but is not likely to adversely affect, the gray wolf and will have no effect on any other federally listed endangered species. BWAR 2903, 2913–15. Though some sensitive species and their habitats may be temporarily affected, the Baby Bear and Bear Wallow Projects were unlikely to contribute to a trend towards federal listing or loss of viability for any species. *Id.* For the South Warner Project, the Forest Service concluded that while the Project may have some short-term effects on certain sensitive plant species in the area, long-term impacts remained positive and would not result in a trend of federal listing or loss of viability for the sensitive plant species. SWAR 12105, 12108. Regarding fish and wildlife, the Forest Service identified a number of sensitive species in the area that may be impacted by the Project but determined, based on the biological evaluation, that the Project is not likely to contribute to a trend towards federal listing or loss of viability of the sensitive species. SWAR 12105–06.

Plaintiffs now challenge the Forest Service's use of CE-6 to approve the Projects, as well as the validity of CE-6 itself.

## LEGAL STANDARD

Judicial review of agency action is governed by the APA. 5 U.S.C. § 706. A reviewing court may set aside an agency's action if the action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "If an agency fails to consider an important aspect of a problem or offers an explanation for the decision that is contrary to the evidence, its action is arbitrary and capricious." *Or. Nat. Res. Council Fund v. Goodman*, 505 F.3d 884, 889 (9th Cir. 2007) (cleaned up). "An agency action is also arbitrary and capricious if the agency fails to 'articulate a satisfactory explanation for its action including a "rational connection between the facts found and the choice made."'" *Friends of Wild Swan,*

*Inc. v. U.S. Fish & Wildlife Serv.*, 12 F. Supp. 2d 1121, 1131 (D. Or. 1997) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

When reviewing an agency action under the arbitrary and capricious standard, the court must consider whether the agency's decision was "based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971). While the court's "inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency." *Id.* That said, the court may not simply "rubber-stamp the agency decision as correct." *N. Spotted Owl (Strix Occidentalis Caurina) v. Hodel*, 716 F. Supp. 479, 482 (W.D. Wash. 1988).

Because this Court's review under the APA is generally limited to the administrative record, no facts are in dispute. However, the parties have filed a Motion and Cross-Motion for Summary Judgment, which may be used as a vehicle for the Court to conduct its review of the record. Therefore, the Court's role is "to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769 (9th Cir. 1985).

## DISCUSSION

Plaintiffs bring two claims. First, they assert that CE-6 does not apply to projects involving this scale of commercial logging. Accordingly, Plaintiffs contend that the Forest Service's reliance on CE-6 to approve the Projects here was arbitrary and capricious. Alternatively, if CE-6 does allow the Projects' commercial logging operations, then Plaintiffs challenge the validity of CE-6 itself. They argue Defendants erred when promulgating CE-6 by

failing to make the required findings that commercial logging operations cause no individually or cumulatively significant environmental effects.

### I. Defendants' use of CE-6 to approve the Projects

"An agency's decision to invoke a categorical exclusion to avoid an EIS or EA is not arbitrary and capricious if 'the agency reasonably determined that a particular activity is encompassed within the scope of a categorical exclusion.'" *Mt. Cmtys. for Fire Safety v. Elliott*, 25 F.4th 667, 680 (9th Cir. 2022). "[A]n agency's interpretation of the meaning of its own categorical exclusion should be given controlling weight unless plainly erroneous or inconsistent with the terms used in the regulation." *Alaska Ctr. for Env't v. U.S. Forest Serv.*, 189 F.3d 851, 857 (9th Cir. 1999). CE-6 permits timber stand and wildlife habitat improvement activities, which include "[t]hinning or brush control to improve growth or to reduce fire hazard," so long as these activities "do not include the use of herbicides or do not require more than 1 mile of low standard road construction." 36 C.F.R. § 220.6(e)(6); *Mt. Cmtys.*, 25 F.4th at 680.

