Oliver J. H. Stiefel, OSB # 135436
(503) 227-2212 │ oliver@crag.org
Meriel L. Darzen, OSB # 113645
(503) 525-2725 │ meriel@crag.org
CRAG LAW CENTER
3141 E. Burnside St.
Portland, Oregon 97214
Fax: (503) 296-5454

Erin Hogan-Freemole, OSB # 212850
(971) 417-5851 │ ehoganfreemole@wildearthguardians.org
WILDEARTH GUARDIANS
213 SW Ash Street, Suite 202
Portland, OR 97204
        *Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

### MEDFORD DIVISION

|  |  |
|---|---|
| **OREGON WILD**, an Oregon nonprofit corporation; **WILDEARTH GUARDIANS**, a New Mexico nonprofit corporation, and GO Alliance, an Oregon nonprofit corporation; | Case No. 1:22-cv-01007-MC |
| Plaintiffs, | **FIRST AMENDED/SUPPLEMENTAL COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| v. | (5 U.S.C. § 706(2)) |
| **UNITED STATES FOREST SERVICE**, **MICHAEL RAMSEY**, in his official capacity as Lakeview Ranger District Ranger; **JEANNETTE WILSON**, in her official capacity as Silver Lake Ranger District Ranger; **TOM SCHULTZ**, in his official capacity as Chief of the U.S. Forest Service; and **BROOKE ROLLINS**, in her official capacity as Secretary of Agriculture,[1] | (Environmental Matters – National Environmental Policy Act and Administrative Procedure Act) |
| Defendants. |  |

---

[1] Mr. Shultz and Ms. Rollins have been substituted pursuant to Fed. R. Civ. P. 25(d)

## GLOSSARY OF TERMS

| | |
|---|---|
| Agency | United States Forest Service |
| APA | Administrative Procedure Act |
| CE | Categorical Exclusion |
| CE-6 | 36 C.F.R. § 220.6(e)(6) |
| CEQ | Council on Environmental Quality |
| Defendants | All named Defendants |
| EA | Environmental Assessment |
| EIS | Environmental Impact Statement |
| Forest | Fremont-Winema National Forest |
| Forest Service | United States Forest Service |
| Girdling | A method of killing trees without cutting them down. This method is often used to create "snags," which are standing, dead trees that provide important habitat for a variety of wildlife. |
| Impact or Effect | Used synonymously to describe ecological, aesthetic, historic, cultural, economic, social, or health consequences of an action, whether direct, indirect, or cumulative. "Direct" effects are caused by an action and occur at the same time and place. "Indirect" effects are caused by an action and are later in time or farther removed in distance. "Cumulative" effects result from the incremental effect of an action when added to other past, present, and reasonably foreseeable future actions. |
| Logging | Any silvicultural method employed for the purpose of cutting down trees. Logging can be accomplished through commercial or noncommercial means, and can involve a variety of techniques including "thinning," "clearcutting," etc. Logging operations can involve felling trees, skidding felled trees to landings, building and maintaining roads, hauling logs on roads, and other associated activities. |
| NEPA | National Environmental Policy Act |
| Plaintiffs | All named Plaintiffs |
| Projects | South Warner, Baby Bear, Bear Wallow |

AMENDED/SUPPLEMENTAL COMPLAINT FOR
DECLARATORY & INJUNCTIVE RELIEF—1

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

**NATURE OF ACTION**

1.      Plaintiffs Oregon Wild and WildEarth Guardians ("Wild") and GO Alliance (collectively, "Plaintiffs") bring this challenge under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706, to the final administrative actions of the United States Forest Service, Michael Ramsey, Jeanette Wilson, Randy Moore, and Thomas Vilsack (collectively, "Forest Service," "agency," or "Defendants") with respect to 36 C.F.R. 220.6(e)(6).

2.      Adopted by the Forest Service in 1992, CE-6 is a categorical exclusion ("CE") from full environmental review under the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321, *et seq.* (2022), for "timber stand and wildlife habitat improvement activities." 36 C.F.R. § 220.6(e)(6).

3.      CEs apply to categories of small, low-impact, and routine actions that the Forest Service has determined—in notice and comment rulemaking—pose no significant environmental effects either individually or cumulatively, and therefore require no further analysis under an Environmental Impact Statement ("EIS") or Environmental Assessment ("EA"). *See* 40 C.F.R. § 1508.4 (2019).

4.      The Forest Service historically used CE-6 for smaller-scale and/or non-commercial projects, but recently began using CE-6 for projects involving larger-scale, commercial logging operations. These larger-scale commercial projects involve, *inter alia*, the cutting and removal of large, merchantable trees; the construction and use of skid trails and log landings, where cut trees are dragged to storage areas for future transport; the construction, reconstruction, and/or maintenance of tens if not hundreds of miles of roads; the use of roads for log hauling; and the use of heavy machinery and equipment ordinarily not needed for smaller scale and/or non-commercial projects.

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

5.      Among other impacts, these types of activities can disturb soils, impair water quality, destroy or fragment wildlife habitat, and release stored carbon into the atmosphere.

6.      In the notice and comment rulemaking that produced CE-6, the Forest Service never found that these types of activities create no significant environmental effects, either individually or cumulatively. Its promulgation and use of CE-6 for commercial logging therefore conflict with NEPA's central mandate: Agencies must analyze and disclose the environmental consequences of their actions.

7.      In 2021 and 2022, the Fremont-Winema National Forest (the "Forest") approved three commercial logging projects under CE-6: South Warner, Bear Wallow, and Baby Bear (collectively, the "Projects"). Upon information and belief, the Forest has imminent plans to approve other CE-6 commercial logging projects.

8.      In its original complaint, Wild alleged that, in approving the South Warner Project, the Bear Wallow Project, and the Baby Bear Project on the Forest, Defendants acted arbitrarily, capriciously, and contrary to NEPA. Wild also brought an as-applied challenge to CE-6, under which each of the Projects was approved.

9.      The Projects all authorize "commercial thinning," a type of logging whereby merchantable trees are cut and removed from the forest for their commercial value. In total, the Projects authorize commercial thinning on up to 29,000 acres, or about 45 square miles. Wild challenged the Forest Service's reliance on CE-6 to authorize the Projects' commercial logging operations on two grounds.

10.     First, Wild challenged the applicability of CE-6 to the Projects on grounds that the Forest Service failed to articulate a rational explanation as to why CE-6 covers projects of the type and scale of the Projects, each of which involve thousands of acres of commercial logging

operations. Wild alleged that the Forest Service was required to prepare EISs or EAs, which would force the agency to take the required "hard look" at—and publicly disclose—the Projects' environmental impacts, consider alternatives, solicit informed public comments, and fulfill the agency's other obligations under NEPA.

11.    On August 4, 2023 this Court issued an Opinion and Order rejecting this claim and ruling in favor of the Forest Service. ECF No. 40. On September 25, 2024, the Ninth Circuit Court of Appeals affirmed in a Memorandum Disposition. *Or. Wild, et al. v. USFS, et al.*, No. 23-35579, ECF No. 57-1.

12.    Second, in the alternative, Wild argued that if CE-6 does permit the Forest Service to approve the Projects' commercial logging operations, then CE-6 itself violates NEPA and its implementing regulations, 40 C.F.R. §§ 1500–1508 (2019). As applied to commercial logging operations like those authorized by the Projects, the Forest Service acted arbitrarily, capriciously, and in excess of its authority in promulgating CE-6 because the agency never made the required findings that commercial logging operations cause no individually or cumulatively significant environmental effects. Moreover, an interpretation of "no cumulatively or individually significant effect" as permitting commercial logging operations on thousands of acres—with no upper limit—flatly contradicts the language and purpose of NEPA and its implementing regulations, and is inconsistent with the Forest Service's CE regulatory regime— in which the agency has promulgated CEs specifically for commercial logging purposes, all with acreage caps.

13.    In its Opinion and Order, this Court held that Wild's claim accrued when CE-6 was promulgated in 1992 and was thus barred by the statute of limitations. ECF No. 40. It did not reach the claim's merits. *Id.*

AMENDED/SUPPLEMENTAL COMPLAINT FOR
DECLARATORY & INJUNCTIVE RELIEF—4

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

14.     The Ninth Circuit reversed. Subsequent to this Court's Opinion and Order, the U.S. Supreme Court in *Corner Post, Inc. v. Board of Governors of the Federal Reserve System* ("*Corner Post*"), held that an APA claim does not accrue for purposes of 28 U.S.C. § 2401(a) until the plaintiff is injured by final agency action. 603 U.S. 799 (2024). The Ninth Circuit therefore remanded "Wild's second claim to the district court to apply *Corner Post* in the first instance to determine whether this claim is time-barred." No. 23-35579, Memorandum at 7, ECF No. 57-1.

