Oliver J. H. Stiefel, OSB # 135436
(503) 227-2212 │ oliver@crag.org
Meriel L. Darzen, OSB # 113645
(503) 525-2725 │ meriel@crag.org
CRAG LAW CENTER
3141 E. Burnside St.
Portland, Oregon 97214
Fax: (503) 296-5454

Erin E. Hogan-Freemole, OSB # 212850
(971) 417-6851 │ ehoganfreemole@wildearthguardians.org
WILDEARTH GUARDIANS
213 SW Ash Street, Suite 202
Portland, OR 97204

        *Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## MEDFORD DIVISION

| | |
|---|---|
| **OREGON WILD**, an Oregon nonprofit corporation; **WILDEARTH GUARDIANS**, a New Mexico nonprofit corporation; and **GO Alliance**, an Oregon nonprofit corporation,<br><br>Plaintiffs,<br><br>v.<br><br>**UNITED STATES FOREST SERVICE**, **DONALD ASHCRAFT**, in his official capacity as Lakeview Ranger District Ranger; **JEANNETTE WILSON**, in her official capacity as Silver Lake Ranger District Ranger; **TOM SHULTZ**, in his official capacity as Chief of the U.S. Forest Service; and **BROOKE ROLLINS**, in her official capacity as Secretary of Agriculture,<br><br>Defendants. | Case No. 1:22-cv-01007<br><br>**PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AND RESPONSE IN OPPOSITION TO DEFENDANTS' CROSS MOTION FOR SUMMARY JUDGMENT AND AFRC'S AMICUS BRIEF** |

## TABLE OF CONTENTS

TABLE OF CONTENTS.............................................................................................I

TABLE OF AUTHORITIES ................................................................................ IIII

GLOSSARY OF TERMS .................................................................................. VIIII

INTRODUCTION ................................................................................................... 1

ARGUMENT ........................................................................................................... 2

    I.    Defendants' Threshold Defenses Lack Merit. .................................................. 2

      B.    Plaintiffs' Claims Are Not Barred by the Statute of Limitations.................... 3

          1.    Oregon Wild's claim did not accrue in 2006. ........................................ 4

          2.    WildEarth Guardians' claim did not accrue in 2014. .............................. 6

          3.    Wild's claims accrued in 2021........................................................... 8

      C.    Claim 2 Is Not Barred by Waiver. ........................................................... 10

      D.    Claim 2 Is Not Barred by Laches............................................................ 13

    III.    CE-6 Exceeds the Forest Service's Authority and is Arbitrary and Capricious. .......... 15

      A.    These Are Not "NEPA Claims" Bound by *Seven County*. ........................... 15

      B.    <u>Claim 2</u>: As Applied to the Projects' Commercial Logging Operations, CE-6 Is *Ultra Vires*. ................................................................................. 18

          1.    The Forest Service's project-level findings are irrelevant....................... 18

          2.    The Forest Service was required, but failed, to rationally determine that commercial logging under CE-6 would have no significant impacts. ..................... 20

             i.    CE-6 allows commercial logging, and Plaintiffs challenge commercial logging specifically under CE-6. .......................................................... 21

             ii.    The Forest Service was required to find that commercial logging under CE-6 would have no individually or cumulatively significant impact. ............... 22

             iii.    The Forest Service did not make any findings as to the individual or cumulative significance of commercial logging under CE-6. ......................... 24

          3.    CE-6 relies on an impermissible interpretation of NEPA......................... 27

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

C.    <u>Claim 3</u>: CE-6 Also Facially Exceeds the Forest Service's Statutory Authority and Is Arbitrary and Capricious. .................................................................................... 29

IV.    Vacatur is the Appropriate Remedy. ........................................................................... 31

CONCLUSION ............................................................................................................................. 35

SIGNATURE BLOCK ..................................................................................................................... i

## TABLE OF AUTHORITIES

**Cases**

*Acri v. Intl. Ass'n of Machinists,*
  781 F.2d 1393 (9th Cir.1986) ................................................................. 7

*Alaska v. Bernhardt,*
  500 F. Supp. 3d 889 (D. Alaska 2020) .................................................. 12

*All. for the Wild Rockies v. U.S. Forest Serv.,*
  907 F.3d 1105 (9th Cir. 2018) .......................................................... 32, 33

*Am. Fed'n of Tchrs. v. Dep't of Educ.,*
  No. CV SAG-25-628, 2025 WL 2374697 (D. Md. Aug. 14, 2025) ......... 32

*Apache Survival Coal. v. United States,*
  21 F.3d 895 (9th Cir. 1994) ................................................................. 14

*Baylor Univ. Med. Ctr. v. Heckler,*
  758 F.2d 1052 (5th Cir. 1985) .............................................................. 14

*Bd. of Natural Res. of the State of Was. v. Brown,*
  992 F.2d 937 (9th Cir. 1993) ................................................................. 3

*Bennett v. Spear,*
  520 U.S. 154 (1997) ............................................................................. 18

*Cal. Cmtys. Against Toxics v. U.S. EPA,*
  688 F.3d 989 (9th Cir. 2012) ................................................................ 33

*Cal. Wilderness Coal. v. U.S. Dep't of Energy,*
  631 F.3d 1072 (9th Cir. 2011) .............................................................. 25

*Cascadia Wildlands v. U.S. Bureau of Land Mgmt.,*
  No. 24-4542, 2025 WL 2460946 (9th Cir. Aug. 27, 2025) .............. 17, 18

*Cedars-Sinai Medical Ctr. v. Shalala,*
  125 F.3d 765 (9th Cir. 1997) ................................................................. 4

*Citizens for Better Forestry v. U.S. Dep't of Agric.,*
  341 F.3d 961, 974 (9th Cir. 2003) ........................................................ 29

*Colorado Wild v. U.S. Forest Serv.,*
  435 F.3d 1204 (10th Cir. 2006) ....................................................... 22, 28

*Conserv. Cong. v. U.S. Forest Serv.,*
  No. 2:12-02416-WBS, 2013 WL 2457481 (E.D. Cal. June 6, 2013) ........ 8

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

*Corner Post, Inc. v. Board of Governors of the Federal Reserve System*,
   603 U.S. 799 (2024) ................................................................................................ passim

*Ctr. for Biological Diversity v. Salazar*,
   706 F.3d 1085 (9th Cir. 2013) ............................................................................. 19

*Envtl. Def. Ctr. v. BOEM*,
   36 F.4th 850 (9th Cir. 2022) ............................................................................... 30

*Envtl. Prot. Info. Ctr. v. Carlson*,
   968 F.3d 985 (9th Cir. 2020) ............................................................................... 17

*Forest Conservation Council v. U.S. Forest Service*,
   No. CV-03-0054-PCT-FJM, 2003 WL 23281957 (D. Ariz. July 9, 2003) ................................ 9

*Gifford Pinchot Task Force v. U.S. FWS*,
   378 F.3d 1059 (9th Cir. 2004) ............................................................................. 30

*Great Old Broads for Wilderness v. Kimbell*,
   709 F.3d 836 (9th Cir. 2013) ......................................................................... 10, 12

*Havasu Water Co. v. United States Dep't of Interior*,
   No. EDCV 24-464-GW-SPX, 2024 WL 4404956 (C.D. Cal. Aug. 27, 2024) ......................... 8

*Heartwood, Inc. v. U.S. Forest Service*,
   230 F.3d 947 (7th Cir. 2000) ........................................................................... 23, 24

*Heartwood, Inc. v. U.S. Forest Service*,
   73 F. Supp. 2d 962 (S.D. Ill. 1999) ................................................................... passim

*Herb Reed Enters., LLC v. Fla. Ent. Mgmt., Inc.*,
   736 F.3d 1239 (9th Cir. 2013) ............................................................................. 13

*Idaho Sporting Congress v. Rittenhouse*,
   305 F.3d 957 (9th Cir. 2002) ............................................................................... 10

*Irwin v. Dep't of Veterans Affairs*,
   498 U.S. 89 (1990) .............................................................................................. 4

*Jarrow Formulas, Inc. v. Nutrition Now, Inc.*,
   304 F.3d 829 (9th Cir. 2002) ............................................................................... 13

*Johnson v. Shalala*,
   2 F.3d 918 (9th Cir. 1993) .................................................................................. 11

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

'Ilio'ulaokalani Coal. v. Rumsfeld,
    464 F.3d 1083 (9th Cir. 2006) .................................................. 11

Lands Council v. McNair,
    629 F.3d 1070 (9th Cir. 2010) .................................................. 10

Lands Council v. Powell,
    395 F.3d 1019 (9th Cir. 2005) .................................................... 9

Los Padres ForestWatch v. U.S. Forest Serv.,
    25 F.4th 649 (9th Cir. 2022) .......................................... 19, 28

Lujan v. Defenders of Wildlife,
    504 U.S. 555 (1992) ...................................................................... 2

Lujan v. Nat'l Wildlife Fed'n,
    497 U.S. 871 (1990) ...................................................................... 7

Marsh v. Oregon Nat. Res. Council,
    490 U.S. 360 (1989) .................................................................... 35

Massachusetts v. EPA,
    549 U.S. 497 (2007) ...................................................................... 3

McBride Cotton & Cattle Corp. v. Veneman,
    290 F.3d 973 (9th Cir. 2002) .................................................... 12

Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.,
    463 U.S. 29 (1983) ............................................................... 22, 25

Mt. Cmtys. for Fire Safety v. Elliott,
    25 F.4th 667 (9th Cir. 2022) ................................... 21, 23, 28

Nat. Res. Def. Council, Inc. v. Evans,
    232 F. Supp. 2d 1003 (N.D. Cal. 2002). .................................. 4

Nat'l Parks Conservation Ass'n v. Semonite,
    422 F. Supp. 3d 92 (D.D.C. 2019) ......................................... 32

National Family Farm Coalition v. EPA,
    966 F.3d 893 (9th Cir. 2020) .................................................... 33

Native Ecosystems Council v. Dombeck,
    304 F.3d 886 (9th Cir. 2002) .......................................... 10, 11

PLAINTIFFS' RESPONSE/REPLY—V

*Native Ecosystems Council v. Marten*,
  612 F. Supp. 3d 1146 (D. Mont. 2020) ................................................. 11

*Neighbors of Cuddy Mountain v. U.S. Forest Serv.*,
  137 F.3d 1372 (9th Cir. 1998) .............................................................. 14

*Nw. Env't Def. Ctr. v. Bonneville Power Admin.*,
  117 F.3d 1520 (9th Cir. 1997) .............................................................. 12

*Ocean Advocs. v. U.S. Army Corps of Eng'rs*,
  402 F.3d 846 (9th Cir. 2005) ................................................................ 14

*Or. Wild v. U.S. Forest Serv.*,
  No. 23-35579, 2024 WL 4286965 (9th Cir. 2024) .................................. 1

