Oliver J. H. Stiefel, OSB # 135436
(503) 227-2212 │ oliver@crag.org
Meriel L. Darzen, OSB # 113645
(503) 525-2725 │ meriel@crag.org
CRAG LAW CENTER
3141 E. Burnside St.
Portland, Oregon 97214
Fax: (503) 296-5454

Erin Hogan-Freemole
(971) 417-6851 │ ehoganfreemole@wildearthguardians.org
WILDEARTH GUARDIANS
213 SW Ash Street, Suite 202
Portland, OR 97204

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## MEDFORD DIVISION

| | |
|---|---|
| **OREGON WILD**, an Oregon nonprofit corporation; **WILDEARTH GUARDIANS**, a New Mexico nonprofit corporation; and **GO Alliance**, an Oregon nonprofit corporation,<br><br>Plaintiffs,<br><br>v.<br><br>**UNITED STATES FOREST SERVICE**, **DONALD ASHCRAFT**, in his official capacity as Lakeview Ranger District Ranger; **JEANNETTE WILSON**, in her official capacity as Silver Lake Ranger District Ranger; **TOM SHULTZ**, in his official capacity as Chief of the U.S. Forest Service; and **BROOKE ROLLINS**, in his official capacity as Secretary of Agriculture,<br><br>Defendants. | Case No. 1:22-cv-01007<br><br>**SECOND DECLARATION OF RALPH BLOEMERS** |

I, Ralph Bloemers, declare as follows:

1.  The facts set forth in this declaration are based on my personal knowledge. If called as a witness, I could and would competently testify thereto.

2.  My name is Ralph Bloemers. I reside in Portland, Oregon. I submit this declaration in support of Plaintiffs' Motion for Summary Judgment. This is the second declaration I have submitted in this matter. *See* ECF No. 68-1.

3.  In their Cross-Motion for Summary Judgment, Defendants claim that I have not established concrete plans to return to the Fremont-Winema National Forest and project areas where the Forest Service plans to use CE-6. To the extent my first declaration did not make it clear, I submit this second declaration to further establish my intent to return to these project areas in the Fremont-Winema.

4.  I have spent the majority of my career working on forest management issues in the Pacific Northwest and California, particularly with respect to wildfires. For over 25 years, I have visited national forests throughout Oregon, including the Fremont-Winema National Forest, to pursue professional and personal interests. I plan to continue this work and to return to national forests across Oregon, including the Fremont-Winema and the South Warner area, for as long as I am able.

5.  Since 2001, I have conducted investigations of claims made in post-fire environments. I have visited forests through the Pacific Northwest and California to investigate claims that fire has caused tree mortality, and examined projects claiming to reduce fire risk. I have worked with forest ecologists, fire scientists, firefighters, prescribed fire specialists, fire investigators, physical scientists and many others who are experts in the issues at stake in this litigation.

BLOEMERS DECL.—1

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

6.  I have a particular interest in and connection to the 2021 Bootleg fire, which burned in parts of the Fremont-Winema National Forest. For over three years, I have been examining the claims made about the role of forest management in the growth and behavior of the 2021 Bootleg Fire. The key issues at stake were presented succinctly in an article by Oregon Public Broadcasting article dated July 25, 2021, entitled '*Did forest management play a role in Bootleg Fire growth?*' (Available at: https://opb.org/article/2021/07/25/did-forest-management-play-role-in-bootleg-fire-growth/) I worked with the expert cartographer to provide this information to the reporter who wrote this story.

7.  The OPB article includes the same assertions made by the United States Forest Service and timber interests seeking to log on public lands that certain thinning and fuel-reduction treatments will slow or influence future fire behavior. These assertions, like many post-fire claims, appear to be based in large part on anecdotal impressions, selective photographs, and incomplete data.

8.  Oftentimes, the timber industry and the U.S. Forest Service make claims that ignore the fire weather and lack of wind that influenced fire behavior as the fire burned the particular patch of forest shown in a selective photograph. The claims also ignore that managed tree plantations and slash piles burned and contributed significantly to fire spread as documented and shown in photographs contained in this article by OPB entitled '*A giant Oregon wildfire shows the limits of carbon offsets in fighting climate change*:' (Available at: https://opb.org/article/2023/08/02/climate-change-carbon-offset-oregon/). I provided preliminary information from my investigation to the reporter to inform this story.