Plaintiffs argue that under no reasonable interpretation does CE-6 permit the type and scale of commercial logging approved by the Projects. Pls.' Mot. Summ. J. 24, ECF No. 16. They contend that Defendants acted arbitrarily and capriciously by failing to consider the scale of commercial logging authorized by the Projects and the environmental impacts that would inevitably result. Plaintiffs' argument is premised on the notion that the Forest Service, as well as courts, must consider two primary factors when deciding whether a project fits under a CE: type and scale. *Id.* at 22; Pls.' Resp. 16–23, ECF No. 31. Plaintiffs rely on *EPIC*, where the plaintiffs challenged the Forest Service's use of a categorical exclusion for road repair and maintenance to approve a project allowing private logging companies to fell and remove large fire-damaged trees up to 200 feet from either side of the road. 968 F.4th at 987. The Ninth Circuit explained

9 – OPINION AND ORDER

that "repair" and "maintenance" were common words with well-understood ordinary meanings, which included activities like resurfacing the culverts of a road, grading a road, clearing the roadside of brush, and resurfacing a road to its original condition. *Id.* at 990. The court determined that "[a] CE of such limited scope cannot reasonably be interpreted to authorize a Project such as the one before [it], which allows commercial logging of large trees up to 200 feet away from either side of hundreds of miles of Forest Service roads." *Id.* Though the Forest Service referred to all of the trees to be felled as "hazard trees," the court noted that a number of the trees would not come close to a road even if they fell directly toward it. *Id.* While the repair and maintenance CE surely would allow felling a dangerous tree right next to the road, the project in *EPIC* "allow[ed] the felling of many more trees than that." *Id.*

More recently, the Ninth Circuit interpreted the scope of CE-6, the exclusion at issue here, in *Mountain Communities*. There, the Forest Service authorized a project under CE-6 aimed at addressing overcrowding of trees and vegetation, which allowed for 601 acres of commercial tree thinning. *Mt. Cmtys.*, 25 F.4th at 673. The Forest Service argued that CE-6 applied because thinning is a timber stand improvement activity, while the plaintiffs argued that CE-6 permitted thinning of only precommercial saplings rather than larger, commercially viable trees. *Id.* at 675. The court employed traditional rules of statutory construction to interpret CE-6, and ultimately concluded that "[t]he plain language of CE-6 is clear. It does not limit activities based on tree age or size." *Id.* at 676. The court found no exception for commercial thinning in the text of CE-6, and found that "timber stand improvement" under CE-6 was broad in definition. *Id.* 676–78. Based on that understanding, the court found the Forest Service reasonably determined that a project authorizing thinning to reduce "stand density, competing vegetation, and fuels" with no use of herbicides or road construction fell within the scope of CE-6. *Id.* at 680.

10 – OPINION AND ORDER

Because Plaintiffs here argue that "CE-6 cannot be reasonably interpreted to allow thousands of acres of commercial logging," the Court follows the framework in *Mountain Communities* to determine the reasonable interpretation of CE-6. *See* Pls.' Mot. 27. "Regulations are interpreted according to the same rules as statutes, applying traditional rules of construction." *Mt. Cmtys.*, 25 F.4th at 676 (quoting *Minnick v. Comm'r of Internal Revenue*, 796 F.3d 1156, 1159 (9th Cir. 2015)). "[T]he starting point of our analysis must begin with the language of the regulation." *Id.* (quoting *Wards Cove Packing Corp. v. Nat'l Marine Fisheries Serv.*, 307 F.3d 1214, 1219 (9th Cir. 2002)).

The Ninth Circuit already determined that the language of "CE-6 unambiguously allows commercial thinning." *Id.* at 675. Plaintiffs therefore cannot credibly attack the Projects based solely on their use of commercial thinning. Instead, they challenge the Projects based on acreage, arguing that the 3,000 to 16,000 acres of commercial thinning under the Projects cannot be categorically excluded under CE-6.[4] Like the Ninth Circuit in *Mountain Communities*, the Court finds the plain language of CE-6 clear on this issue. It contains no acreage limit. Plaintiffs point to nothing in CE-6's text that would suggest activities under this exclusion are limited by number of acres. Instead, CE-6 limits the scope of timber stand and wildlife habitat improvement activities by prohibiting the use of herbicides and more than one mile of low standard road construction.