15.     The Circuit Court mandate issued on November 18, 2024.

16.     Plaintiffs now file this Amended/Supplemental Complaint to conform the pleadings to the Supreme Court's intervening authority and the remand instructions from the Ninth Circuit, and to add a new party.

17.     Plaintiffs Oregon Wild and WildEarth Guardians maintain their indirect challenge to CE-6 vis-à-vis the Forest Service's final agency actions approving the Project's commercial logging operations via CE-6. Under *Corner Post*, this claim did not accrue until Plaintiffs were injured by the application of CE-6 in a manner that harmed Wild's interests. This did not occur until the Projects were approved in 2021 and 2022, and thus this challenge is well within the statute of limitations.

18.     Plaintiffs Oregon Wild, WildEarth Guardians, and GO Alliance now also bring a direct challenge to the Forest Service's final agency action when it adopted CE-6. Under *Corner Post*, this claim, too, only accrued once Plaintiffs were injured by the application of CE-6 in a manner that harmed Plaintiffs' interests. This did not occur until the Projects were approved in 2021 and 2022, and thus this challenge is well within the statute of limitations.

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

19.     On the merits, both claims for relief advance the same argument: the Forest Service acted in excess of its authority in adopting a CE for activities the agency has never determined cause no individually or cumulatively significant impacts. Moreover, interpreting "no individually or cumulatively significant effect" to encompass commercial logging operations on thousands of acres—with no upper limit—flatly contradicts the language and purpose of NEPA and its implementing regulations.

20.     As to remedy for the second claim for relief, Wild respectfully requests that this Court vacate the Projects' approvals of commercial logging operations and hold unlawful and set aside CE-6 as applied to commercial logging operations on the scale of the Projects.

21.     As to remedy for the third claim for relief, Plaintiffs respectfully request that this Court hold unlawful and partially set aside CE-6 and declare it *ultra vires* as applied to commercial logging operations.

22.     If necessary, Plaintiffs intend to seek narrowly tailored injunctive relief during the pendency of this litigation to protect sensitive species and their habitats and other resources that are adversely affected by commercial logging operations.

23.     Should they prevail, Plaintiffs will seek attorneys' fees and costs pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412, and/or any other applicable authorities.

## JURISDICTION AND VENUE

24.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiffs' claims present a federal question, and 28 U.S.C. § 1346 because the United States is a defendant. A present, actual, and justiciable controversy exists between the parties. The requested relief for a declaratory judgment is proper under 28 U.S.C. § 2201, and the requested injunctive relief is proper under 28 U.S.C. § 2202.

AMENDED/SUPPLEMENTAL COMPLAINT FOR
DECLARATORY & INJUNCTIVE RELIEF—6

25.     Plaintiffs have exhausted their administrative remedies, to the extent any such requirement exists. As to the second claim for relief, Wild has exhausted its administrative remedies by submitting scoping comments on the three Projects. In the alternative, exhaustion is not required because there are no administrative appeal procedures for CEs. As to the third claim for relief, there is no administrative exhaustion requirement for challenging 36 C.F.R. 220.6(e)(6), which was adopted through formal notice and comment rulemaking.

26.     The challenged agency actions are subject to this Court's review under 5 U.S.C. §§ 702, 704, and 706. Defendants have waived sovereign immunity in this matter pursuant to 5 U.S.C. § 702.

27.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because the Project areas are located within this District. Defendants maintain an office in this District. Plaintiffs Oregon Wild, WildEarth Guardians, and GO Alliance maintain offices in this District.

28.     This case is properly filed in the Medford Division pursuant to Local Rule 3-2 because a substantial part of the Project area, and Defendants' offices where the decisions were signed, are located in Lake County. A substantial part of the events or omissions giving rise to this claim occurred, and the property that is subject to this action is situated in Lake and Klamath Counties.

## PARTIES

### Plaintiffs

29.     Plaintiff OREGON WILD is a nonprofit corporation with approximately 20,000 members and supporters throughout the state of Oregon and the Pacific Northwest. Oregon Wild is headquartered in Portland, Oregon and maintains field offices in Bend, Eugene, and Enterprise, Oregon. Oregon Wild's mission is to protect and restore Oregon's wildlands,

*Crag Law Center
3141 E Burnside St.
Portland, OR 97214
Tel. (503) 227-2212*

wildlife, and waters as an enduring legacy. Oregon Wild's wilderness, old-growth forest, and clean rivers/watersheds programs protect pristine drinking water, unparalleled recreation opportunities, and vital fish and wildlife habitat across Oregon.

30.    Plaintiff WILDEARTH GUARDIANS is a nonprofit organization dedicated to protecting and restoring the wildlife, wild places, wild rivers, and health of the American West. WildEarth Guardians has 7,990 members and more than 187,000 supporters across the western states and maintains an office in Portland, Oregon.

31.    Plaintiff GO ALLIANCE (dba Green Oregon) is a nonprofit organization that works toward resilient fire-adapted communities, protected forests, and clean waters. With thousands of members and supporters in Oregon, Washington, and throughout the West and North America, Go Alliance envisions an Oregon that has resilient rural communities, healthy intact forests, and safe drinking water. Go Alliance taps the expertise of people working with fire in forests and across communities to inform people to take action to live and thrive.

32.    Plaintiffs and their members, supporters, and staff regularly visit and enjoy the Forest, including the Project areas, and intend to do so again in the near future. Members, supporters, and staff appreciate the aesthetics of the Forest, including its waters and wildlife, and use the area to engage in recreational, professional, scientific, and spiritual activities such as hunting, hiking, camping, fishing, photography, watershed research, and wildlife observation.

33.    Plaintiffs have organizational interests in the proper and lawful management of the Forest. Plaintiffs and their members, supporters, and staff have actively participated in the Projects' administrative processes.

34.    Plaintiffs and their members, supporters, and staff would sustain injury to their aesthetic, educational, recreational, professional, spiritual, and scientific interests if the Projects

AMENDED/SUPPLEMENTAL COMPLAINT FOR
DECLARATORY & INJUNCTIVE RELIEF—8

proceed as authorized. Plaintiffs and their members, supporters, and staff have concrete plans to return to the proposed Project areas. Unless this Court grants the requested relief, Plaintiffs and their members, supporters, and staff will be adversely and irreparably harmed by the Projects.

35.    Plaintiffs and their members, supporters, and staff would sustain injury to aesthetic, educational, recreational, professional, spiritual, and scientific interests if the Forest Service is permitted to authorize commercial logging operations under CE-6. Unless this Court grants the requested relief, Plaintiffs and their members, supporters, and staff will be adversely and irreparably harmed by the application of CE-6 to commercial logging operations.

**Defendants**

36.    Defendant the UNITED STATES FOREST SERVICE is an agency within the United States Department of Agriculture entrusted with the management of our national forests. The Forest Service is headquartered in Washington, D.C., and it has nine regions across the country. The national forests of Oregon are in Region 6. All or a significant portion of the actions and omissions alleged in this Complaint occurred in Region 6.

37.    Defendant MICHAEL RAMSEY is the District Ranger for the Lakeview Ranger District of the Forest, where all or a significant portion of the South Warner Project activities would occur. Mr. Ramsey is the responsible official for the South Warner Project, and he signed the Decision Memorandum, constituting the final administrative action. As District Ranger, Mr. Ramsey has the responsibility to ensure that all projects on the Lakeview Ranger District are consistent with applicable laws and regulations. Wild brings this action against Mr. Ramsey in his official capacity.

38.    Defendant JEANNETTE WILSON is the District Ranger for the Silver Lake Ranger District of the Forest, where all or a significant portion of the Bear Wallow and Baby

AMENDED/SUPPLEMENTAL COMPLAINT FOR
DECLARATORY & INJUNCTIVE RELIEF—9

*Crag Law Center
3141 E Burnside St.
Portland, OR 97214
Tel. (503) 227-2212*

Bear Project activities would occur. Ms. Wilson is the Responsible Official for the Bear Wallow and Baby Bear Projects, and she signed the Decision Memoranda, constituting the final administrative actions. As District Ranger, Ms. Wilson has the responsibility to ensure that all projects on the Silver Lake Ranger District are consistent with applicable laws and regulations. Wild brings this action against Ms. Wilson in her official capacity.