*Oregon Nat. Desert Ass'n v. Bureau of Land Mgmt.*,
  625 F.3d 1092 (9th Cir. 2010) ............................................... 12, 17, 30

*Oregon Nat. Desert Ass'n v. Jewell*,
  840 F.3d 562 (9th Cir. 2016) ................................................................ 12

*Oregon Nat. Desert Ass'n v. McDaniel*,
  751 F. Supp. 2d 1151 (D. Or. 2011) ..................................................... 10

*Petrella v. Metro-Goldwyn-Mayer, Inc.*,
  572 U.S. 663 (2014) ............................................................................. 13

*Robertson v. Methow Valley Citizens Council*,
  490 U.S. 332 (1989) ............................................................................. 27

*Save the Peaks Coal. v. U.S. Forest Serv.*,
  669 F.3d 1025 (9th Cir. 2012) ......................................................... 13, 14

*Seven County Infrastructure Coalition v. Eagle County*,
  145 S. Ct. 1497 (2025) ................................................................... passim

*Sierra Club v. Bosworth*,
  510 F.3d 1016 (9th Cir. 2007) ....................................................... passim

*Solar Energy Indus. Ass'n v. FERC*,
  80 F.4th 956 (9th Cir. 2023) ................................................................. 31

*Summers v. Earth Island Institute*,
  555 U.S. 488 (2009) ............................................................................... 3

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

*Trump v. CASA,*
    145 S. Ct. 2540 (2025) ............................................................................. 32

*United States v. Garza-Sanchez,*
    217 F.3d 806 (9th Cir. 2000) .................................................................... 30

*United States v. Kwai Fun Wong,*
    135 S. Ct. 1625 (2015) ............................................................................... 4

*WildEarth Guardians v. Jeffries,*
    370 F. Supp. 3d 1208 (D. Or. 2018) ........................................................... 3

*WildEarth Guardians v. Jeffries,*
    370 F. Supp. 3d 1208 (D. Or. 2019) ..................................................... 3, 10

*Wilderness Soc. v. Robertson,*
    824 F. Supp. 947 (D. Mont. 1993) .............................................................. 7

**Statutes**

16 U.S.C. § 6591 ............................................................................................... 34

16 U.S.C. § 6591d ............................................................................................ 34

28 U.S.C § 2401 ........................................................................................... 4, 13

42 U.S.C. § 4336a(g) (2024) ............................................................................ 34

5 U.S.C. § 706 ........................................................................................... passim

**Other Authorities**

73 Fed. Reg. 43,084 (July 24, 2008) ............................................................... 24

85 Fed. Reg. 73,620 (Nov. 19, 2020) ......................................................... 33, 34

Executive Order 14225 (March 1, 2025) ......................................................... 15

Pub. L. 117-58 .................................................................................................. 34

**Regulations**

36 CFR 220.6 (2008) ............................................................................ 5, 19, 21

40 C.F.R. § 1507.3 (1978) ............................................................................... 31

40 C.F.R. § 1508.4 (1978) .......................................................... 22, 23, 31, 34

7 C.F.R. § 1.b.4(d)(30) (2025) ........................................................................ 35

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

## GLOSSARY OF TERMS

| | |
|---|---|
| AFRC | *Amicus* American Forest Resource Council |
| Agency | United States Forest Service |
| APA | Administrative Procedure Act |
| Board foot | A unit of measurement for a piece of lumber 12"x12"x1" (144 cubic inches). One million board feet (often abbreviated as "mmbf") is equivalent to roughly 200 logging trucks' worth of timber. |
| CE | Categorical Exclusion. A category of actions which do not individually or cumulatively have a significant effect on the human environment and which have been found to have no such effect and for which, therefore, neither an EA nor an EIS is required. |
| CE-6 | 36 C.F.R. § 220.6(e)(6) |
| CEQ | Council on Environmental Quality |
| Defendants | All named Defendants |
| EA | Environmental Assessment |
| EIS | Environmental Impact Statement |
| Forest | Fremont-Winema National Forest |
| Forest Service | Defendant United States Forest Service |
| Guardians | Plaintiff WildEarth Guardians |
| Impact or Effect | Used synonymously to describe ecological, aesthetic, historic, cultural, economic, social, or health consequences of an action, whether direct, indirect, or cumulative. "Direct" effects are caused by an action and occur at the same time and place. "Indirect" effects are caused by an action and are later in time or farther removed in distance. "Cumulative" effects result from the incremental effect of an action when added to other past, present, and reasonably foreseeable future actions. |
| Logging | Any silvicultural method employed for the purpose of cutting and removing trees. Logging can involve a variety of techniques including "thinning" and "clearcutting." Logging operations can involve felling trees, skidding felled trees to landings, building and maintaining roads, hauling logs on roads, and other associated activities. |
| NEPA | National Environmental Policy Act |
| Plaintiffs | All Plaintiffs |
| Projects | South Warner, Baby Bear, and Bear Wallow Projects |
| Salvage | Commercial logging of dead and dying trees |
| Wild | Plaintiffs Oregon Wild and WildEarth Guardians |

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

## INTRODUCTION

At its core, this case presents one fundamental question: Does NEPA grant an agency the power to waive its environmental review provisions at will? It does not—but that is what the Forest Service has done here. If the Forest Service had made the prerequisite finding that commercial logging under CE-6 would cause no individually or cumulatively significant environmental effects, one might expect Defendants' brief to point this Court towards those findings and the data behind them. But Defendants cite only a few passing references to the agency's general experience and expertise. This is plainly insufficient under NEPA and the APA.

It is no surprise, then, that Defendants continue to balk at addressing this case's merits, instead rehashing a series of threshold defenses. But *Corner Post, Inc. v. Board of Governors of the Federal Reserve System* ("*Corner Post*") cut the legs out from under their statute of limitations argument. 603 U.S. 799 (2024). Although the Ninth Circuit remanded specifically to "apply *Corner Post* in the first instance," *Or. Wild v. U.S. Forest Serv.*, No. 23-35579, 2024 WL 4286965 (9th Cir. 2024), Defendants substantively cite that case only once, and *amicus curiae* AFRC fails to apply *Corner Post* at all. *See* ECF No. 74-1 ("Am."). This, too, is understandable. Under *Corner Post*, it is not even a close question—Plaintiffs' claims are timely. And Defendants' grab-bag of other defenses fails for similar reasons. Plaintiffs first suffered an injury-in-fact in 2021, at which time they properly noticed the agency of their concerns with applying CE-6 to large-scale commercial logging operations.

Ultimately, Defendants and AFRC rely on policy appeals that cannot save CE-6. *See Corner Post*, 603 U.S. at 803 ("Pleas of administrative inconvenience never justify departing from the statute's clear text.") (cleaned up). Defendants must now grapple with the substance of Plaintiffs' challenge, and the Forest Service must comply with NEPA and the APA.

PLAINTIFFS' RESPONSE/REPLY—1

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

## ARGUMENT

### I.    Defendants' Threshold Defenses Lack Merit.

In the initial proceedings before this Court, and again before the Ninth Circuit, Defendants staunchly refused to address the merits of claim 2, instead relying entirely on a series of threshold defenses. They now recycle many of the same arguments—plus a few new ones for good measure. None have merit. Plaintiffs have standing and did not waive their second claim. Both claims are timely, regardless of whether Defendants style their opposition as an issue of the statute of limitations or of laches. This Court should therefore now turn to the merits of Plaintiffs' challenge.

Defendants first attack GO Alliance's standing. They insist that GO Alliance has not shown that any of its members have concrete plans to visit any CE-6 project areas or the Fremont-Winema National Forest. Defendants' Response, ECF No. 72 ("Defs."), at 49–51. Not so.

Ralph Bloemers, the Executive Director of GO Alliance, has worked on forest law and policy issues in Oregon, specifically related to wildfire, for nearly 25 years. ECF No. 68-1 ("Bloemers Decl."). Mr. Bloemers often visits Oregon's National Forests, including the Fremont-Winema, to pursue professional and personal interests. Second Declaration of Ralph Bloemers ("Bloemers 2nd Decl.") ¶¶ 4–6. He has described this ongoing work and cited recent trips to the Forest and surrounding areas both for recreation and to work with people and communities affected by wildfire. *Id.* ¶¶ 4–5, 13–14. In short, Mr. Bloemers demonstrates a deep and long-standing interest in Oregon forests and public lands, including the specific Project areas where CE-6 will be used for commercial logging operations. *See id.* ¶¶ 4–6, 13–15.

Contrast the instant matter to *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992). There, plaintiffs challenged a rule eliminating certain Endangered Species Act requirements for overseas projects. *Id.* at 557–59. They proffered two declarations, each testifying to a single past trip abroad

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

to view species impacted by the rule change. *Id.* at 563–64. Neither declarant testified to a definite plan to return; their mere "'some day' intentions" were insufficient. *Id.* at 564. Indeed, one of the countries was in the midst of a civil war, preventing any return visits for the foreseeable future. *Id.* Similarly, in *Summers v. Earth Island Institute*, the Court held that asserting "plans to visit several unnamed national forests" did not establish a concrete interest in any particular place, while identifying specific objectionable projects without asserting "any firm intention to visit their locations" did not establish an imminent injury. 555 U.S. 488, 495–96 (2009).

Mr. Bloemers, in contrast, testifies to numerous visits to the Forest and, specifically, to CE-6 project areas. Bloemers Decl. ¶¶ 7–9. He has shown both an interest in those particular areas and a likelihood of imminent injury. *Cf. Summers*, 555 U.S. at 495–96. Although implicit in his original declaration, Mr. Bloemers now submits a supplemental declaration describing firm plans to visit the Forest in the near future for specific investigative purposes. Bloemers 2nd Decl. ¶¶ 4, 13, 15. *Cf. WildEarth Guardians v. Jeffries*, 370 F. Supp. 3d 1208, 1229 (D. Or. 2018), *adopted in relevant part by* 370 F. Supp. 3d 1208 (D. Or. 2018) (crediting supplemental declaration). All Plaintiffs have standing.[1]

## B.    Plaintiffs' Claims Are Not Barred by the Statute of Limitations.

Defendants once again raise the statute of limitations, arguing—despite the sea-change wrought by *Corner Post*—that Wild's claims are time-barred. They are wrong. Defendants have abandoned their primary argument from Round 1 and no longer assert that Wild's claim accrued in 1992. They now rely entirely on the premise that Wild was injured by alleged earlier applications

---

[1] This Court need only find standing for one plaintiff. *See Massachusetts v. EPA*, 549 U.S. 497, 518 (2007). Thus, if either Oregon Wild or WildEarth Guardians can pursue claim 3, this Court may dispense with the question of GO Alliance's standing. *Bd. of Natural Res. of the State of Was. v. Brown*, 992 F.2d 937, 942 (9th Cir. 1993) ("If any of these [plaintiffs] has standing, we may reach the merits without considering whether the other two also have standing.").