9.  To establish a more complete understanding of Bootleg, I have worked with a GIS expert, an expert fire investigator, and I have sought the advice of several expert scientists about

BLOEMERS DECL.—2

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

the issues. I have examined the context and conditions under which these claims were made, and the team has been evaluating whether the reported 'success' or 'failure' of management treatments is supported by evidence.

10. The effort has involved obtaining primary fire data, including GIS shapefiles showing perimeter growth over time, daily satellite heat detection records (NASA MODIS and VIIRS satellites), and weather station data from RAWS sites in the fire area during July 2021. In addition, I have reviewed treatment records from the U.S. Forest Service and Bureau of Land Management, including maps of mechanical thinning, prescribed burns, and post-fire logging completed within the fire footprint in the 10 to 15 years prior to the event, as well as related environmental assessments and monitoring reports.

11. The experts I have worked with have cross-reference anecdotal accounts and photographic evidence cited in the article with official fire progression data to confirm whether the observations can be attributed to management treatments or whether they were influenced by other factors, such as changes in wind, humidity, or firefighting tactics. The investigation has included mapping treatment areas against fire progression to identify patterns and differences in spread and intensity, and one expert has conducted field visits to both treated and untreated stands to document residual tree mortality, canopy condition, surface fuels, and home ignition zone characteristics where structures survived.

12. In addition, I have reviewed relevant scientific literature regarding the effectiveness and longevity of thinning treatments in mixed conifer and lodgepole pine forests, the influence of extreme weather on fire behavior, and the role of embers in structure ignition.

13. In the course of my investigations, I have made several trips to the Fremont-Winema National Forest and I intend to revisit the areas burned in the Bootleg fire and, likewise,

BLOEMERS DECL.—3

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

to return to the areas I discussed in my first declaration—including the South Warner area. In fact, I will be visiting the areas east of Crater Lake, in and around the Sun Pass Project area, in the coming weeks, and I plan to return to the Warner Mountains, including the areas in and around the South Warner project area, either later this year or next year.

14. Depending on what I find, I may work with other experts to compile and release a report, supported by maps, data analysis, and photographic documentation, with conclusions about whether the management treatments in question had a measurable effect and with recommendations for interpreting claims in the future. Or, alternatively, I may provide this information to journalists and other experts who are interested in the information, and submit it to the U.S. Forest Service to inform future projects.

15. Part of my research includes investigating areas of the forest that did not burn in the 2021 Bootleg Fire, where the Forest Service is planning or has approved vegetation management projects allegedly designed to influence fire behavior, like Sun Pass and South Warner. I will return to these areas over the next year to follow-up on my recent visits and continue my research. Implementation of the South Warner Project as currently approved will both lessen my enjoyment of the area and impede my work.

16. All of this work is ultimately designed to help land managers like the Forest Service make better decisions, backed by science and on-the-ground research. When the agency reviews and approves a project via a categorical exclusion, however, environmental analysis and public involvement are severely circumscribed; the opportunity to help shape more ecologically sound decisions is slim to non-existent. The rationale for a CE is that the agency has already fully studied and publicly disclosed the environmental effects and trade-offs of the covered activities. But no such analysis and disclosure occurred for large-scale vegetation management

projects under CE-6, including projects allegedly intended to shape future fire behavior. This lack of information hampers my advocacy work and contributes to the lack of public understanding around wildfire and sound, effective land management.

17.  In conclusion, I will share my observation that "active management" is a code term that means different things to each group that hears it. In particular, it is habitually used to promote or disguise less-regulated logging. In this regard, I have three observations. First, active management is necessary. It's how humans have always lived with fire. Look at Europe today to see what allowing feral landscapes can mean for wildfires. But active management must be assessed relative to what it means *to fire*. Logging and fire, for example, do different things: one is not a surrogate for the other. Until the past few decades, the worst fires in American history fed on the slash from logging and land-clearing. Active management for fire requires fire. Thinning has consequences for the landscape and its ecology, as it often means running heavy equipment across the land. Without burning, thinning trees is generally a formula to worsen the firescape. I am generally wary, for example, of arguments that seek to protect communities by broadcast treatments of wildlands. Third, a proposal to actively manage a site must be evaluated *on that site*, not by universal principles or free-floating anecdotes. A ruthless pragmatism is the only legitimate means of evaluating the claims. These are the types of significant environmental costs and trade-offs that must be fully and fairly evaluated before the Forest Service uses CE-6 for these types of activities.

BLOEMERS DECL.—5

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 26th day of August, 2025 in Portland, Oregon.

*[signature: Ralph Bloemers]*

_____
Ralph Bloemers

BLOEMERS DECL.—6

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*