Plaintiffs urge the Court to follow the reasoning in *EPIC* and its progeny. *See* Pls.' Mot. 22. But those cases involved an entirely different categorical exclusion with different limiting criteria. The court in *EPIC* invalidated a project involving commercial logging of large trees up to 200 feet away from either side of hundreds of miles of roads because under no reasonable

---

[4] Plaintiffs do not challenge any other proposed activity aside from the commercial thinning involved in the Projects.

11 – OPINION AND ORDER

interpretation would such activity come within a CE for road "repair and maintenance." 968 F.3d at 991. The court explained that even under the CE's example allowing the clearing of roadside brush, the project would allow for removal of trees that did not come close to a road even if they fell directly toward it. *Id.* at 990. The project there included activities that were too far removed from those activities permitted under the categorical exclusion at issue.

In contrast, it is apparent that the activities involved in the Projects here fall squarely within those permitted by CE-6. Each of the Projects aim to improve timber stand and/or wildlife habitat by means of thinning and prescribed burning. The Forest Service explained how the overpopulation and encroachment of conifer trees negatively impacts the growth of other more desirable tree species as well as various wildlife habitats. The Forest Service found that all three Projects would promote improved timber stand conditions, reduce risk of insect infestation and disease, and reduce fuel loads. Additionally, for the South Warner Project, the Forest Service identified a number of habitats that would benefit from tree thinning. For example, thinning trees would provide more open habitat preferred by woodpeckers and improve riparian area conditions for yellow rail and western pond turtle to breed and nest. The Baby Bear and Bear Wallow Projects also identified the mule deer as a species that would enjoy improved habitat as a result of thinning overcrowded conifer trees.

As the Ninth Circuit recently explained, an agency does not act arbitrarily and capriciously "if the agency reasonably determined that a particular activity is encompassed within the scope of a categorical exclusion." *Mt. Cmtys.*, 25 F.4th at 680. Based on the plain language of CE-6, which contains no acreage limit, the Forest Service reasonably determined that thinning to improve wildlife habitat and favorable timber stand conditions fell within the scope of CE-6. *See also Alaska Ctr. for Env't*, 189 F.3d at 857 ("An agency's interpretation of

12 – OPINION AND ORDER

the meaning of its own categorical exclusion should be given controlling weight unless plainly erroneous or inconsistent with the terms used in the regulation.").

Plaintiffs urge the Court to infer an acreage limit in CE-6 based on other categorical exclusions involving commercial logging with acreage limits. Plaintiffs argue that allowing this extent of commercial logging under CE-6 would render other categorial exclusions pertaining to timber harvest with acreage limits meaningless. The Ninth Circuit rejected the argument that other exclusions implicitly limit CE-6 in *Mountain Communities*. *See* 25 F.4th at 679–80 ("[I]n selecting a CE for a project, the Forest Service only needs to cite and rely on one CE, even if other CEs may apply."); *see also Earth Island Inst. v. Elliott*, 318 F. Supp. 3d 1155, 1180–81 (E.D. Cal. 2018) ("CEs may overlap," and the fact that a project fits into one CE "does not mean that it could not also have fit into another one"). Nor is the Court persuaded by Plaintiffs' appeal to the regulatory history of CE-6 or the purpose of categorical exclusions generally. As the Ninth Circuit explained, when the "words of a [regulation] are unambiguous, then, this first canon [of relying on the text of the statute or regulation] is also the last: judicial inquiry is complete." *Mt. Cmtys.*, 25 F.4th at 676–77 (alterations in original) (quoting *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 254 (1992)); *see also id.* at 677 n.4 ("When the language is clear as it is here, we need not look to "history" or "purpose" of a regulation.").

Because CE-6 on its face permits commercial thinning for timber stand and wildlife habitat improvement and contains no acreage limit, the Forest Service did not act arbitrarily and capriciously in approving the Projects under CE-6.

## II. Validity of CE-6

Plaintiffs next argue that if CE-6 allows commercial logging of this scale, then CE-6 itself is "fatally flawed" because the Forest Service never determined that commercial logging

13 – OPINION AND ORDER

has no significant impacts when it promulgated CE-6, which violates the requirements of NEPA. Pls.' Mot. 27.