39.    Defendant TOM SCHULTZ is the Chief of the Forest Service. Under a predecessor Chief, the Forest Service promulgated the CE challenged in this case. As Chief, Mr. Schultz has the responsibility to ensure that all regulations promulgated by the Forest Service are consistent with applicable laws and regulations. Wild brings this action against Mr. Schultz in his official capacity.

40.    Defendant BROOKE ROLLINS is the Secretary of Agriculture. Under a predecessor Secretary, the Forest Service promulgated the CE challenged in this case. As Secretary, Ms. Rollins has the responsibility to ensure that all regulations promulgated by all Agriculture Department agencies, including the Forest Service, are consistent with applicable laws and regulations. Wild brings this action against Ms. Rollins in his official capacity.

## **LEGAL BACKGROUND**

### **National Environmental Policy Act**

41.    Congress enacted NEPA to "declare a national policy which will encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and

welfare of man; [and] to enrich the understanding of the ecological systems and natural resources important to the Nation." 42 U.S.C. § 4321.[2]

42.     To achieve these aims, NEPA and its implementing regulations set forth procedures designed to (1) ensure that federal agencies take a "hard look" at the environmental consequences of their proposed actions, and (2) foster meaningful public participation.

43.     NEPA requires all agencies of the federal government to prepare a "detailed statement" for all "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). Commonly known as the Environmental Impact Statement or EIS, the detailed statement must describe, *inter alia*, the adverse environmental impact of the proposed action and alternatives to the proposed action. *Id.*

44.     The Council on Environmental Quality ("CEQ") promulgated regulations implementing NEPA. 42 U.S.C. § 4342 (establishing CEQ); 40 C.F.R. §§ 1500–1508 (2019) (CEQ's NEPA regulations). CEQ modified the NEPA regulations by final rule on July 16, 2020, 40 C.F.R. §§ 1500–1508 (2021), but has since rescinded portions of the 2020 modifications. 87 Fed. Reg. 23,453 (April 20, 2022), 85 Fed. Reg. 35,442 (May 1, 2024). CE-6 was adopted pursuant to the pre-2020 version of the CEQ regulations.[3]

45.     CEQ regulations direct federal agencies to identify in their NEPA procedures certain categories of actions that normally do not require an EIS or an EA, which is a concise public document which briefly provides sufficient evidence and analysis for determining whether

---

[2] Congress amended NEPA through the Fiscal Responsibility Act of 2023, P.L. 118-5 (June 3, 2023). Because CE-6 was adopted and the Projects analyzed and approved under NEPA prior to the Act's passage, citations are to the pre-amendment version of NEPA, 42 U.S.C. §§ 4321 *et seq.* (2022).

[3] Unless otherwise noted, citations are therefore to the 2019 version of the CEQ regulations, 40 C.F.R. §§ 1500.1 *et seq.* (2019).

AMENDED/SUPPLEMENTAL COMPLAINT FOR
DECLARATORY & INJUNCTIVE RELIEF—11

to prepare an EIS or a finding of no significant impact. 40 C.F.R. § 1507.3(b)(1)(iii); *id.* § 1508.9(a)(1). These categories of actions are called CEs, which are "category[ies] of actions which do not individually or cumulatively have a significant effect on the human environment and which have been found to have no such effect by a federal agency in implementation of these regulations." 40 C.F.R. § 1508.4.

46.     The Forest Service promulgated a series of regulatory CEs, including CE-6, in 1992. *See* 57 Fed. Reg. 43,180 (Sept. 18, 1992) (establishing categories); 73 Fed. Reg. 43,084 (July 24, 2008) (placing established categories under Forest Service NEPA regulations at 36 C.F.R. Part 220).

47.     CE-6 encompasses "timber stand and/or wildlife habitat improvement activities that do not include the use of herbicides or do not require more than 1 mile of low standard road construction." 36 C.F.R. § 220.6(e)(6).

48.     Other Forest Service CEs apply specifically to logging projects and expressly contemplate an acreage-limited commercial component, including 36 C.F.R. § 220.6(e)(12), (14), and (25).

49.     36 C.F.R. § 220.6(a) provides that the Forest Service shall categorically exclude a proposed action from further analysis and documentation in an EIS or EA "only if there are no extraordinary circumstances related to the proposed action" and if it is within a category established by the Secretary or Chief.

50.     In addition to the regulatory CE's, Congress has established CEs for Forest Service projects implementing restoration treatments to address insects and disease, hazardous fuels reduction, and restoration of mule deer and sage grouse habitat. *See* 16 U.S.C. § 691. These

AMENDED/SUPPLEMENTAL COMPLAINT FOR
DECLARATORY & INJUNCTIVE RELIEF—12

statutory CEs are subject to a series of qualifications and limitations, such as a cap on project

size (between 3,000 and 4,500 acres) and development through a collaborative process.

**Administrative Procedure Act**

51.    The APA confers a right of judicial review on any person adversely affected by

agency action within the meaning of a relevant statute. 5 U.S.C. § 702. Agency action made

reviewable by statute and final agency action for which there is no other adequate remedy in

court are subject to judicial review. 5 U.S.C. § 704.

52.    Upon review under the APA, a court shall hold unlawful and set aside agency

action, findings, and conclusions found to be: Arbitrary, capricious, an abuse of discretion, or

otherwise not in accordance with law; in excess of statutory jurisdiction, authority, or limitations,

or short of statutory right; or without observance of procedure required by law. 5 U.S.C.

§ 706(2)(A), (C), (D).

## FACTUAL BACKGROUND

**Logging Operations**

53.    As compared to noncommercial activities like prescribed burning and

precommercial thinning, commercial logging operations cause more significant environmental

impacts.

54.    For example, commercial logging ordinarily targets larger trees. Such trees have

higher commercial value than smaller trees, but when left in the forest provide invaluable

ecosystem benefits including storing carbon and providing habitat for birds and other wildlife.

55.    To facilitate commercial logging, the Forest Service (and/or timber sale

contractors) conducts associated activities such as using heavy equipment to create and utilize

AMENDED/SUPPLEMENTAL COMPLAINT FOR
DECLARATORY & INJUNCTIVE RELIEF—13

landings (where logs and equipment are placed and temporarily stored) and skid trails (the routes where logs are dragged to landings), as well as roadwork and log hauling on primitive roads.

56.     Combined, these commercial logging operations can cause significant environmental effects, including disturbing soils, causing erosion into streams, destroying or degrading wildlife habitat, releasing stored carbon, modifying fire behavior, spreading invasive weeds, degrading scenery, interfering with recreation, and more.

57.     In contrast, noncommercial activities often are carried out using hand tools and do not involve the creation and utilization of log landings and skid trails, thereby creating fewer impacts like noise disturbance and soil compaction. Even where heavy equipment is used to fell trees for noncommercial purposes, the logs are left in the forest and thus continue to provide habitat and other values.

58.     Forest Service projects often are developed to achieve multiple purposes. For example, a project designed with the primary purpose of "timber stand improvement" also may further the purposes of providing wood products to local mills and securing timber sale receipts to fund other Forest Service activities like restoration. The Forest Service often labels such latter purposes as "incidental" to a project's primary purpose, but in practice, these purposes can dictate the scope of a project and influence its environmental impacts.

59.     When commercial logging operations are involved, a project inherently will have more significant environmental impacts, regardless of the project's primary purpose.

**CE-6 and the Forest Service's Logging-Related CEs**

***1991/1992 Rulemaking***

60.     On April 29, 1991, the Forest Service issued a Notice of proposed revisions to its NEPA policies and procedures. 56 Fed. Reg. 19,718 (Apr. 29, 1991). The proposed revisions

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

included new and expanded direction for excluding certain categories of action from documentation in an EA or EIS.

61.     As relevant here, the Forest Service sought to replace an existing CE for "low-impact silvicultural activities," which included a variety of activities such as harvest, salvage, thinning, planting, and site preparation that were limited in size and duration.