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

of CE-6 to commercial logging, but fail to establish the existence of any such injuries. *See* Defs. at 21–24. In support of this narrative, Defendants and AFRC make a variety of baseless claims regarding the historical use of CE-6, but the record demonstrates that Plaintiffs' claims first accrued in 2021.[2]

Initially, Defendants contend that Section 2401(a) must be construed strictly in the government's favor. Defs. at 21–22 (citing *Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89, 94 (1990)). But Section 2401(a) is not jurisdictional, so the strict-construction doctrine is inapplicable. *Cedars-Sinai Medical Ctr. v. Shalala*, 125 F.3d 765, 770 (9th Cir. 1997); *cf. United States v. Kwai Fun Wong*, 135 S. Ct. 1625 (2015) (holding that Section 2401(b) is not jurisdictional). Moreover, while Defendants suggest that all relevant **facts** should be construed in their favor, *Irwin*'s "strictly construed" language goes to the interpretation of the **statute**—and the Supreme Court in *Corner Post* has interpreted Section 2401(a) as a "plaintiff-centric" accrual rule. 603 U.S. at 813. *Corner Post*, not *Irwin*, provides the governing framework.

### 1.    Oregon Wild's claim did not accrue in 2006.

Defendants claim that Oregon Wild's opportunity to challenge commercial logging under CE-6 came in 2006, when the Forest Service approved the Jack Creek and Rock Creek Meadows Fuel Reduction and Meadow Restoration Project ("the Jack Creek Project"). Defs. at 22–23. But the Jack Creek Project did not authorize commercial logging under CE-6, as the project documents demonstrate, and as the Forest Service lead for that project confirms. *See* Declaration of Jayne

---

[2] Defendants do not challenge GO Alliance's timeliness as to claim 3, and therefore this Court need not decide when it accrued as to Wild, because "even if certain plaintiffs are time-barred from making this argument, the remainder of the plaintiffs are not." *Nat. Res. Def. Council, Inc. v. Evans*, 232 F. Supp. 2d 1003, 1024 (N.D. Cal. 2002). For the same reasons, if this Court rejects Defendants' timeliness arguments as to either Oregon Wild or WildEarth Guardians, it need not decide them as to the other original plaintiff and may address the merits of claim 2.

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

Goodwin ("Goodwin Decl.") ¶ 20; *see also* SAR_169–71, 174, 211 (identifying Ms. Goodwin as "Team Leader"), 218, 221. Instead, it relied solely on (now-defunct) CE-10 for certain de minimis sales of forest products. *See* SAR_169–74, 218, 221; Goodwin Decl. ¶¶ 13–15, 19–20.

The Forest Service first discussed authorizing the "Jack Creek and Rock Creek Meadows Fuel Reduction Project," which included a minimal level of potential commercial activity, under CE-10 alone. *See* Goodwin Decl. ¶ 19; *see also* SAR_217–18. In a later "legal notice of comment opportunity," the Forest Service again proposed the "Jack Creek and Rock Creek project" solely under CE-10, stating that it would "remove dead lodgepole pines, thin overstocked live trees and remove lodgepole pine encroachment[.]" SAR_221. It also proposed the separate "Round Meadow Riparian Restoration project," which would "remove lodgepole pine encroachment and thin overstocked small lodgepole pine trees," under CE-6. *Id.* There was no reference to commercial logging in either project. *See id.* Nonetheless, ONRC (Oregon Wild's predecessor organization) responded by asking if the agency would "sell the large logs as a commercial timber sale" and urged it to instead use them as "restoration logs" rather than cut "live green trees" for that purpose. SAR_174; *see also* Third Declaration of Doug Heiken ("3d Heiken Decl.) ¶¶ 7–8, 10–11, 16–17.

The "Jack Creek and Rock Creek Meadows Fuel Reduction and Meadow Restoration Project" decision notice combined the two projects and cited both CE-6 and CE-10. SAR_169–174.[3] It responded to ONRC's comments, stating that "merchantable dead trees would be offered commercially. Estimates indicate approximately 60–70% of the dead trees would be merchantable as firewood or chips. Recently dead trees may be suitably sound to be sold for sawlogs or house

---

[3] The Forest Service frequently approved projects under multiple CEs where one alone would not cover all project activities. For example, South Warner was approved under both CE-6 and CE-18, but this does not mean that CE-6 was or could be used to authorize "culvert repairs and replacements." SWAR_12107–08 (quoting 36 CFR 220.6(e)(18)).

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

logs." SAR_174. In other words, the only commercial material—primarily firewood and wood chips rather than lumber—would come from dead trees. This is significant because, when the Forest Service originally proposed Jack Creek as two separate projects, it stated that dead trees would be cut only under CE-10, while the CE-6 project would involve cutting only small live trees—none of which were ever proposed for commercial sale. *See* SAR_174, 217–18, 221–22; Goodwin Decl. ¶¶ 18–20; 3d Heiken Decl. ¶¶ 5–6, 10–11, 16–17.

In short, the Forest Service never authorized any commercial activities under CE-6, nor did Oregon Wild have any reason to believe that it would.[4] *See* 3d Heiken Decl. ¶¶ 5–6, 10–11, 16–17; Goodwin Decl. ¶¶ 18–20; *cf.* SWAR_3299 (Forest stating that South Warner was different from "similar past projects" because "NEPA will be accomplished with a CE instead of an EA"). Oregon Wild was not injured by the use of CE-10 to authorize firewood cutting under forest product permits in 2006. As *Corner Post* establishes, Oregon Wild could not have challenged commercial logging under CE-6 at that time, because none occurred. *See* 603 U.S. at 813.

## 2.   WildEarth Guardians' claim did not accrue in 2014.

Defendants also cite the Cordovas Project, authorized in 2014 on the Santa Fe National Forest in New Mexico, to argue that WildEarth Guardians is time-barred from bringing claim 2. Defs. at 23; *see also* Am. at 9. Not so. The Cordovas Project—a 2,280-acre "restoration thinning and prescribed fire project" with an unknown level of commercial thinning—did not start the clock running against Guardians, because Guardians was neither injured by nor on notice of the project and its authorization under CE-6. PAR_3534.

---

[4] Indeed, as the project team leader has explained, the Jack Creek Project did not authorize any timber sales under **either** CE. *See* Goodwin Decl. ¶¶ 13–20. Rather, it allowed the removal of some posts and poles, saw logs, woodchips, and firewood under individual "forest product removal permits." *See* Goodwin Decl. ¶¶ 14–15. These actions have very different impacts than timber sales, and even this minimal level of commercial activity was authorized under CE-10, not CE-6.

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

Defendants do not explain how the Cordovas Project injured Guardians such that claim 2 accrued. *See* Corner Post, 603 U.S. at 817 (rejecting rule that would start limitations period "not when [the plaintiff] had a complete and present cause of action but when the agency action was final and, theoretically, some **other** plaintiff was injured and could have sued."). Instead, they skip the standing inquiry and simply insist that Guardians "reasonably knew" about the Cordovas Project because it occurred on a National Forest near a city in which Guardians maintains an office. Defs. at 23. This is not enough to establish interest in the project area, much less injury and right to bring suit. *Cf.* Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 886–89 (1990) (use of lands "in the vicinity" of affected area does not confer a right to sue); *see also* Corner Post, 603 U.S. at 809.

But even assuming that Guardians does have interests in the Santa Fe National Forest as a whole, and that the Cordovas Project did harm these interests, Defendants have failed to show that Guardians was, or even should have been, aware of its alleged injury. *See* Acri v. Intl. Ass'n of Machinists, 781 F.2d 1393, 1396 (9th Cir.1986) ("[A] cause of action accrues when the plaintiff is aware of the wrong[.]"), *cert. denied*, 479 U.S. 816 (1986). Defendants tacitly concede that they never notified Guardians of the Cordovas Project. *See* Resp. at 28–29. Nor did Defendants effect constructive notice through publication in the federal register; actions authorized under a CE do not appear in the federal register. *Cf.* Wilderness Soc. v. Robertson, 824 F. Supp. 947, 951 (D. Mont. 1993) (holding that neither agency decision nor press releases constituted notice, and claim thus did not accrue until publication in federal register). Defendants suggest no mechanism by which Guardians should have discovered the Cordovas Project without notice, and never explain how failure to do so revealed a lack of reasonable diligence.

Defendants argue for a broad, defendant-focused standard under which notice is assumed to occur as soon as the government acts—regardless of whether any actual or constructive notice

PLAINTIFFS' RESPONSE/REPLY—7

is provided. *See* Defs. at 23–24. But this theory flies in the face of *Corner Post*'s central holding: "[T]he standard accrual rule that § 2401(a) exemplifies is **plaintiff specific**." 603 U.S. at 802 (emphasis in original). So, too, must the notice inquiry be, as Defendants themselves suggests and their one citation confirms. Defs. at 23–24. "[W]hen the accrual period for Plaintiff's APA claims began depends on **when it knew, or should have known**, of the alleged failed duty[.]" *Havasu Water Co. v. United States Dep't of Interior*, No. EDCV 24-464-GW-SPX, 2024 WL 4404956, at *7 (C.D. Cal. Aug. 27, 2024) (citing *Corner Post* and holding that claim accrued upon actual notice of underlying action) (emphasis added). For Wild, that did not occur until the South Warner Project was approved in 2021.

### 3.    Wild's claims accrued in 2021.

Defendants and AFRC also produce a handful of other citations regarding the timeliness of claim 2, but their attempted "gotchas" all fall flat.

The 2017 Bull Run Project and 2018 Spear Creek Project were well within the statute of limitations when Wild filed suit in 2022. *See* Am. at 8–9.[5] It is unclear whether the Tatham Ridge Project actually involved any commercial thinning. *See id.* at 9; *see also Conserv. Cong. v. U.S. Forest Serv.*, No. 2:12-02416-WBS, 2013 WL 2457481, at *1 (E.D. Cal. June 6, 2013) (describing and enjoining project). Moreover, all three projects were in California, *see id.*, where neither group maintains an office and Oregon Wild does not operate at all. And AFRC never even suggests that Wild had any notice (actual or constructive) of these activities. *See id.* at 8–9.

Defendants cite *Forest Conservation Council v. U.S. Forest Service* to assert that the "use of CE-6 in projects with commercial thinning is long-established and litigation over such use has

---

[5] Defendants also refer in passing to the 2020 Bluemile Project on the Forest, but do not argue that Wild's second claim is untimely due to this application of CE-6. *See* Defs. at 6–7.

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

long been public record." Defs. at 29 (citing No. CV-03-0054-PCT-FJM, 2003 WL 23281957, at *1, *3 (D. Ariz. July 9, 2003), *aff'd,* 110 F. App'x 26 (9th Cir. 2004)). But Defendants neglect to mention what that court record shows: The Forest Service was enjoined from using CE-6 to authorize the commercial logging at issue. *See* 2003 WL 23281957 at *4. It is unclear how Wild was injured by the Forest Service being **prevented** from using CE-6 for commercial logging, or what more Defendants believe Wild should have done to protect its interests. If anything, *Forest Conservation Council* would have convinced Wild that CE-6 did not apply to commercial logging. *Cf.* Corner Post, 603 U.S. at 812 ("Statutes of limitations require plaintiffs to pursue diligent prosecution of **known** claims[.]") (emphasis added).