The Council of Environmental Quality ("CEQ") promulgates regulations pursuant to NEPA, one of which requires agencies to "identify categories of actions which do not individually or cumulatively have a significant effect on the human environment," otherwise known as categorical exclusions. *Alaska Ctr. for the Env't*, 189 F.3d at 857 (citing 40 C.F.R. §§ 1507.3(b)(2)(ii), 1508.4). The categories of actions must "have been found to not have individual or cumulative effects on the environment." *Heartwood, Inc. v. U.S. Forest Serv.*, 73 F. Supp. 2d 962, 976 (S.D. Ill. 1999).

Plaintiffs argue that, during rulemaking, the Forest Service never made the required finding that commercial logging authorized under CE-6 would have no significant individual or cumulative environmental effects. Pls.' Mot. 29–30. Plaintiffs assert that, in fact, the Forest Service made no specific statements at all regarding CE-6, nor was there any mention that CE-6 might include commercial logging. *Id.*

Defendants argue that Plaintiffs' challenge to the 1992 rulemaking of CE-6 is time-barred.[5] The statute of limitations for challenges to an agency action under the APA is six years after the right of action first accrues. 28 U.S.C. § 2401(a); *Wind River Mining Corp. v. United States*, 946 F.2d 710, 713–14 (9th Cir. 1991). Defendants claim that Plaintiffs' challenge to CE-6's promulgation accrued in 1992 and, accordingly, Plaintiff's challenge is time-barred.

Plaintiffs respond that traditional exceptions to the statute of limitations, such as equitable tolling, are available here. Pls.' Mot. 34. Namely, Plaintiffs rely on an exception to the

---

[5] The Court does not address Defendants' alternative argument that Plaintiffs failed to administratively exhaust this claim.

14 – OPINION AND ORDER

six-year statute of limitations for claims in which a plaintiff asserts that an agency acted in excess of its statutory authority. *Id.* at 35.

> Under *Wind River*, challenges to a "mere procedural violation in the adoption of a regulation or other agency action" must be brought within six years of the agency rulemaking, whereas challenges to "the substance of an agency's decision as exceeding constitutional or statutory authority" may be brought any time "within six years of the agency's application of the disputed decision to the challenger."

*Perez-Guzman v. Lynch*, 835 F.3d 1066, 1077 (9th Cir. 2016) (quoting *Wind River*, 946 F.2d at 715-16)). Whether Plaintiffs' second claim here is timely "therefore depends on whether [it is] procedural or substantive." *Id.*

Plaintiffs rely on *California Sea Urchin Commission v. Bean*, 828 F.3d 1046 (9th Cir. 2016) for support that their claim is a substantive challenge. There, Congress passed Public Law 99-625 to "improve the operation of certain fish and wildlife programs." *Id.* at 1047. Specifically, the Act authorized the U.S. Fish and Wildlife Service to develop a plan for the relocation and management of a threatened species of sea otter. *Id.* The agency subsequently promulgated a rule in 1987 that implemented a recovery program for the sea otter species. *Id.* Recognizing that the experimental program may fail, the agency included in the 1987 rule five termination criteria that would permit the agency to terminate the program. *Id.* at 1048. The program did in fact suffer many failures, and in 2012, the agency promulgated a rule terminating the program based on application of the 1987 rule's termination criteria. *Id.* The plaintiffs filed suit in 2013, alleging that the program's termination exceeded the agency's statutory authority under Public Law 99-625 because Congress only gave the agency the authority to implement the program, not terminate it, and Congress did not authorize the termination criteria in the 1987 rule. *Id.* The Ninth Circuit held that the operative agency action challenged was the 2012 program termination, and the plaintiffs' claim was therefore timely. *Id.* at 1049. The court

15 – OPINION AND ORDER

explained that the plaintiffs were not challenging the 1987 establishment of the failure criteria, but rather the separate termination decision that the agency made in 2012 as exceeding the agency's authority under Public Law 99-625. *Id.* at 1050.