62.     Regarding the previous CE for low-impact silvicultural activities, environmental organizations had petitioned the Forest Service to: (a) Amend the CE to describe specific and objectively identifiable categories of actions to be excluded from environmental documentation; (b) prohibit the categorical exclusion of timber sales involving more than 25 thousand board feet[4] or more than one acre; and (c) immediately stay the CE's application to timber sales of more than 25 thousand board feet or more than one acre until final agency action on the petition.

63.     In response, the Forest Service issued an interim directive to limit timber salvage, thinning, and harvesting to less than 100 thousand board feet or less or to areas of less than 10 acres. 54 Fed. Reg. 9073 (March 3, 1989). The Forest Service intended this interim directive to guide timber harvests on national forest land until more comprehensive revisions could be made to the agency's NEPA procedures.

64.     The proposed rule expanded the previous CE and divided it into four separate categories: Proposals to harvest or salvage timber which remove one million board feet or less of merchantable wood products, require one mile or less of new road construction, and assure regeneration of harvested or salvaged areas, where required ("proposal 1"); proposals to thin merchantable timber from overstocked stands which require one mile or less of new road

---

[4] One board foot is 12"x12"x1" (144 cubic inches). One million board feet is equivalent to roughly 200 logging trucks' worth of timber.

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

construction ("proposal 2"); proposals to artificially regenerate areas to native tree species, including needed site preparation not involving the use of pesticides ("proposal 3"); and proposals to improve vegetation or timber conditions using approved silvicultural or habitat management techniques, not including the use of herbicides, which have little potential for soil movement, loss of soil productivity, water and air quality degradation, or impact on sensitive resource values ("proposal 4").

65.    The Forest Service explained that proposal 1 (related to timber harvest or salvage) was intended to address the petition for rulemaking concerning the previous CE for low-impact silvicultural activities.

66.    In response to the petition's first two requests, the Forest Service identified its proposed rules' intent as making the categories more specific and objectively identifiable. The agency also stated that the suggestion to limit categorically excluded timber sales to 25 thousand board feet or one acre was unreasonably conservative and had not been adopted.

67.    Instead, proposal 1 would apply to proposals to harvest or salvage timber which remove one million board feet or less of merchantable wood products, require one mile or less of new road construction, assure regeneration of harvested or salvaged areas where required, and are consistent with Forest land and resource management plans. The Forest Service asserted that these activities have little potential for soil movement, loss of soil productivity, water and air degradation, or impact on sensitive resource values. The Forest Service further stated that the agency had prepared hundreds of EAs for projects with these characteristics and always found them to have no significant environmental effects.

68.    On September 18, 1992 the Forest Service announced its adoption of the final revised NEPA rules, modified to reflect public comment on the proposal. 57 Fed. Reg. 43,180

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

(Sept. 18, 1992). The agency noted that the revisions to its CE rules had generated the greatest number of comments.

69.    In response to a comment regarding the use of the term, "routine," the Forest Service stated that its intent was that only routine actions with no extraordinary circumstances should be within the categories for exclusion. Accordingly, the final rule removed the term "routine" from each category and examples and instead placed it as a criterion applicable to all categorically excluded actions.

70.    Based on input from the public, the Forest Service reduced the scope of proposal 1. The agency stated that in consideration of a wide divergence of views and concern of several respondents regarding the visual effects of logging, it had reduced the size of timber harvests of live trees suitable for this category to 250,000 board feet or less of merchantable wood products.

71.    In the final rule, the Forest Service stated that it had reorganized the categories for low-impact silvicultural activities to improve clarity. Specifically, proposals 1 (timber harvest or salvage) and 2 (thinning of merchantable timber) were subsumed into a single category. The agency did not provide any explanation or analysis regarding the reorganization.

72.    The final rule adopted three categories of low-impact silvicultural activities.

73.    CE-4 applies to: Timber harvest which removes 250,000 board feet or less of merchantable wood products or salvage which removes 1,000,000 board feet or less of merchantable wood products; which requires one mile or less of low standard road construction; and assures regeneration of harvested or salvaged areas, where required. Examples include, but are not limited to:

    a.    Harvesting 60,000 board feet of merchantable timber from 100 acres, including the construction of one-half mile of additional roads.

    b.    Salvaging an estimated volume of 750,000 board feet of merchantable

AMENDED/SUPPLEMENTAL COMPLAINT FOR
DECLARATORY & INJUNCTIVE RELIEF—17

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

wood products timber from dead or dying trees, including the construction of one mile of access road from an area that is generally flat with good drainage.

c.    Thinning (FSM 2431 and 2470.5) an estimated 200,000 board feet of timber from over-stocked timber stands, which requires construction of one-quarter mile of additional access road.[5]

74.    CE-5 applies to: Regeneration of an area to native tree species, including site preparation which does not involve the use of herbicides or result in vegetation type conversion. Examples include but are not limited to:

a.    Planting seedlings of superior trees in a progeny test site to evaluate genetic worth.

b.    Planting trees or mechanical seed dispersal of native tree species following a fire, flood, or landslide.

75.    CE-6 applies to: Timber stand and/or wildlife habitat improvement activities which do not include the use of herbicides or do not require more than one mile of low standard road construction. Examples include, but are not limited to:

a.    Girdling trees to create snags.

b.    Thinning or brush control to improve growth or to reduce fire hazard including the opening of an existing road to a dense timber stand.

c.    Prescribed burning to control understory hardwoods in stands of southern pine.

d.    Prescribed burning to reduce natural fuel build-up and improve plant vigor.

### Heartwood Decision

76.    On September 28, 1999, a district judge held unlawful and set aside CE-4.

*Heartwood, Inc. v. U.S. Forest Serv.*, 73 F. Supp. 2d 962 (S.D. Ill. 1999).

---

[5] "FSM" is the Forest Service Manual.

AMENDED/SUPPLEMENTAL COMPLAINT FOR
DECLARATORY & INJUNCTIVE RELIEF—18

77.     The court found that the Forest Service had failed to provide any rationale for why this magnitude of timber sales (250,000 board feet for live-tree harvest and 1,000,000 board feet for salvage) would not have a significant effect on the environment. The court also found that the Forest Service had failed to adequately explain or provide support for its position that timber harvests of this magnitude would not have cumulatively significant effects on the environment.

78.     The court issued a nationwide injunction barring the Forest Service from applying CE-4.

79.     There was no similar challenge to CE-6, which remained in effect.[6]

### 2003 Rulemaking in response to Heartwood

80.     On January 8, 2003, in response to *Heartwood*, the Forest Service gave notice and requested comments on proposed revisions to its directives for implementing NEPA. 68 Fed. Reg. 1,026 (Jan. 8, 2003). The agency proposed adding three CEs applicable to small-scale timber harvesting projects. The Forest Service explained that the proposed new categories were much more specific and limited in scope than the CE invalidated by *Heartwood*.

81.     The Forest Service also stated that it now believed acreage to be a more useful measure than timber volume, which it had used to define the previous logging CEs, as acreage is easily delineated and quantified for purposes of developing a proposal.

82.     The final rule adopting the new Forest Service CEs was published on July 29, 2003. 68 Fed. Reg. 44,598 (July 29, 2003). The Forest Service added three new categories.

---

[6] Plaintiffs also challenged the *process* by which the new CEs were adopted, including CE-6. Specifically, they claimed that the adoption of the new CEs required preparation of an EA or EIS. The district court rejected this claim and the Seventh Circuit affirmed. *Heartwood, Inc. v. U.S. Forest Serv.*, 230 F.3d 947 (7th Cir. 2000).

AMENDED/SUPPLEMENTAL COMPLAINT FOR
DECLARATORY & INJUNCTIVE RELIEF—19

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

83.     "CE-12," now codified at 36 C.F.R. § 220.6(e)(12), allows harvest of live trees not to exceed 70 acres with no more than one-half mile of temporary road construction. The purpose of this category is to allow low-impact silvicultural treatments through timber harvest. Examples include, but are not limited to, thinning of overly dense stands of trees to improve the health and vigor of the remaining trees, and removing individual trees for forest products or fuelwood. After reviewing similar projects while developing the rule, the Forest Service increased the acreage from its initially proposed 50 acres to 70 acres, which the agency explained would better reflect the acreage of the reference projects.

84.     "CE-13," now codified at 36 C.F.R. § 220.6(e)(13), allows the salvage of dead and/or dying trees not to exceed 250 acres with no more than one-half mile of temporary road construction. This CE allows salvage harvest in areas where trees have been severely damaged by forces such as fire, wind, ice, insects, or disease and still have some economic value as a forest product.