In the end, none of this extra-record evidence can save Defendants.[6] CE-6 has existed for 33 years, and the Forest Service has apparently used it extensively: AFRC notes that CE-6 "accounted for 2.4 million of the 2.9 million acres to be treated for projects approved under CEs" between 2003 and 2005. Am. at 8. Yet from all these projects, Defendants and AFRC together have dredged up one example of an undefined amount of commercial thinning authorized under CE-6 between 1992 and 2016 (six years before this lawsuit commenced). This hardly reflects a "substantial practice of relying on CE-6" for commercial logging. Am. at 8. Had any such "substantial practice" existed, this Court would undoubtedly have been shown evidence of it in the last three years. But no such evidence has been presented, and so, under *Corner Post*, this Court must rule that Wild's claims accrued only in 2021.

---

[6] AFRC's brief in particular relies heavily on extra-record sources irrelevant to the questions presented. *Compare* Am. at 4–9 (citing multiple extra-record documents) *and* Defs. at 23 n.7 (citing extra-record documents) *with* ECF No. 40 (denying judicial notice of similar documents). Neither AFRC nor Defendants articulate the specific purposes for which this Court could review these documents, nor describe any applicable exception to the record-review rule. *Cf.* Lands Council v. Powell, 395 F.3d 1019, 1030 (9th Cir. 2005).

PLAINTIFFS' RESPONSE/REPLY—9

### C.    Claim 2 Is Not Barred by Waiver.

Defendants next allege that claim 2 was waived because Wild failed to raise it in scoping comments. Defs. at 47–49.[7] Untrue. Wild (and others) adequately notified the Forest Service of its fundamental concern: Applying CE-6 to commercial thinning on the scale of the Projects would violate NEPA. Wild thus "provided sufficient notice to the [agency] to afford it the opportunity to rectify the violations." *Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 899 (9th Cir. 2002). Further refinement of Wild's legal argument was not required and would have served no purpose.

The Ninth Circuit has "consistently defined the exhaustion requirement broadly" for environmental claims brought under the APA. *Great Old Broads for Wilderness v. Kimbell*, 709 F.3d 836, 848 (9th Cir. 2013). The requirement allows "agencies to utilize their expertise, correct any mistakes, and avoid unnecessary judicial intervention[.]" *Id.* at 846. To accomplish these purposes, a plaintiff need not use "precise legal formulations*." Idaho Sporting Congress v. Rittenhouse*, 305 F.3d 957, 965 (9th Cir. 2002). Indeed, "plaintiffs need not cite the relevant statute or regulation to exhaust a legal issue," as long as their comments are not "completely attenuated from the legal authority[.]" *Oregon Nat. Desert Ass'n v. McDaniel*, 751 F. Supp. 2d 1151, 1161—63 (D. Or. 2011) (collecting cases). "Alerting an agency in general terms is enough to satisfy the exhaustion requirement[.]'" *WildEarth Guardians v. Jeffries*, 370 F. Supp. 3d 1208, 1235–36 (D. Or. 2019) (citing *Lands Council v. McNair*, 629 F.3d 1070, 1075 (9th Cir. 2010)).

Wild satisfied this broad standard. Wild (and others) repeatedly informed Defendants that CE-6 was inappropriate for large-scale commercial logging, which must instead be analyzed in an EA or EIS. *See*, e.g., SWAR_4001–02, 8701–02 ("the Forest Service cannot, by law, approve a

---

[7] Defendants never allege waiver of claim 3; this Court must therefore reach its merits if any Plaintiff has standing.

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

project of this size . . . using its CE authority"), 8707–10 (explaining that use of a CE for large projects conflicts with NEPA's purpose); BBAR_689–90 (explaining that commercial logging specifically involves "trade-offs that need to be considered in a NEPA analysis"); BWAR_2273 (summarizing comments opposing the use of a CE for large logging projects), 2577–80 (same). The Forest Service was well aware of the issue (even prior to Wild's scoping comments), knew that it was pushing the boundaries, and had ample opportunity to reconsider using CE-6 to meet its NEPA obligations. *See*, e.g., SWAR_1788–89 (this "type of NEPA" might "raise a big red flag"), 1829–30 (agency concern about use of CE-6), 2937 (noting past internal "resistance" to using CEs for large logging projects like South Warner); *cf. 'Ilio'ulaokalani Coal. v. Rumsfeld, 464 F.3d 1083, 1092 (9th Cir. 2006)* (no exhaustion problem "where the agency had independent knowledge of the issues that concerned Plaintiffs"). Wild thus "provided sufficient notice to the [agency] to afford it the opportunity to rectify the violations." *Dombeck*, 304 F.3d at 899.[8]

Moreover, this is not a case where a more "refined legal argument" in Wild's scoping comments would have assisted the agency or this Court in resolving the matter. *Id.* at 898. Nothing would have been "gained from permitting the compilation of a detailed factual record, or from agency expertise," and so greater specificity by Wild would have been "futile." *Johnson v. Shalala, 2 F.3d 918, 922 (9th Cir. 1993)*.

Wild does not challenge the agency's failure to adequately address a specific factual matter

---

[8] It would be particularly inappropriate to apply a heightened exhaustion requirement here. For a CE project, the public cannot comment on the draft analysis or object to the agency's decision, as it would for an EA or EIS. *See* 36 C.F.R. §§ 218.1, 218.5(a), 218.20, 218.25. Here, the public's only opportunity to raise issues was in response to two-to-three-page scoping notices that—for South Warner—did not even identify the legal authority being invoked. BBAR_127–28; BWAR_1998–99; SWAR_3643–45 (scoping notices). Defendants cannot reasonably expect detailed comments presenting fully developed legal theories based on so little information. *See Native Ecosystems Council v. Marten, 612 F. Supp. 3d 1146, 1163 (D. Mont. 2020)*.

PLAINTIFFS' RESPONSE/REPLY—11

in approving the Projects; the only relevant fact is that the Projects authorize commercial logging under CE-6. *See Alaska v. Bernhardt*, 500 F. Supp. 3d 889, 907–09 (D. Alaska 2020), *aff'd sub nom. Safari Club Int'l v. Haaland*, 31 F.4th 1157 (9th Cir. 2022) (distinguishing challenge to use of CE from "a specific factual contention regarding the substantive content of an EIS" and holding issue exhaustion inapplicable) (quoting *Nw. Env't Def. Ctr. v. Bonneville Power Admin.*, 117 F.3d 1520, 1535 (9th Cir. 1997)); *contra Oregon Nat. Desert Ass'n v. Jewell*, 840 F.3d 562, 572–73 (9th Cir. 2016) (considering whether plaintiffs sufficiently put agency on notice that it should address highly specific factual issue in EIS); *see also infra* at 18–20, 27–29. The Forest Service could not have resolved Wild's concerns through applying its expertise or adding more detail to its Project-level analyses. The only action the agency could have taken to "correct any mistakes, and avoid unnecessary judicial intervention" was to not apply CE-6 to the Projects' commercial aspects—which Wild repeatedly urged it to do. *Great Old Broads*, 709 F.3d at 846.

Nor would compilation of more detailed project-level records have assisted this Court in deciding whether CE-6 was lawfully promulgated. The Forest Service's opportunity to "develop a detailed factual record and utilize its expertise" in support of its decision occurred during the 1992 rulemaking. *McBride Cotton & Cattle Corp. v. Veneman*, 290 F.3d 973, 982 (9th Cir. 2002). That rulemaking record is where the relevant analysis, findings, and conclusions must be found— anything added in response to Wild's comments or to prepare for litigation would have been mere "post hoc rationalization advanced to defend past agency action against attack." *Oregon Nat. Desert Ass'n v. Bureau of Land Mgmt.*, 625 F.3d 1092, 1120 (9th Cir. 2010) (cleaned up). The Fremont-Winema National Forest in 2022 lacked the ability to fix the Forest Service's rulemaking in 1992, regardless of how precisely Wild articulated its legal argument. Demanding highly detailed scoping comments "would be an idle act." *McBride Cotton & Cattle*, 290 F.3d at 982.

PLAINTIFFS' RESPONSE/REPLY—12

### D.    Claim 2 Is Not Barred by Laches.

Finally, Defendants debut a fourth threshold argument, invoking laches. Defs. at 27–29. But Wild's action is timely under 28 U.S.C. § 2401, and laches is thus inapplicable. *See Petrella v. Metro-Goldwyn-Mayer, Inc., 572 U.S. 663, 678–79 (2014)* (suggesting that "laches should be limited to cases in which no statute of limitations applies"); *Jarrow Formulas, Inc. v. Nutrition Now, Inc., 304 F.3d 829, 836 (9th Cir. 2002)* ("the strong presumption is that laches is inapplicable" for claims within analogous limitations period). Moreover, any alleged delay did not unduly prejudice Defendants, and so laches would not apply even if claim 2 was untimely. *See Save the Peaks Coal. v. U.S. Forest Serv., 669 F.3d 1025, 1033 (9th Cir. 2012)*.

In an attempt to salvage their original argument post-*Corner Post*, Defendants again insist that Wild should have brought claim 2 when CE-6 was promulgated. Defs. at 27–28. But this fails for the same reason that any such suit would have failed in 1992: Wild was not injured by CE-6's application to commercial logging until CE-6 was applied to commercial logging. *See Corner Post, 603 U.S. at 812* (rejecting proposed rule that would start the statute of limitations clock at finality, not injury).[9] Wild did not "sleep on [its] rights"—it simply had no right to bring that challenge at that time. Defs. at 28 (quoting *Jarrow Formulas, 304 F.3d at 835*); *see also Herb Reed Enters., LLC v. Fla. Ent. Mgmt., Inc., 736 F.3d 1239, 1246 (9th Cir. 2013)* (holding laches inapplicable when plaintiff had no right to sue earlier, although challenged actions occurred decades before).

Defendants also re-package their arguments regarding other decisions that allegedly authorized commercial logging under CE-6, allegedly injuring Wild. Defs. at 28. They fare no better here. Wild was not injured in 2003, or 2006, or 2014. *See supra* at 4–9. It did not "delay"

---

[9] Defendants do not assert that CE-6 was used to authorize commercial logging in 1992, or even in the following decade. *See* Defs. at 28.

PLAINTIFFS' RESPONSE/REPLY—13

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

by waiting to file until it had a complete and present cause of action. *See Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1381 (9th Cir. 1998).