Plaintiffs here "challenge[] CE-6's application to large-scale commercial logging as in excess of the Forest Service's authority." Pls.' Resp. 36. Specifically, they assert that "the Forest Service's promulgation of CE-6—without finding that its application to commercial logging would have no significant impact—directly conflicted with NEPA and the CEQ regulations and exceeded agency authority, as does its application to the Projects at issue here." *Id.* at 38–39. Plaintiffs categorize their claim as a substantive, as-applied challenge that would fall under the *Wind River* exception rather than a procedural challenge. They challenge the Forest Service's recent application of CE-6 to approve large-scale commercial logging projects, arguing that the Forest Service exceeded its authority under NEPA by failing to make the required finding of no significant impact.

After reviewing the relevant case law, the Court is not convinced that Plaintiffs' claim falls within the *Wind River* exception. The flaw in Plaintiffs' argument is that NEPA is a procedural statute. NEPA directs agencies to create categorical exclusions and requires certain procedures for doing so. *See Alaska Ctr. for the Env't*, 189 F.3d at 857. It does not dictate specific substantive results. *See EPIC*, 968 F.3d at 988 ("NEPA itself does not mandate particular results. Instead, NEPA imposes only procedural requirements."). Plaintiffs' claim—that Defendants violated the *procedural* requirements of NEPA by failing to abide by a certain process—is necessarily a procedural claim.

Plaintiffs argue that NEPA being a procedural statute is irrelevant to whether their claim is substantive. Pls.' Resp. 40. The Court disagrees. The Ninth Circuit in *California Sea Urchin*,

for example, determined that the plaintiffs' claim against the agency's 2012 decision was a separate, substantive claim because it challenged the agency's authority to make that decision under Public Law 99-625, an act of Congress which imposed substantive parameters on the agency. NEPA, in contrast, imposes only procedural requirements on the Forest Service. Though Plaintiffs attempt to frame their claim as the Forest Service exceeding its statutory authority under NEPA, Plaintiffs cannot claim that the Forest Service lacked authority to promulgate CE-6. NEPA expressly directs the Forest Service to create categorical exclusions. Instead, Plaintiffs claim the Forest Service violated the process that NEPA mandates for the promulgation of categorical exclusions. This is not "a substantive challenge to an agency decision alleging lack of agency authority." *See Wind River*, 946 F.2d at 716; *see also Sierra Club v. Bosworth*, 510 F.3d 1016, 1024 (9th Cir. 2007) ("The invalidity of the CE flows from the NEPA violation, not from the application of the CE."). Instead, Plaintiffs raise a "procedural violation in the adoption of a regulation." *Wind* River, 946 F.2d at 715. Additionally, the Court notes that none of the many cases Plaintiffs relied on in their briefing applied the *Wind River* exception to a procedural NEPA claim. *See Cal. Sea Urchin Comm'n v. Bean*, 828 F.3d 1046 (9th Cir. 2016); *Perez-Guzman v. Lynch*, 835 F.3d 1066 (9th Cir. 2016); *Ctr. for Biological Diversity v. Salazar*, 695 F.3d 893 (9th Cir. 2012); *N. County Cmty. Alliance, Inc. v. Salazar*, 573 F.3d 738 (9th Cir. 2009); *Nw. Envtl. Advocates v. EPA*, 537 F.3d 1006 (9th Cir. 2008); *Forestkeeper v. Tidwell*, 847 F. Supp. 2d 1217 (E.D. Cal. 2012); *NRDC v. Evans*, 232 F. Supp. 2d 1003 (N.D. Cal. 2002).

Because the *Wind River* exception does not apply here, Plaintiffs' challenge to the improper promulgation of CE-6 accrued in 1992. Plaintiffs' second claim is therefore time-barred.

17 – OPINION AND ORDER

**CONCLUSION**

For the above reasons, Plaintiffs' Motion for Summary Judgment (ECF No. 16) is DENIED and Defendants' Cross-Motion for Summary Judgment (ECF No. 24) is GRANTED.

IT IS SO ORDERED.

DATED this 4th day of August, 2023.

                                                s/Michael J. McShane
                                                **Michael J. McShane**
                                                **United States District Judge**