85.     "CE-14," now codified at 36 C.F.R. § 220.6(e)(14), allows commercial and noncommercial felling and removal of any trees necessary to control the spread of insects and disease on no more than 250 acres with no more than one-half mile of temporary road construction. This CE allows the Forest Service to apply harvest methods to control insects and disease before they spread to adjacent healthy trees.

86.     In developing these CEs, the Forest Service reviewed the effects of 154 projects with actions similar to those allowed in the three new categories. Based on post-implementation field review, the Forest Service concluded that the projects' environmental impacts were not "significant" for NEPA purposes.

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

87.     The Forest Service also explained that approximately 300 projects had been implemented using the now-vacated CE-4. These projects involved approximately 8,200 acres of green tree harvest (in total) and approximately 41,100 acres of salvage (in total). Review of these projects further supported the agency's conclusion that the new CEs would not result in individually or cumulatively significant impacts.

88.     On January 18, 2006, the Tenth Circuit Court of Appeals rejected a facial challenge to CE-13. *Colo. Wild v. U.S. Forest Serv.*, 435 F.3d 1204 (10th Cir. 2006). The court held that the Forest Service had adequately supported its conclusions and decision in the record.

*2002–2003 Hazardous Fuels Reduction Rulemaking*

89.     On December 16, 2002, the Forest Service and other agencies gave notice of and requested comment on a proposal to promulgate two new CEs, including one applying to hazardous fuels reduction activities such as thinning overstocked stands and brush. 67 Fed. Reg. 77,038 (Dec. 16, 2002).

90.     Activities permitted under the proposed fuels CE included commercial or precommercial tree thinning. The proposed fuels CE contained a number of stipulations, but did not include an acreage cap.

91.     On June 5, 2003, the Forest Service published a final rule which, *inter alia*, added the two new CEs. 68 Fed. Reg. 33,814 (June 5, 2003). The new fuels CE ("CE-10") explicitly permitted commercial logging.

92.     The Forest Service's proposed draft of CE-10 had not included an acreage limit for hazardous fuels projects. In response to public comment, the agency in the final rule elected to limit hazardous fuels reduction activities using mechanical methods to 1,000 acres or smaller.

**Bosworth *Decision***

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

93.     On December 5, 2007, the Ninth Circuit Court of Appeals held unlawful and set aside CE-10. *Sierra Club v. Bosworth*, 510 F.3d 1016 (9th Cir. 2007).

94.     The Court concluded that the Forest Service had failed to properly assess the significance of activities included in the category, failed to support its conclusions with evidence in the record, and thus failed to demonstrated that it had made a reasoned decision to promulgate CE-10 based on relevant factors and information. Accordingly, the court held that the promulgation of CE-10 was arbitrary and capricious.

95.     Critical to the court's decision was the Forest Service's failure to demonstrate, with reference to the administrative record, that commercial logging of up to 1,000 acres had only insignificant impacts.

96.     The court permanently enjoined the Forest Service from using CE-10 to authorize any project not initiated prior to October 2004.

***2007/2008 Rulemaking***

97.     On August 16, 2007, the Forest Service gave notice that it was preparing to move its NEPA-implementing procedures from the Forest Service Manual and Forest Service Handbook to the Code of Federal Regulations. With respect to CEs, the Forest Service explained that the new regulations would incorporate the implementing language from the Forest Service Handbook. The headings would be changed to be more explanatory, but the content would remain the same. 72 Fed. Reg. 45,998 (Aug. 16, 2007).

98.     On July 24, 2008, the Forest Service issued a final rule codifying its NEPA procedures, moving them from the Forest Service Manual to the Code of Federal Regulations. 73 Fed. Reg. 43,084 (July 24, 2008).

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

99.     The majority of the implementing procedures remained intact, including CE-6, CE-12, CE-13, and CE-14. The 2008 rule did not add any new CEs, change any existing CEs, or modify any relevant definitions or requirements.

100.     No additional findings or data were provided to support the existing CEs.

*2020 Rulemaking*

101.     On June 13, 2019, the Forest Service requested comments on proposed revisions to its NEPA regulations, including the addition of several new CEs. 84 Fed. Reg 27,544 (June 13, 2019). One of the proposed categories applied to "ecosystem restoration and/or resilience activities." *Id.* at 27,557 (later codified as "CE-25"). Activities authorized under this proposed CE to improve ecosystem health, resilience, and other watershed conditions could not exceed 7,300 treated acres. Commercial and noncommercial timber harvest activities were permitted, but only in combination with at least one additional restoration activity, and the commercially logged area could not exceed 4,200 of the total acreage.

102.     Following the public comment period, the Forest Service convened a group of agency scientists to review the body of literature submitted in public comments specific to the proposed CE-25. The agency reviewed publicly submitted information, relevant science, and the original project data on which the limitations in the proposed rule were based.

103.     In developing CE-25, the Forest Service reviewed a random selection of 68 projects from over 718 projects completed under EAs from fiscal years 2012 to 2016. The agency stated that these were projects where all or a portion of proposed activities could be covered under the new CE-25. The median of net commercial and noncommercial activities was 2,499 acres.

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

104.    On November 19, 2020, the Forest Service promulgated a final rule amending its NEPA regulations. 85 Fed. Reg. 73,620 (Nov. 19, 2020). The 2020 final rule included a modified CE-25, now codified at 36 C.F.R. § 220.6(e)(25), which allowed projects of up to 2,800 total acres, including commercial logging operations.

105.    The Forest Service published a "Supporting Statement" to summarize the administrative record and rationale for the establishment of the new CEs.

106.    In responding to the comments on the 2020 rule, the Forest Service specifically addressed comments related to CE-25's acreage limit. The final rule lowered the total acreage to 2,800 acres, based on review of information submitted in public comments, a science review, and a review of project data.

107.    The Forest Service stated that it had determined that CE-25 comprises a category of actions that normally do not have significant effects on the human environment, based on reviewing previously implemented actions, benchmarking other Federal agencies' CEs, working with subject matter experts and scientists, reviewing public comments, and examining the history and use of certain existing CEs. Specific quantifiable limitations (*e.g.*, acreage) are included in CEs to limit the amount of proposed disturbance and ensure that environmental effects are kept below the level of significance.

108.    On January 8, 2021, a coalition of plaintiffs filed a complaint challenging, *inter alia*, the promulgation of CE-25. *The Clinch Coal., et al. v. U.S. Forest Serv., et al.*, No. 2:21-cv-00003-JPJ-PMS (W.D. Va.). The case is pending.

109.    In response to the lawsuit, on May 21, 2021, the Acting Deputy Chief of the Forest Service issued guidance to Regional Foresters regarding the use of CEs. The guidance

AMENDED/SUPPLEMENTAL COMPLAINT FOR
DECLARATORY & INJUNCTIVE RELIEF—24

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

instructed that engagement with Regional and Washington Office NEPA staff during initial

proposal development was required for a project proposing to use CE-25.

110.    The guidance amounted to a litigation hold, with the effect of restricting, if not

halting, the use of CE-25.

***Application of CE-6 and the Forest Service's Logging CEs***

111.    For nearly thirty years after CE-6 was promulgated in 1992, the Forest Service

used it to authorize only noncommercial projects.

112.    When the agency chose to authorize commercial logging pursuant to a CE rather

than an EA or EIS, it would invoke one of the CEs discussed above which expressly authorize

commercial operations.

113.    For example, in 2015, another forest within Region 6 approved the Birds Track

Springs Fuels Reduction project, which included 1,218 acres of precommercial thinning, 8,851

acres of prescribed burning, and 60 acres of commercial thinning. The Forest Service invoked

CE-6 for the precommercial thinning and prescribed burning, and CE-12—which permits up to

70 acres of commercial timber harvest—for the commercial thinning.

114.    Had the Forest Service interpreted CE-6 to cover commercial thinning operations,

it would not have needed to invoke CE-12.

115.    Similarly, when the Forest Service chose to authorize projects with purposes

related to "timber stand and/or wildlife habitat improvement," it did so via EIS or EA when those

projects involved more than 70 acres of commercial logging.