Moreover, laches does not apply because the "prejudice" Defendants allege is irrelevant here. "Prejudice in environmental actions is measured by what Congress defines as prejudice." *Save the Peaks Coal.*, 669 F.3d at 1032 (cleaned up); *see also Ocean Advocs. v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 862 (9th Cir. 2005) ("Laches is strongly disfavored in environmental cases."). The "primary concern is whether the harm that Congress sought to prevent through the relevant statutory scheme is now irreversible . . . or is reversible only at undue cost to the relevant project[.]" *Apache Survival Coal. v. United States*, 21 F.3d 895, 912 (9th Cir. 1994) (finding undue prejudice where project was substantially complete, $8,000,000 had been expended, and relevant harm was "in large measure" irreversible). Such is not the case here.

Under this framework, the need to prepare an EA or EIS for any **future** project cannot be prejudicial, as it would not be caused by Wild's alleged delay but by a decision on the merits partially invalidating CE-6.[10] *Baylor Univ. Med. Ctr. v. Heckler*, 758 F.2d 1052, 1058 (5th Cir. 1985); *cf. Corner Post*, 603 U.S. at 823 ("[A] federal regulation that makes it six years without being contested does not enter a promised land free from legal challenge."). In contrast, the harm Congress sought to prevent—uninformed agency action—has not yet occurred. Defendants cannot show any undue prejudice, and laches is therefore inapplicable.

---

[10] Nor would partially enjoining the Projects at issue create undue prejudice. Defendants elsewhere complain that "multiple timber sales . . . have been bid and awarded without challenge from Plaintiffs[.]" Defs. at 53. But all of these timber sales were awarded in the past year, long after Wild first brought suit, and are therefore irrelevant to the laches inquiry. *See Save the Peaks Coal.*, 669 F.3d at 1033 ("[P]rejudice must be judged as of the time the lawsuit was filed, thereby eliminating consideration of post-lawsuit expenditures and progress[.]").

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

At base, Defendants' position is that they wish to use CE-6 to authorize more large logging projects faster, and that they should not be required to face judicial review. *See* Kinder Decl., ECF No. 73 ¶¶ 3 (CE-6 is "key to attaining the objectives set forth in Executive Order 14225, Immediate Expansion of American Timber Production (March 1, 2025)"), 4 (noting adoption of CE-6 by other agencies in June, 2025); Defs. at 29; ECF No. 57 at 10, 14 (opposing motion to amend on grounds that it would permit merits briefing). Defendants are entitled to advocate for this policy view. But they have no lawful interest in continuing to evade their statutory duties, and the prospect of losing in court does not constitute undue prejudice. Defendants must finally respond to the merits of Plaintiffs' challenge.

## III.    CE-6 Exceeds the Forest Service's Authority and is Arbitrary and Capricious.

Once past the thicket of Defendants' threshold arguments, Wild's position is simple: An agency has no authority to exempt an expansive category of activities from full NEPA review without demonstrating that they will have no individually or cumulatively significant impacts. The Forest Service never made or supported such a finding as to commercial logging under CE-6. Its promulgation for such activities was based on an unreasonable interpretation of the statute. CE-6 is thus *ultra vires* as applied to the Projects' commercial logging activities. This conclusion is compelled by the text and purpose of NEPA.

### A.  These Are Not "NEPA Claims" Bound by *Seven County*.

In a last-ditch effort to avoid the true merits of this case, Defendants attempt to re-write the standard of review. Defendants ask for unfettered deference by trying to shoehorn this case into *Seven County Infrastructure Coalition v. Eagle County* ("*Seven County*"), 145 S. Ct. 1497 (2025). Although Defendants cite that case no less than eight times, it is inapposite. Defendants fail to unpack what that case was about and relate it back to the facts of this case.

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

*Seven County* resolved a NEPA challenge to an 88-mile rail line in Utah. 145 S. Ct. at 1507. Although the EIS was "extraordinarily lengthy"—over 3,600 pages—opponents attacked its treatment of indirect effects, alleging that it improperly ignored increased upstream drilling due to improved access to the basin and increased downstream refining of crude oil carried by the rail line. *Id.* at 1509. The D.C. Circuit agreed, concluding that the increased drilling and refining were "reasonably foreseeable" impacts that should have been disclosed and evaluated in the EIS. *Id.*

The Supreme Court reversed on two grounds. First, the five-justice majority reiterated "long-standing NEPA precedents." *Id.* at 1515. "[W]hen reviewing an agency's EIS, 'the only role for a court' is to confirm that the agency has addressed environmental consequences and feasible alternatives as to the relevant project." *Id.* at 1511. Thus, "when determining whether an agency's EIS complied with NEPA, a court should afford substantial deference to the agency." *Id.* at 1511–12. The D.C. Circuit had run astray of this principle, failing to defer to the agency's reasonable line-drawing on which indirect effects to consider. *Id.* at 1513.

Second, the panel's "decision was mistaken on the merits under NEPA," *id.* at 1515, because "NEPA requires agencies to focus on the environmental effects of the project at issue." *Id.* at 1508. The D.C. Circuit had erroneously required consideration of "separate projects," distant in time and space, that "fall outside the [agency's] authority" and are regulated by other entities. *Id.* at 1515. To analyze a project, the agency need only consider **that project's** impacts. *See id.*

Unlike *Seven County*, this case does not involve a challenge to a project-level NEPA analysis. *Contra* Defs. at 39–45.[11] NEPA allows agencies to address the potential significance of a project or activities at one of two stages: (1) when reviewing and approving a specific project

---

[11] This bears repeating, as Defendants persistently confuse Wild's as-applied challenge to CE-6 with a challenge to the Forest Service's project-specific analysis. *See infra* at 18–20, 27–29.

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

through an EIS or EA; or, (2) if a project is approved under a CE, upon adoption of that CE in a rulemaking, by making reasonable and supported findings that the covered activities do not individually or cumulatively cause significant effects. *See Envtl. Prot. Info. Ctr. v. Carlson*, 968 F.3d 985, 988 (9th Cir. 2020). *Seven County* dealt with the former—a project-specific challenge to the contents of an EIS. 145 S. Ct. at 1512. The Court reiterated that in such cases, once an agency has identified significant environmental impacts and feasible alternatives, a reviewing court should not second-guess the agency's predictive and scientific judgments. *Id.*; *see also Cascadia Wildlands v. U.S. Bureau of Land Mgmt.*, No. 24-4542, 2025 WL 2460946, *25–26 (9th Cir. Aug. 27, 2025)* (rejecting challenge to project-specific EA based on substantive disagreement with agency's findings on a "technical, scientific issue").

But this case deals with the latter. *Seven County* does not address NEPA's requirements at the CE rulemaking stage, or the APA's basic requirements for rulemaking in general. To the extent that *Seven County* applies, however, it weighs in favor of Plaintiffs' arguments because it confirms that a reviewing court must ensure that the agency's decision must be "reasonable and reasonably explained." 145 S. Ct. at 1511. There, the agency easily met that standard where it prepared over 3,600 pages of analysis for a single project and reasonably declined to consider remote effects. Here, on the other hand, all Defendants can point to are conclusory statements and blind reliance on agency expertise. Defs. at 35 (citing only PAR_3168; SAR_9–10, 51). There were no findings, no analysis, no predictive or scientific judgements to which this Court might defer. *See infra* at 24–27; *see also Or. Nat. Desert Ass'n*, 625 F.3d at 1121 ("[The court] cannot defer to a void").

Plaintiffs are not "flyspecking" an otherwise detailed analysis, or demanding consideration of attenuated upstream or downstream indirect effects. The Forest Service never disclosed and considered even the direct environmental impacts of commercial logging under CE-6 **at all**—

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

indeed, it never even mentioned the issue in its rulemaking. *See* Plaintiffs' Mot. Summary Judgement, ECF No. 68 ("Op.") at 6–8, 23–25. Plaintiffs are not attacking the agency's "predictive and scientific judgments." *Seven County*, 145 S. Ct. at 1512. The Forest Service never explicitly made any such judgements. The agency may have discretion to "weigh environmental consequences as [it] reasonably sees fit," *id.* at 1507, but it must weigh them somehow. *Cf. Bennett v. Spear*, 520 U.S. 154, 172 (1997) ("It is rudimentary administrative law that discretion as to the substance of the ultimate decision does not confer discretion to ignore the required procedures of decisionmaking."); *Cascadia Wildlands.*, 2025 WL 2460946 at *23–24 (requiring detailed analysis but deferring to agency's choice to set analysis forth in appendix, biological assessment, and tiering documents rather than body of EA). This simply did not occur with the adoption of CE-6. *See infra* at 24–27.

**B.** <u>Claim 2</u>**: As Applied to the Projects' Commercial Logging Operations, CE-6 Is *Ultra Vires*.**

**1. The Forest Service's project-level findings are irrelevant.**

Defendants' first stab at the merits focuses primarily on defending against claims Plaintiffs did not bring and rebutting arguments Plaintiffs did not make. They highlight various project-specific findings that they suggest Plaintiffs should have challenged, but none of them are relevant to the questions before this Court.

Defendants argue at some length that "the Forest Service made rational and unchallenged findings that the projects did not have significant effects warranting further NEPA analysis." Defs. at 39. This is irrelevant to Plaintiffs' as-applied challenge to CE-6—no project-specific determinations made in 2021 could affect the lawfulness of rulemaking in 1992. *See Sierra Club v. Bosworth*, 510 F.3d 1016, 1027 (9th Cir. 2007) ("That the Forest Service may perform an impacts analysis at the project level does not relieve it of its obligation to ensure that [a] CE as a

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

whole has no cumulative impacts."); *Heartwood, Inc. v. U.S. Forest Service*, 73 F. Supp. 2d 962, 977 (S.D. Ill. 1999) ("*Heartwood*") (explaining that project-level findings are "irrelevant to the FS's initial decision to find that timber harvests of this size should be categorically excluded.").

First, no environmental significance analysis is required to approve a project under a CE, and there is limited requirement for public involvement. *Cf. Ctr. for Biological Diversity v. Salazar*, 706 F.3d 1085, 1097 (9th Cir. 2013) (holding that for actions covered by a CE, a "full NEPA analysis is not required" and would be "inconsistent with the efficiencies that the abbreviated [CE] process provides"). The only NEPA "analysis" for a CE project is to determine whether the activities are covered by the chosen CE and whether any extraordinary circumstances exist. *See* 36 C.F.R. § 220.6(a); *contra* Defs. at 39–44.