116.    For example, in 2006, the Fremont-Winema National Forest approved the Burnt

Willow Project, a project geographically proximate to the South Warner Project area. The Burnt

Willow Project authorized 3,200 acres of commercial thinning. One stated purpose of the project

AMENDED/SUPPLEMENTAL COMPLAINT FOR
DECLARATORY & INJUNCTIVE RELIEF—25

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

was to reduce excess vegetation in order to increase vigor, health, and growth rates in the forest

ecosystem, or, in other words, "timber stand improvement." The Forest Service reviewed the

project's potential environmental effects in an EA.

117.    On December 21, 2018, President Trump issued Executive Order 13855:

"Promoting Active Management of America's Forests, Range-lands, and Other Federal Lands to

Improve Conditions and Reduce Wildfire Risk." EO 13855 instructed the Forest Service to use

"all applicable categorical exclusions set forth in law or regulation for fire management,

restoration, and other management projects in forests, rangelands, and other Federal lands when

implementing the requirements of the National Environmental Policy Act."

118.    Upon information and belief, in or around 2018, the Forest Service began having

internal discussions regarding the use of CE-6 to authorize projects involving commercial

logging operations.

119.    In or around 2018, the Forest Service began approving projects involving

commercial logging operations under CE-6 on an ad hoc basis. The Forest Service did not

conduct new rulemaking, make new findings, or announce a change in official agency policy.

**The Forest**

120.    The 2.3-million-acre Fremont-Winema National Forest is located in south-central

Oregon. It ranges from the Cascade Range in the west to the Warner Mountain Range in the east.

121.    Lying within the rain shadow created by the Cascades, the Forest contains mature

stands of drought-tolerant tree species such as juniper and ponderosa pine, although abundant

stands of white fir occur at higher elevations. The Forest is home to more than 300 species of

fish and wildlife.

///

AMENDED/SUPPLEMENTAL COMPLAINT FOR
DECLARATORY & INJUNCTIVE RELIEF—26

**The Projects**

*South Warner*

122.    On June 28, 2021, the Lakeview Ranger District of the Fremont-Winema National Forest issued a Scoping Notice on the proposed South Warner Project. The Forest Service requested public comment by July 19, 2021.

123.    The four-page Scoping Notice provided a cursory description of the project location, purpose, and proposed actions. The Scoping Notice did not mention whether the Forest Service planned to review the South Warner Project under an EIS, EA, or CE.

124.    On July 19, 2021, Plaintiff Oregon Wild timely submitted scoping comments.

125.    On July 19, 2021 Plaintiff WildEarth Guardians timely submitted scoping comments.

126.    In these comments, Wild emphasized that the Forest Service cannot, by law, approve a project of South Warner's proposed size and scope using a CE. Wild noted that the proposal appeared to be both a "black box"—because, other than noting the possible acreage of the proposed treatments, the Forest Service did not disclose any specifics about the treatments' time, place, or manner—and a "blank check"—because the agency would not define the where, when, and how of the project until after the NEPA process was complete.

127.    No further information was provided to the public during the administrative process.

128.    When the Forest Service prepares an EIS or EA, it releases to the public supporting documents including reports prepared by specialists on topics such as hydrology, wildlife, and botany. No such reports were provided during the South Warner administrative process.

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

129. There were no other formal opportunities for public comment.

130. On December 27, 2021, Defendant Ramsey signed a Decision Memorandum approving the South Warner Project.

131. The South Warner Project area spans 69,567 acres of national forestland in Lake County, Oregon. The Project is located southeast of the town of Lakeview, northeast of Goose Lake, and southwest of Hart Mountain National Antelope Refuge in the Warner Mountains, which extend from Abert Rim across the border into Northern California.

132. The South Warner Decision Memorandum authorizes thinning of large and small trees, prescribed fire, juniper cutting, aspen/mountain mahogany/meadow enhancement, culvert replacement and/or removal, stream restoration, and commercial sale of merchantable forest products.

133. Commercial thinning is authorized on up to 16,000 acres. Operations will involve heavy equipment to, *inter alia*, fell merchantable trees, skid them to landings, and load them onto logging trucks.

134. The South Warner Decision Memorandum does not provide any site-specific information about the location of the commercial thinning units, how many trees would be cut or an estimate of the board feet of timber produced, or the specific logging prescriptions for each unit. This is information the Forest Service ordinarily develops and discloses to the public when it prepares an EIS or EA.

135. In addition to commercial thinning, the South Warner Decision Memorandum authorizes road maintenance and repair to facilitate the hauling of logs along forest roads. Hundreds if not thousands of logging trucks' worth of timber will be felled and removed from the forest.

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

136.    The South Warner Decision Memorandum does not identify how many miles of roads would be used for the Project, or the extent of maintenance and repair that would be required to make the primitive forest roads suitable for extended use by logging trucks and heavy equipment. This is information the Forest Service normally develops and discloses to the public when it prepares an EIS or EA.

137.    The South Warner Decision Memorandum discloses potential "project effects" in three pages. For a project of this magnitude—including 16,000 acres of commercial thinning—the Forest Service ordinarily discloses and considers project effects over dozens, if not hundreds of pages in an EIS or EA.

138.    Defendant Ramsey found the South Warner Project categorically excluded from documentation in an EIS or EA. Defendant Ramsey determined that two CEs were applicable: CE-6, 36 C.F.R. § 220.6(e)(6); and CE-18, 36 C.F.R. § 220.6(e)(18).[7]

139.    The South Warner Project's commercial logging operations may have a significant environmental effect. The Forest Service in notice and comment rulemaking never has found that commercial operations of the type and scale authorized by the South Warner Project do not individually or cumulatively have a significant effect on the human environment.

140.    The Forest Service's issuance of the South Warner Project Decision Memorandum constitutes final agency action subject to judicial review pursuant to the APA, 5 U.S.C. § 706(2).

///

///

---

[7] CE-18 authorizes the restoration of wetlands, streams, riparian areas or other water bodies by removing, replacing, or modifying water control structures. Wild does not challenge the use of CE-18 for such activities in the South Warner Project.

AMENDED/SUPPLEMENTAL COMPLAINT FOR
DECLARATORY & INJUNCTIVE RELIEF—29

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

*Baby Bear*

141.    On September 1, 2021, the Silver Lake Ranger District of the Fremont-Winema National Forest issued a Scoping Notice for the proposed Baby Bear Project. The Forest Service requested public comment by September 22, 2021.

142.    The three-page Scoping Notice provided a cursory description of the project location, purpose, and proposed actions. The Scoping Notice stated that the Forest Service might use CE-6 to approve the Project.

143.    On September 22, 2021, Plaintiff Oregon Wild timely submitted scoping comments.

144.    On March 24, 2022 Plaintiff WildEarth Guardians timely submitted scoping comments.

145.    Wild's comments explained that Baby Bear is too big of a project for a CE and urged the Forest Service to conduct a more thorough analysis of the proposal's impacts.

146.    The Forest Service did not provide any further information to the public during the administrative process. There were no other formal opportunities for public comment.

147.    On May 6, 2022, Defendant Wilson signed a Decision Memorandum approving the Baby Bear Project.

148.    The Baby Bear Project area spans 4,774 acres of national forestland in Lake and Klamath Counties, Oregon. Nearby public attractions include Fort Rock State Park and Hole in the Ground, both notable volcanic features of central Oregon.

149.    The Baby Bear Decision Memorandum authorizes silviculture treatments, aspen treatments, meadow and riparian treatments, and prescribed burning.

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

150.    Silviculture treatments would include commercial thinning on up to 3,000 acres. Operations will involve heavy equipment to, *inter alia*, fell merchantable trees, skid them to landings, and load them onto logging trucks.

151.    The Baby Bear Decision Memorandum does not provide any site-specific information about the location of the commercial thinning units or the specific logging prescriptions for each unit.

152.    In addition to commercial thinning, the Baby Bear Decision Memorandum authorizes road maintenance and repair to facilitate the hauling of logs along forest roads. Hundreds if not thousands of logging trucks' worth of timber will be felled and removed from the forest.

153.    The Baby Bear Decision Memorandum does not identify how many miles of roads would be used for the Project, or the extent of maintenance and repair that would be required to make the primitive forest roads suitable for extended use by logging trucks and heavy equipment.

154.    The Baby Bear Decision Memorandum discloses "project effects" in three pages. For a project of this magnitude—including 3,000 acres of commercial thinning—the Forest Service ordinarily discloses and considers project effects over dozens, if not hundreds of pages in an EIS or EA.