Defendants complain that Plaintiffs failed to challenge the Forest Service's conclusion that no extraordinary circumstances barred the application of CE-6 to the Projects. *See* Defs. at 12, 39–40. True. Plaintiffs do not challenge the agency's project-specific extraordinary circumstances review, because it is irrelevant to the question presented. The extraordinary circumstances analysis is confined to seven narrow resource conditions—the agency need only explain why they do not exist or, if they do, the degree to which they are impacted. 36 C.F.R. § 220.6(b); *see also Los Padres ForestWatch v. U.S. Forest Serv.*, 25 F.4th 649, 663 (9th Cir. 2022). The rationale for this streamlined review is that the agency has already conducted a full analysis at the CE rulemaking stage to ensure that the relevant actions have no significant impact under **normal** circumstances. *See Heartwood*, 73 F. Supp. 2d at 976 (rejecting "circular argument" that project-level extraordinary circumstances review can substitute for required analysis during CE promulgation). Plaintiffs challenge CE-6's application to the Projects on grounds that the CE-6 rulemaking did

PLAINTIFFS' RESPONSE/REPLY—19

not conduct any such analysis of commercial thinning on the scale of the Projects. Whether the project-specific extraordinary circumstances reviews were done properly is not the issue.

Plaintiffs also do not argue that project-specific cumulative impact analyses are required for CE projects, or that the Forest Service failed to comply with project-specific notice requirements for applying a CE. *Contra* Defs. at 39–48. The fact that no cumulative effects analysis is required at the project stage is the problem, not an answer; it means that no cumulative effects evaluation of commercial logging under CE-6 ever occurred or ever will occur. *See Bosworth*, 510 F.3d 1027–28 ("Relying solely on a project level analysis is inadequate because it fails to consider impacts from past, present, or reasonably foreseeable future [] CE projects which may be located in close proximity, in the same watershed or endangered species habitat area.").

Defendants' suggestion the Project-level analyses were so comprehensive as to make a programmatic analysis at the CE rulemaking stage unnecessary is incorrect as a matter of law, as the *Bosworth* and *Heartwood* courts have already determined. The question is whether that analysis actually did occur at the rulemaking stage.

### 2. The Forest Service was required, but failed, to rationally determine that commercial logging under CE-6 would have no significant impacts.

In its rulemaking, the Forest Service never discussed, analyzed, or made any findings regarding commercial logging activities under CE-6 like those authorized by the Projects. Because CE-6 does permit such commercial logging activities, the Forest Service was required to conduct that analysis and make those findings. That is the issue at the heart of this case.

In response, Defendants advance three arguments: (1) they dispute that CE-6 authorizes "commercial logging"; (2) they claim that the Forest Service was not required to make any particular findings or meet any particular standards in its rulemaking; but also (3) they insist that the agency did make those findings and meet those standards. *See* Defs. at 31–39. None have merit.

PLAINTIFFS' RESPONSE/REPLY—20

i. **CE-6 allows commercial logging, and Plaintiffs challenge commercial logging specifically under CE-6.**

Defendants first insist that CE-6 does not authorize "commercial logging," but merely "restoration-aimed thinning" that "result[s] in the commercial sale" of logged trees. Defs. at 32; *but see id.* at 33 (equating "commercial thinning" under CE-6 with "timber harvest"). The plain language of CE-6 covers commercial logging for timber stand and/or wildlife habitat improvement purposes, so long as such activities "do not include herbicides or [] allow more than 1 mile of low standard road construction." *Mt. Cmtys. for Fire Safety v. Elliott*, 25 F.4th 667, 675 (9th Cir. 2022). Plaintiffs do not argue that the Forest Service was required to analyze all commercial logging, or commercial logging in the abstract, *contra* Defs. at 31–32. Rather, the Forest Service was obliged to analyze and disclose the impacts of commercial logging **specifically under CE-6**, within CE-6's specific parameters.

Defendants' position, in contrast, depends on words that do not appear in CE-6. "Restoration-aimed thinning" is both broader and narrower than the actual text: CE-6 does not authorize "restoration-aimed" projects in general, but specifically "timber stand and/or wildlife habitat improvement activities." 36 CFR § 220.6(e)(6). And these activities are "not limited to . . . thinning or brush control." *Id.* The bare text of CE-6 alone does not bar commercial clearcutting, *contra* Defs. at 32, if done for wildlife habitat improvement—an agency might claim that its proposed clearcut would improve habitat for meadow-associated species. Whether this would be "ecologically-beneficial" is arguably irrelevant, because CE-6 does not include that criterion either. *Contra* Defs. at 52. The plain text of CE-6 and NEPA dictate what the Forest Service was obliged to find in its rulemaking.

PLAINTIFFS' RESPONSE/REPLY—21

ii. **The Forest Service was required to find that commercial logging under CE-6 would have no individually or cumulatively significant impact.**

Defendants' next argument bypasses the relevant text to assert that the Forest Service was not required to "undertake a particular kind of effects analysis" in its rulemaking. Defs. at 32. But that is precisely what NEPA requires. Under NEPA, categorical exclusions are actions "which do not **individually or cumulatively** have a significant effect on the human environment and which **have been found** to have no such effect[.]" 40 C.F.R. § 1508.4 (1978) (emphasis added). Thus, the Forest Service was obligated to make findings regarding the individual and cumulative effect of the activities permitted by CE-6—including commercial logging within the particular parameters of the rule. As relevant to the commercial logging activities authorized by the Projects, the CE-6 rulemaking fell far short of the bar set by NEPA—and the APA's basic standards for agency decisionmaking—as benchmarked by multiple courts. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983) (setting forth requirements for non-arbitrary agency action); *Bosworth*, 510 F.3d at 1027–32 (describing textual requirements for CE rulemaking); *Colorado Wild v. U.S. Forest Serv.*, 435 F.3d 1204 (10th Cir. 2006) (same); *Heartwood*, 73 F. Supp. 2d at 975–77 (same).

Defendants are clearly aware that *Bosworth*, in particular, presents a problem for them, but fail to distinguish it. The issue in *Bosworth* was not merely that the Forest Service "established a new CE in 2003 before conducting a 'data call' it said it would undertake." *Contra* Defs. at 36 (citing 510 F.3d at 1027). The Ninth Circuit flagged multiple ways in which the agency failed to properly assess CE-10's individual and cumulative significance, instead "offer[ing] only conclusory statements that there would be no significant impact." 510 F.3d at 1027–32.

The Ninth Circuit concluded that NEPA (and the APA) demanded specific, detailed analysis and findings, including a "programmatic cumulative impacts analysis" supported by

PLAINTIFFS' RESPONSE/REPLY—22

"quantified or detailed information," and a "well-reasoned explanation" for the Forest Service's conclusion that the restoration and fuels-reduction activities permitted under CE-10 would have no individually or cumulatively significant impacts. *Id.* at 1029–32. The Forest Service had failed to meet this standard. *Id* at 1033–34. The Ninth Circuit therefore rejected the Forest Service's conclusions and enjoined CE-10, like the *Heartwood* court in 1999 did for CE-4. *See* 510 F.3d at 1033; *Heartwood*, 73 F. Supp. 2d at 976–77, 980.

Rather than engaging with the case's relevant holdings, Defendants posit that *Bosworth* is not binding precedent because it postdates CE-6's promulgation. *See* Defs. at 38–39.[12] In an argument untethered to any authority, Defendants claim that prior to 2007, "there was no requirement in the NEPA statute or regulations" for agencies to analyze significance when promulgating CEs. Defs. at 38. That is plainly incorrect. The "NEPA-review duties" discussed in *Bosworth* were clearly stated in the NEPA statute and regulations—the exact same statute and regulations that had existed in 1992 and governed the CE-6 rulemaking. *See* 40 C.F.R. § 1508.4; *see also Bosworth*, 510 F.3d at 1026–33. *Bosworth* controls as to their meaning. *Bosworth* did not impose a "newly found" "detailed NEPA-significance analysis duty." *Contra* Defs. at 38. Rather, it applied statutory text and long-standing precedent to determine that the Forest Service had failed in its core NEPA duties. *See Bosworth*, 510 F.3d at 1026–33.

Defendants cite the Seventh Circuit's decision in *Heartwood, Inc. v. U.S. Forest Service* ("*Heartwood II*") for the proposition that "the Forest Service's promulgation of new CEs did not require NEPA review," implying that *Bosworth* broke with this practice. Defs. at 38–39 (citing 230 F.3d 947, 954–55 (7th Cir. 2000)). That is not what *Heartwood II* says. Rather, the district and

---

[12] So, of course, do *Mountain Communities* and *Seven County*, and by significantly longer—indeed, both decisions also postdate the Projects at issue here, but Defendants use them to adjudge the lawfulness of the Projects and application of CE-6.

PLAINTIFFS' RESPONSE/REPLY—23

appellate courts both held that the Forest Service need not prepare an EA or an EIS to promulgate a new CE—as did the Ninth Circuit in *Bosworth*. *See* 510 F.3d at 1025 (citing *Heartwood II*, 230 F.3d at 954–55, and ruling that no EA or EIS was needed). But the district court, again like *Bosworth*, also held that the Forest Service was required to fully analyze and make detailed findings as to the individual and cumulative environmental significance of the activities covered by the proposed CE—and that the Forest Service had failed to do so in promulgating CE-4. *See Heartwood*, 73 F. Supp. 2d at 974–77; *Heartwood II*, 230 F.3d at 951 n.4 (agency did not appeal this holding). Defendants' failure to acknowledge the *Heartwood* opinion addressing the very rulemaking at issue here is glaring.

### iii. The Forest Service did not make any findings as to the individual or cumulative significance of commercial logging under CE-6.

Finally, Defendants devote a handful of paragraphs to the true merits of this case. Defendants insist that the Forest Service "rationally followed NEPA procedures" and "provided some quantified or detailed information to support its findings that CE-6 activities would have no significant cumulative effects on the environment." Defs. at 35. This is the heart of the case, but neither the record nor the law support Defendants' position.

In Defendants' view, the fact that the Forest Service "provided for an opportunity for public review and established CE-6 'in consultation with' [the CEQ] 'and with [the CEQ's] concurrence'" is dispositive of its lawfulness as to commercial thinning. *Id.* at 34 (quoting 73 Fed. Reg. 43,084, 43,091 (July 24, 2008) (describing all CEs 16 years after CE-6's promulgation)). Not quite. Both CE-4 and CE-10 were also established after public review and with the CEQ's concurrence. But this did not save them during judicial review, which determined that the Forest Service had botched its rulemakings. *See Bosworth*, 510 F.3d at 1027–33; *Heartwood*, 73 F. Supp. 2d at 974–77. And

PLAINTIFFS' RESPONSE/REPLY—24

CE-6 was adopted through the **exact same** rulemaking that produced CE-4—clearly, these procedures were not independently sufficient to ensure the rulemaking's validity.

Turning to the contents of that rulemaking, Defendants offer a series of conclusory statements purporting to show that commercial logging under CE-6 was found to have no significant impact. *See* Defs. at 34–35. They show no such thing.