155.    Defendant Wilson found the Baby Bear Project categorically excluded from documentation in an EIS or EA. Defendant Wilson determined that CE-6, 36 C.F.R. § 220.6(e)(6), was applicable to the Project.

156.    The Baby Bear Project's commercial logging operations may have a significant environmental effect. The Forest Service in notice and comment rulemaking never has found that

AMENDED/SUPPLEMENTAL COMPLAINT FOR
DECLARATORY & INJUNCTIVE RELIEF—31

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

commercial operations of the type and scale authorized by the Baby Bear Project do not individually or cumulatively have a significant effect on the human environment.

157.    The Forest Service's issuance of the Baby Bear Decision Memorandum constitutes final agency action subject to judicial review pursuant to the APA, 5 U.S.C. § 706(2).

**Bear Wallow**

158.    On September 22, 2021, the Silver Lake Ranger District of the Fremont-Winema National Forest issued a Scoping Notice for the proposed Bear Wallow Project. The Forest Service requested public comment by October 13, 2021.

159.    The three-page Scoping Notice provided a cursory description of the project location, purposes, and proposed activities. The Scoping Notice stated that the Forest Service might use CE-6 to approve the Project.

160.    On October 13, 2021, Plaintiff Oregon Wild timely submitted scoping comments.

161.    On March 24, 2022 Plaintiff WildEarth Guardians timely submitted scoping comments.

162.    Wild's comments explained that Bear Wallow does not fit any CE category because it entails too much commercial logging and road construction, both of which can have significant environmental impacts. Wild noted that the Forest Service has adopted specific acreage limits for logging CEs, and observed that the Forest Service's tactic of simply relabeling a logging project as "stand and habitat improvement" to evade these acreage limitations violates NEPA.

163.    The Forest Service did not provide any further information to the public during the administrative process. There were no other formal opportunities for public comment.

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

164.    On May 6, 2022, Defendant Wilson signed a Decision Memorandum approving the Bear Wallow Project.

165.    The Project area spans 17,200 acres of national forestland in Lake and Klamath Counties, Oregon.

166.    The Bear Wallow Project area is directly adjacent to the Baby Bear Project area. The southeastern boundary of the Bear Wallow Project area shares a border with the northern border of the Baby Bear Project area.

167.    The Bear Wallow Project and the Baby Bear Project share the same stated purpose. The two projects authorize the same treatments. In fact, the two DMs are nearly identical, except for the projects' names and geographic descriptions.

168.    Neither Decision Memoranda discusses the two projects' cumulative effects.

169.    The Bear Wallow Decision Memorandum authorizes silviculture treatments, aspen treatments, meadow and riparian treatments, and prescribed burning.

170.    Silviculture treatments would include commercial thinning on up to 10,000 acres. Operations will involve heavy equipment to, *inter alia*, fell merchantable trees, skid them to landings, and load them onto logging trucks.

171.    The Bear Wallow Decision Memorandum does not provide any site-specific information about the location of the commercial thinning units or the specific logging prescriptions for each unit.

172.    In addition to commercial thinning, the Bear Wallow Decision Memorandum authorizes road maintenance and repair to facilitate the hauling of logs along forest roads. Hundreds if not thousands of logging trucks' worth of timber will be felled and removed from the forest.

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

173.    The Bear Wallow Decision Memorandum does not identify how many miles of roads would be used for the Project, or the extent of maintenance and repair that would be required to make the primitive forest roads suitable for extended use by logging trucks and heavy equipment.

174.    The Bear Wallow Decision Memorandum discloses "project effects" in three pages. For a project of this magnitude—including 10,000 acres of commercial thinning—the Forest Service ordinarily discloses and considers project effects over dozens, if not hundreds of pages in an EIS or EA.

175.    Defendant Wilson found the Bear Wallow Project categorically excluded from documentation in an EIS or EA. Defendant Wilson determined that CE-6, 36 C.F.R. § 220.6(e)(6), was applicable to the Project.

176.    The Bear Wallow Project's commercial logging operations may have a significant environmental effect. The Forest Service in notice and comment rulemaking never has found that commercial operations of the type and scale authorized by the Bear Wallow Project do not individually or cumulatively have a significant effect on the human environment.

177.    The Forest Service's issuance of the Bear Wallow Decision Memorandum constitutes final agency action subject to judicial review pursuant to the APA, 5 U.S.C. § 706(2).

**Other CE-6 Projects**

178.    The Forest has imminent plans to approve additional projects under CE-6 involving large-scale commercial logging operations.

179.    On March 23, 2023, the Forest issued a scoping notice for the Ninemile Fuelbreak and Timber Stand Improvement Project, which proposes to create and maintain 1,000-foot-wide linear fuel breaks along roads on the Chiloquin Ranger District within a past project area.

AMENDED/SUPPLEMENTAL COMPLAINT FOR
DECLARATORY & INJUNCTIVE RELIEF—34

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

180.    On up to 24,000 acres, the Forest Service would conduct, *inter alia*, commercial and non-commercial understory thinning through mechanical treatment, mowing or masticating, piling, yarding, and removal of residual logging debris.

181.    On April 7, 2023, Plaintiff Oregon Wild submitted scoping comments.

182.    On October 7, 2024 the Forest issued a scoping notice for the Sun Pass Restoration Project, which proposes wildlife and timber stand activities.

183.    On approximately 16,000 acres, the Forest Service would, *inter alia*, conduct precommercial and commercial treatments.

184.    On November 7, 2024, Plaintiffs Oregon Wild, WildEarth Guardians, and GO Alliance submitted scoping comments.

**Procedural History**

185.    On July 12, 2022, Wild filed its complaint for declaratory and injunctive relief. ECF No. 1. Wild brought two claims for relief: (1) a challenge to the Forest Service's failure to prepare an EIS or EA for the Projects, because CE-6 does not cover activities of the type and scale authorized by the Projects; and (2) in the alternative that, if CE-6 covers the Project's commercial logging operations, then CE-6 is unlawful as applied.

186.    On cross-motions for summary judgment, this Court issued its Opinion and Order on August 4, 2023. On claim 1, this Court held that CE-6 on its face covers the activities authorized by the Projects and does not contain an acreage limitation. ECF No. 41. On claim 2, this Court held that Wild's as-applied challenge to CE-6 was barred by the statute of limitations, on grounds that it was a procedural challenge that had accrued in 1992 when CE-6 was adopted. *Id.* Accordingly, this Court granted summary judgment in favor of Defendants. *Id.*

187.    On August 28, 2023, Wild filed its notice of appeal.

AMENDED/SUPPLEMENTAL COMPLAINT FOR
DECLARATORY & INJUNCTIVE RELIEF—35

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

188.    After the close of appellate briefing, on July 1, 2024, the Supreme Court issued its *Corner Post* decision. On July 8, 2024, Wild submitted a 28(j) letter, observing that the principal cases on which Defendants/Appellees had relied in arguing that claim 2 was time-barred have likely been overruled. No. 23-35579, ECF No. 50-1. Defendants/Appellees responded on July 30, 2024, whereby they abandoned their argument that claim 2 accrued in 1992, and instead, argued that claim 2 accrued in 2006 as to Plaintiff Oregon Wild and 2014 as to Plaintiff WildEarth Guardians, when CE-6 was allegedly applied to commercial thinning projects that allegedly harmed Plaintiffs' interests. No. 23-35579, ECF No. 53.

189.    On September 25, 2024, the Ninth Circuit issued a Memorandum Disposition. No. 23-35579, ECF No. 57-1. On claim 1, the Ninth Circuit affirmed, holding that this Court correctly determined that the Forest Service's use of CE-6 to approve the Projects was not arbitrary or capricious so as to violate the APA. Memorandum at 2. On claim 2, the Ninth Circuit vacated this Court's ruling that the claim was time barred. The Ninth Circuit observed that this Court's determination had relied on *Wind River Mining Corporation v. United States*, 946 F.2d 710, 715–16 (9th Cir. 1991), but that, in light of *Corner Post*, *Wind River* has likely been abrogated. Memorandum at 7.