Defendants cite the Forest Service's reliance on agency experience. *Id.* at 34. But a reviewing court "may not rely merely on the agency's expertise. To uphold the agency's decision, the Court must be convinced that the record contains adequate evidence supporting the agency's expert opinions and decisions as well as evidence upon which the agency states it relied in making its decisions." *Heartwood*, 73 F. Supp. 2d at 969; *cf. Cal. Wilderness Coal. v. U.S. Dep't of Energy*, 631 F.3d 1072, 1097 (9th Cir. 2011) ("[O]ur precedents hold that an agency cannot merely assert that its decision will have an insignificant effect on the environment, but must adequately explain its decision."). Defendants do not identify the evidence to which the agency applied its expertise or that supported its expert opinions. As *Bosworth* explained, "[t]his is insufficient." 510 F.3d at 1028–29 ("The Forest Service does not reveal its methodology or offer any quantified results supporting its conclusory statements that there are no cumulative impacts—it argues only that through the exercise of its expertise it determined that there was no such impact."); *see also Heartwood*, 73 F. Supp. 2d at 975 (references to the agency's "expertise and prior experience" are "not sufficient" to support decision). It is bedrock administrative law that "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *State Farm*, 463 U.S. at 43. But Defendants seek an exemption from the need to produce **any** data, find **any** facts, or give **any** explanation for the agency's actions.

PLAINTIFFS' RESPONSE/REPLY—25

Defendants recite the Forest Service's "finding that stand/wildlife habitat improvement activities did not have significant environmental effects[.]" Defs. at 34–35 (citing PAR_3168, which does not specifically address CE-6). Defendants assert that "the Forest Service provided sufficient, concise support," and "provided some quantified or detailed information to support its findings." *Id.* at 35 (citing PAR_3168; SAR_9–10). But Defendants never describe what that support consisted of, nor direct this Court to any information in the record (quantified, detailed, or otherwise). The three record pages on which Defendants rely consist of a short description of the four new CEs adopted in 1992, and part of the Forest Service's response to negative comments on the promulgation of those CEs. *See id.* There is no support for the agency's "findings" in either passage beyond the conclusory statement Defendants quote—and no findings or information pertaining to commercial logging activities under CE-6. *See* SAR_9–10.[13]

The record before this Court, and before the *Heartwood* court that first reviewed this rulemaking, falls far short of the bar for CE promulgation. *See* Op. at 8, 24–26 (describing *Heartwood* court's review of CE-6 rulemaking record), 11 (describing CE-25 rulemaking), 9–10 (describing CE-12, CE-13, and CE-14 rulemaking and unsuccessful challenge thereto). There is no "hard data," no "[a]ccurate scientific analysis [or] expert agency comments," no "quantified or detailed information," no "supporting analytical data," and certainly no programmatic cumulative impacts analysis. *Bosworth*, 510 F.3d at 1027–32.

---

[13] The only conceivably pertinent sentence is the statement that "[t]he parameters for the harvesting activities have been increased because of the number of environmental assessments and findings of no significant impact found in every case over the last years in timber sales of this size." SAR_10. But this vague statement refers specifically to harvesting under CE-4, which set a low numerical limit on commercial harvest. *See Heartwood*, 73 F. Supp. 2d at 975 (explaining evolution of CE-4). And, as the *Heartwood* court explained, "the ten-fold increase in the board feet limit for salvage and the 2 ½ times increase in harvest limit for live trees is a classic example of an arbitrary decision." *Id.* This "support" is neither relevant nor adequate.

PLAINTIFFS' RESPONSE/REPLY—26

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

More to the point, none of the Forest Service's purported analysis or findings pertain to the impacts of commercial logging under CE-6, within CE-6's particular parameters. The record contains no "sufficient, concise support" for a finding that commercial logging under CE-6 has no individually or cumulatively significant effects. *Contra* Defs. at 34–35. Without a finding that commercial logging under CE-6 would have no significant impact, the Forest Service lacked the authority to promulgate CE-6 for large-scale commercial logging. *See* Op. at 20–26. Defendants fail to identify evidence that this finding was made, because the Forest Service failed to make the requisite finding. As applied to the Projects' commercial activities, CE-6 is thus *ultra vires*.

### 3. CE-6 relies on an impermissible interpretation of NEPA.

Defendants never directly engage with Plaintiffs' argument that CE-6, as applied to large-scale commercial logging, relies on an impermissible interpretation of NEPA. Instead, they reprise a series of assertions regarding Project-specific findings and project-level requirements for **applying** a CE. *See* Defs. at 39–48. Again, these are irrelevant to the **promulgation** of CE-6.

As Plaintiffs have explained, the promulgation and use of CE-6 for commercial logging thwarted NEPA's twin purposes of ensuring informed decisionmaking and fostering meaningful public involvement. *See Seven County*, 145 S. Ct. at 1521–22 (describing purposes of NEPA's action-forcing requirements); *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989) (same). Agencies must fully inform the public, through notice-and-comment-rulemaking, of a proposed CE's impacts before it is promulgated. *See Bosworth*, 510 F.3d at 1026–33 (applying requirements for CE rulemaking). For CE-6, this never happened, allowing actions like the Projects to forever escape full environmental review. This outcome contradicts NEPA's text and purpose. *See* Op. at 27–29.

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

Apparently in response to this argument, Defendants assert that "Plaintiffs are wrong regarding the Forest Service's interpretation and use of CE-6[.]" Defs. at 45. This is surprising, as Plaintiffs do not dispute the Forest Service's interpretation of CE-6; both parties agree that CE-6 permits commercial logging and has no acreage limitation. Plaintiffs do not argue that other CEs "implicitly cabin CE-6's scope." *Contra* Defs. at 45 (quoting *Mt. Cmtys*, 25 F.4th at 679). Plaintiffs instead cite the acreage limits in other timber CEs as indicia of both Forest Service and Congress' interpretations of "significance," which are directly at odds with CE-6 **because** CE-6 permits logging with no acreage limit.[14] *See* Op. at 26–30.

Rather than answering this charge, Defendants merely point to their Project-specific conclusions and actions, arguing that the Forest Service did all that was required under CE-6 at the project level. *See* Defs. at 45–48, *supra* at 18–20. This may be true, but it is beside the point.

For one example of this disconnect: Plaintiffs explained that promulgation of a CE must include a programmatic cumulative effects analysis at the rulemaking stage, which never occurred for CE-6. *See* Op. at 23–26. As Plaintiffs noted, the harms from this omission were perfectly illustrated here by the approval of adjacent Projects without any cumulative effects review. *Id.* at 14. In answer, Defendants state that "a cumulative-effects analysis is [not] required in a Forest Service NEPA review under a CE" and thus did not occur for the Projects. Defs. at 48.[15] Again,

---

[14] As AFRC conceded in an earlier case, "[i]f the Forest Service were to try to go out and do something [under CE-6] that's a completely different order of magnitude from [the statutory CEs], [it] again would have a problem." Oral Argument at 42:25, *Los Padres*, 25 F.4th at 642, available at https://www.ca9.uscourts.gov/media/video/?20210512/20-55859/.

[15] Defendants cite only one example addressing the **promulgation** of a CE. *See* Defs. at 48 (citing *Colorado Wild*, 435 F.3d 1204). The plaintiffs there unsuccessfully challenged the agency's "substantive conclusions" regarding CE-13's "potential for significant cumulative impacts." *Id* at 1212, 1219. But the agency had identified the specific projects on which it had based its analysis and explained how that data had informed its determination that the covered actions had no cumulative impact. *See id.* at 1210–11. Here, in contrast, Plaintiffs challenge the agency's failure

PLAINTIFFS' RESPONSE/REPLY—28

this is non-responsive to Plaintiffs' argument that **promulgating** CE-6, without establishing that the commercial logging it authorizes has no individually **or cumulatively** significant impacts, was entirely at odds with NEPA's text and purpose and, therefore, *ultra vires*.

The present result of that unlawful statutory interpretation—approval of 29,000 acres of commercial logging without full environmental review or a NEPA significance analysis, at any stage—is indeed consistent with the regulatory text of CE-6. That is why, as applied to such activities, **CE-6 is itself contrary to NEPA** and its promulgation exceeded the agency's authority.

## C. Claim 3: CE-6 Also Facially Exceeds the Forest Service's Statutory Authority and Is Arbitrary and Capricious.

Defendants' response to claim 3 relies almost exclusively on their arguments on claim 2, effectively conceding that if this Court agrees with Plaintiffs on claim 2, it must also find CE-6 facially invalid. *See* Defs. at 51–52. And, indeed, the Forest Service made no findings or conclusions regarding the effects of **any** commercial logging under CE-6, regardless of scale; thus, because CE-6 authorizes commercial logging operations without any acreage limits, CE-6 is based on an unreasonable interpretation of NEPA and, therefore, *ultra vires*.

As to claim 3 specifically, Defendants point only to a single, "simple example" of why CE-6 was lawfully promulgated: Because CE-6 includes **some** specific criteria, it necessarily ensures against significant effects. Defs. at 52. But the Forest Service never made this finding in its rulemaking. It failed to connect the dots and explain how prohibitions on herbicides and over one mile of road construction ensure against significant environmental impact. *See Gifford Pinchot*

---

to make **any** findings regarding the cumulative impact of commercial logging under CE-6, to conduct **any** analysis of the matter, or to provide **any** concrete support for its decision.

In any event, *Colorado Wild* is not binding authority—*Bosworth* is. To the extent that the two cases are in tension, *Bosworth* controls. *See Citizens for Better Forestry v. U.S. Dep't of Agric.*, 341 F.3d 961, 974 (9th Cir. 2003) ("With all due respect for our sister circuit, we are bound to follow the law of the Ninth Circuit.").

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

*Task Force v. U.S. FWS*, 378 F.3d 1059, 1074 (9th Cir. 2004), *amended*, 387 F.3d 968 (9th Cir. 2004) (courts may not "imply[] an analysis that is not shown in the record").

Moreover, the record, and the law, belie the argument that these two criteria are adequate bulwarks. For example, the agency takes an expansive view of road "reconstruction" or "repair" of old road beds—for which there is no mileage limitation. BWAR_2802–03 ("If there is an old road bed, then that is open[ing] an existing road, not creating a new road"; "the road is in such bad shape that the cost is similar to that of new construction."); *see also* PAR_543 ("The . . . reconstruction of roads can produce increases in erosion, sedimentation of streams, wildlife disturbance, and landscape alteration."); *cf. Bosworth*, 510 F.3d at 1031 (discussing impacts from "reconstruction of decommissioned roads"). What are the impacts of such road construction and repair to support commercial logging under CE-6? What are the impacts of log hauling on dozens or hundreds of miles of forest roads? The rulemaking record is silent on these issues—there is no evidence that the agency even considered them, much less made supportable findings. The Forest Service's failure to explain—let alone support—its implicit conclusion regarding these issues merely demonstrates the arbitrary nature of its decisionmaking. *See Or. Nat. Desert Ass'n*, 625 F.3d at 1121 (no deference for voids).