190.    Accordingly, the Ninth Circuit "remand[ed] Wild's second claim to the district court to apply *Corner Post* in the first instance to determine whether this claim is time-barred." *Id.*

### FIRST CLAIM FOR RELIEF
### (NEPA and APA Compliance)

191.    [Deleted]

///

///

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

## SECOND CLAIM FOR RELIEF
### (NEPA and APA Compliance)

192.    Wild re-alleges and incorporates all preceding paragraphs herein by reference.

193.    NEPA requires federal agencies to prepare an EIS for "all major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C) (2022).

194.    The Council on Environmental Quality issued regulations allowing agencies to prepare an EA to determine whether an action (1) may have significant environmental effects and therefore requires preparation of an EIS, or (2) will not have significant environmental effects and therefore no EIS is required. *See* 40 C.F.R. §§ 1501.4, 1508.9.

195.    The CEQ has permitted federal agencies to avoid preparing an EIS or EA only when the proposed action is "categorically excluded" from further NEPA review. CEs only apply to categories of actions which the agency has "found to have no significant effect in procedures adopted" by the agency. 40 C.F.R. § 1508.4.

196.    In promulgating 36 C.F.R. § 220.6(e)(6), the Forest Service never made the required finding that commercial logging under CE-6 would have no individually or cumulatively significant impacts.

197.    Because CE-6 permits projects like South Warner (16,000 acres of commercial logging), Bear Wallow (10,000 acres of commercial logging), and Baby Bear (3,000 acres of commercial logging) to be approved without analysis of their environmental impacts, CE-6 violates NEPA and its implementing regulations.

198.    Interpreting "no cumulatively or individually significant effect" as permitting commercial logging operations on thousands of acres—with no upper limit—flatly contradicts the language and purpose of NEPA and its implementing regulations, and is inconsistent with the

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

Forest Service's CE regulatory regime—in which the agency has promulgated CEs specifically for commercial logging purposes, all with limited acreage caps.

199.    When promulgating CE-6, the Forest Service explained that CEs only apply to "routine actions." 57 Fed. Reg. at 43,184. Large-scale commercial logging operations are not "routine actions" as contemplated by the Forest Service's CE regulations.

200.    Instead, the Forest Service has promulgated a series of logging-related CEs—including CE-4, CE-10, CE-12, CE-13, CE-14, and CE-25—that all include acreage caps.

201.    Of the logging-related CEs still in effect, one category specifically applies to "commercial thinning"; such activities cannot exceed 70 acres. 36 C.F.R. § 220.6(e)(12). Another applies to commercial "sanitation harvest"; such activities cannot exceed 250 acres. 36 C.F.R. § 220.6(e)(14). Another applies to "timber harvesting" to improve ecosystem health, resilience, and other watershed and habitat conditions; such activities cannot exceed 2,800 acres. 36 C.F.R. § 220.6(e)(25).

202.    The Forest Service based these acreage limitations on similar, previous projects which it had analyzed and determined caused no significant impacts.

203.    In contrast, the Forest Service never has produced any support for the environmental insignificance of projects involving larger-scale commercial logging operations. In fact, courts have rejected the agency's attempts to show that larger-scale commercial logging operations would have only insignificant impacts.

204.    The scale of the South Warner, Bear Wallow, and Baby Bear Projects dwarf the acreage limitations of the logging-related CEs.

AMENDED/SUPPLEMENTAL COMPLAINT FOR
DECLARATORY & INJUNCTIVE RELIEF—38

*Crag Law Center
3141 E Burnside St.
Portland, OR 97214
Tel. (503) 227-2212*

205.    The South Warner Project authorizes commercial thinning on up to 16,000 acres—well beyond the size of any logging CE. The Bear Wallow Project authorizes commercial thinning on up to 10,000 acres—well beyond the size of any logging CE.

206.    While the Baby Bear Project's commercial thinning acreage (3,000) is close to (but higher than) the acreage allowed under CE-25 (2,800), the Forest Service did not apply CE-25 and instead relied on CE-6. Had the Forest Service employed CE-25, it would be bound by the requirements of that CE, such as the acreage cap and the requirement to have the project developed or refined through a collaborative process.

207.    By applying CE-6 to commercial logging operations like those authorized by the Projects, the Forest Service is unlawfully evading the acreage caps of its logging-related CEs.

208.    In 1992, when CE-6 was first developed, or 2008, when it was codified in the Code of Federal Regulations, Wild could have had no idea that the Forest Service planned to apply CE-6 to commercial logging projects—especially given the promulgation of several CEs expressly for that purpose. It is not apparent from the regulatory language or the rulemaking record that such an application was contemplated. This as-applied challenge to CE-6 is within the statute of limitations because the specific applications of CE-6 that Wild challenges occurred in the last six years, 28 U.S.C. § 2401(a).

209.    The Forest Service's application of CE-6 to commercial logging operations, like those authorized by the Projects, violates NEPA and its implementing regulations, and is arbitrary, capricious, an abuse of discretion, in excess of statutory authority, not in accordance with and without observance of procedure required by law. 5 U.S.C. § 706(2).

**THIRD CLAIM FOR RELIEF**
**(NEPA and APA Compliance)**

210.    Wild re-alleges and incorporates all preceding paragraphs herein by reference.

AMENDED/SUPPLEMENTAL COMPLAINT FOR
DECLARATORY & INJUNCTIVE RELIEF—39

211.    The Forest Service approved three projects on the Forest in 2021 and 2022 that apply CE-6 to commercial logging operations. These projects represent the first time the Forest Service has applied CE-6 in such a manner that harms Plaintiffs' interests.

212.    The Forest Service exceeded its authority under NEPA and the CEQ regulations by adopting a regulation covering a category of activities—limitless commercial logging operations—(1) for which it made no formal determination in notice and comment rulemaking would pose no individually or cumulatively significant impacts; and (2) that directly conflicts with NEPA and the CEQ's regulations.

213.    The adoption of CE-6 was therefore arbitrary, capricious, an abuse of discretion, in excess of statutory authority, not in accordance with and without observance of procedure required by law. 5 U.S.C. § 706(2).

## PRAYERS FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in favor of Plaintiffs and issue the following relief:

A.    Declare the Forest Service's issuance of the Decision Memoranda for the South Warner, Bear Wallow, and Baby Bear Projects is arbitrary, capricious, an abuse of discretion, not in accordance with, and/or without observance of procedure required by law under the APA, 5 U.S.C. § 706(2)(A), (D);

B.    Declare that, because commercial logging operations like those authorized by the South Warner, Bear Wallow, and Baby Bear Projects are permitted under CE-6, CE-6 is *ultra vires*, violates NEPA and its implementing regulations, and the Forest Service acted arbitrarily, capriciously, and in excess of its authority in promulgating CE-6;

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

C.      Partially vacate the Decision Memoranda and remand to the Forest Service for additional consideration;

D.      Vacate 36 C.F.R. § 220.6(e)(6) as applied to commercial logging operations;

E.      Issue preliminary and permanent injunctive relief prohibiting the Forest Service from authorizing implementation of the South Warner, Bear Wallow, and Baby Bear Project's commercial logging operations until such time as the Forest Service can demonstrate compliance with the requirements of the National Environmental Policy Act and the Administrative Procedure Act;

F.      Issue preliminary and permanent injunctive relief prohibiting the Forest Service from using CE-6 to authorize commercial logging operations;

G.      Award Plaintiffs their reasonable fees, costs, expenses and disbursements, including reasonable attorneys' fees associated with this litigation pursuant to the Equal Access to Justice Act or other applicable statutes; and

H.      Grant such additional relief as the Court deems just and proper.


DATED this 11th day of April, 2025.

///

///

///

///

///

///

///

AMENDED/SUPPLEMENTAL COMPLAINT FOR
DECLARATORY & INJUNCTIVE RELIEF—41

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

Respectfully submitted,

s/ Oliver J. H. Stiefel
Oliver J. H. Stiefel, OSB # 135436
(503) 227-2212 │ oliver@crag.org
Meriel L. Darzen, OSB # 113645
(503) 525-2725 │ meriel@crag.org
CRAG LAW CENTER
3141 E. Burnside St.
Portland, Oregon 97214
Fax: (503) 296-5454

Erin Hogan-Freemole, OSB # 212850
(971) 417-5851 │ ehoganfreemole@wildearthguardians.org
WILDEARTH GUARDIANS
213 SW Ash Street, Suite 202
Portland, OR 97204

*Attorneys for Plaintiffs*

AMENDED/SUPPLEMENTAL COMPLAINT FOR
DECLARATORY & INJUNCTIVE RELIEF—42

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*