Defendants also regard CE-6's purported restoration purpose as a panacea. Defs. at 52 ("actions must be ecologically-beneficial"). But CE-6 itself says nothing about "ecological benefits." *See United States v. Garza-Sanchez*, 217 F.3d 806, 810 (9th Cir. 2000) (courts "may not read into [a] regulation a requirement that it does not impose by its precise terms"). Nor does the rulemaking record. *Cf. Envtl. Def. Ctr. v. BOEM*, 36 F.4th 850, 878 (9th Cir. 2022) (explaining "well-established" principle that agency action "must be upheld, if at all, on the basis articulated by the agency itself," and not post-hoc rationalization.). Nor would this imaginary requirement,

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

standing alone, ensure against significant impacts, or even constitute a **specific** criterion. *Cf. Solar Energy Indus. Ass'n v. FERC*, 80 F.4th 956, 992 (9th Cir. 2023) (focus is on impacts, not labels).

The limited "specific criteria" of CE-6 cannot save it. Rather, they make the absence of any significance analysis in the rulemaking record all the more glaring: How did the Forest Service determine that those parameters were sufficient? What data did it base them on? Not only must a CE contain specific criteria, those criteria must be enough to screen out actions with potentially significant impacts. *See* 40 C.F.R. §§ 1507.3(b)(2) (1978) (agency must have "specific criteria" to identify actions eligible for CE), 1508.4. AFRC underscores this point where it concedes that different projects may have different impacts. Am. at 5–8. The problem is that CE-6 authorizes all of them, without sufficient parameters to ensure against significant effects. The rulemaking record plainly fails to demonstrate that the herbicide prohibition, road construction limits, or alleged restoration purpose satisfy this requirement. *Cf. Bosworth*, 510 F.3d at 1032 (holding CE-10 lacked sufficiently specific criteria to avoid significant impacts) (citing 40 C.F.R. § 1508.4).

"The briefs and record control, and the government has made no serious attempt to show [this Court] why [CE-6] was not arbitrary and capricious or that it gave the required 'hard look' at the categorical exclusion before promulgating it." *Id.* at 1034 (Kleinfeld, J., concurring). This Court must therefore "hold unlawful and set aside" CE-6 as to commercial logging. 5 U.S.C. § 706(2).

## IV.    Vacatur is the Appropriate Remedy.

Should this Court find a violation on the merits, the APA governs. *Contra* Defs. at 52–54; Am. at 15–18. Under the APA, a "reviewing court shall hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2). The Supreme Court in *Seven County* made passing

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

reference to vacatur in the context of project-level NEPA violations, pointing out that not every deficiency in an EIS "necessarily require[s] a court to vacate the agency's ultimate approval of a project[.]" 145 S. Ct. at 1514. But this case does not concern the sufficiency of project-level analysis, which might be amenable to a quick fix on remand. If this Court agrees that the Forest Service lacked the authority to adopt CE-6, or that the rulemaking was otherwise deficient, it must "set aside" that regulation consistent with the APA. *See All. for the Wild Rockies v. U.S. Forest Serv.*, 907 F.3d 1105, 1121 (9th Cir. 2018) ("[O]rdinarily when a regulation is not promulgated in compliance with the APA, the regulation is invalid.") (citation omitted).

Defendants largely punt on the question of remedy and simply seek further briefing, but their bases for the request are fundamentally inconsistent with the law of vacatur. First, Defendants conflate vacatur with the separate and distinct issue of universal injunctions. Defs at 53–54. In *Trump v. CASA*, the Supreme Court unequivocally stated: "Nothing we say today resolves the distinct question whether the [APA] authorizes courts to vacate federal agency action." 145 S. Ct. 2540, 2554 n.10 (2025). Yet Defendants argue that Plaintiffs' request for **vacatur** under the APA is barred by *CASA's* prohibition on **universal injunctions**. These are separate inquiries, and it is a "long-settled" principle of administrative law that the APA "authorize[s] vacatur of unlawful agency rules[.]" *Corner Post*, 603 U.S. at 826–27; *see also Am. Fed'n of Tchrs. v. Dep't of Educ.*, No. CV SAG-25-628, 2025 WL 2374697, at *32 (D. Md. Aug. 14, 2025) (collecting every post-*CASA* case and concluding, "[l]ike every other court to consider this issue since *CASA*," that "the APA has always expressly authorized vacatur, and *CASA* did not change that").

Second, Defendants misunderstand their relevant burden. "Because vacatur is the default remedy . . . defendants bear the burden to prove that vacatur is unnecessary." *Nat'l Parks Conservation Ass'n v. Semonite*, 422 F. Supp. 3d 92, 99 (D.D.C. 2019). Remand without vacatur

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

is appropriate only when "equity demands," *Wild Rockies*, 907 F.3d at 1121, after **the government**

**proves that** (1) the seriousness of the agency's errors and (2) the disruptive consequences of an

interim change that may itself be changed weigh against full vacatur. *Cal. Cmtys. Against Toxics*

*v. U.S. EPA*, 688 F.3d 989, 992 (9th Cir. 2012). Defendants fail to make the required showing.

AFRC attempts to shore up this deficiency, but its arguments, too, are irreconcilable with

the facts and law. First, as to the seriousness of the errors, AFRC suggests that the Forest Service

could merely backfill its analysis on remand. Am. at 16–17. This argument runs headlong into

*Bosworth*. As Defendants acknowledge, *Bosworth* prohibits the Forest Service from relying on

post-hoc information to support the adoption of a CE. Defs. at 37 (citing 510 F.3d at 1025). If the

Forest Service wishes to re-do its adoption of CE-6, it must do so through the correct procedural

mechanism: full, APA-compliant notice and comment rulemaking.[16]

Moreover, it is difficult to see how the deficiencies here are "easily curable." *Contra* Am.

at 17. In its most recent CE rulemaking involving commercial thinning, the Forest Service was

unable to show that restoration-oriented commercial thinning on up to 4,200 acres had no

significant effects. 85 Fed. Reg. 73,620, 73,628 (Nov. 19, 2020); *see also* Op. at 11. The agency

ultimately decreased CE-25 to 2,800 acres and narrowed its scope. *See id.* Here, on remand, the

Forest Service could not "merely provide additional explanations for why commercial thinning is

permissible under CE-6." Am. at 17. Rather, it would have to complete notice-and-comment

rulemaking and properly demonstrate that commercial thinning on unlimited acres has no

---

[16] *National Family Farm Coalition v. EPA* is therefore inapposite. *See* Am. at 16 (citing 966 F.3d 893, 929 (9th Cir. 2020)). There, the court noted the agency's substantial compliance with its legal duties, found only a single error of a "technical nature," and opined that "EPA will likely be able to offer better reasoning and adopt the same rule on remand." *Id.* Nothing like those facts is present if this Court decides that the Forest Service lacked the authority to adopt CE-6.

PLAINTIFFS' RESPONSE/REPLY—33

individually or cumulatively significant effects. 40 C.F.R. § 1508.4; *see also supra* at 22–24. In light of the most recent CE rulemaking, this seems likely to be difficult if not impossible.

AFRC also greatly overstates the disruptive consequences of vacating CE-6. The Forest Service has numerous other tools to address wildfire risk. *See*, e.g., 16 U.S.C. §§ 6591(b), 6591d; Pub. L. 117-58; 85 Fed. Reg. at 73,620. And, as always, the Forest Service may prepare an EA or EIS, which must be completed within one and two years, respectively.[17] 42 U.S.C. § 4336a(g) (2024). Or, it may undertake the same projects under CE-6 that it did for many years, without commercial logging.

Moreover, commercial logging operations on the scale of the Projects, regardless of their stated purpose, can cause serious adverse environmental consequences, to, *inter alia*, soil (SWAR_24–27, 91–93) water quality and aquatic habitats (SWAR_14, 27, 9444–75, 9662–69), invasive species (SWAR_279–81, 9558; PAR_2113), climate (SWAR_4123–25, 9651–54, 10992–93), and wildlife (SWAR_21, 2454, 4088–89, 11015–17, 11564–65); *see also* PAR_583–88; Am. at 6–7 (discussing potential impacts specific to commercial thinning); *Bosworth*, 510 F.3d at 1029, 1031–32 (discussing potential adverse effects of fuels reduction thinning and burning). Defendants and AFRC imply that the Projects will be wholly beneficial, but that is simply not the case. There are important trade-offs to commercial logging operations; NEPA requires the weighing of these trade-offs in an EA, EIS, or during lawful notice-and-comment rulemaking. *See Bosworth*, 510 F.3d at 1029 (CE review "cannot focus only on the beneficial effects . . . but must also analyze the effects on the environment as a whole"). These irremediable environmental effects weigh in favor of vacatur, while requiring well-informed, NEPA-compliant decisionmaking does

___
[17] Defendants claim that "South Warner restoration has been a priority goal" since 1998. Defs. at 9. They cannot seriously maintain that the Forest Service had no time to prepare an EA or EIS for this work in the intervening 27 years.

PLAINTIFFS' RESPONSE/REPLY—34

not constitute a "harm" of the sort feared by Congress. *Cf. Marsh v. Oregon Nat. Res. Council,* 490 U.S. 360, 371 (1989) (noting NEPA's "manifest concern with preventing uninformed action").

Finally, neither Defendants nor AFRC differentiate between the remedies appropriate for claim 2 and claim 3. For claim 2, Plaintiffs respectfully request an order setting aside CE-6 as applied to commercial logging operations on the scale of the Projects—i.e., between 3,000 and 16,000 acres. Op. at 33.[18] For claim 3, Plaintiffs respectfully request an order setting aside CE-6 as to all commercial logging. Defendants do not dispute that these are the standard remedies for the violations underlying each claim. *See* Op. at 35. While they may prefer a departure from this norm, Defendants have not carried their burden to rebut the presumption of vacatur under the APA.

## CONCLUSION

For all of the foregoing reasons, Plaintiffs respectfully request that this Court grant their *Motion for Summary Judgment*; vacate the South Warner, Baby Bear, and Bear Wallow Projects as to commercial logging only; declare unlawful and set aside CE-6 as applied to commercial logging operations on the scale of the Projects; and/or declare unlawful and set aside CE-6 as to commercial logging.[19]

DATED this 29th day of August, 2025.

---

[18] Plaintiffs would not contest a vacatur order that carves out the three already awarded timber sales. *See* Defs. at 53.

[19] Plaintiffs note that CE-6 has been recodified at 7 C.F.R. § 1b.4(d)(30).

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

Respectfully submitted,

s/ Oliver J. H. Stiefel
Oliver J. H. Stiefel, OSB # 135436
(503) 227-2212 │ oliver@crag.org
Meriel L. Darzen, OSB # 113645
(503) 525-2725 │ meriel@crag.org
CRAG LAW CENTER
3141 E. Burnside St.
Portland, Oregon 97214
Fax: (503) 296-5454

Erin Hogan-Freemole
(971) 417-6851 │ ehoganfreemole@wildearthguardians.org
WILDEARTH GUARDIANS
213 SW Ash Street, Suite 202
Portland, OR 97204

*Attorneys for Plaintiffs*