IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MEDFORD DIVISION

OREGON WILD; WILDEARTH
GUARDIANS; and GO ALLIANCE,

    Plaintiffs,

  v.

UNITED STATES FOREST SERVICE;
MICHAEL RAMSEY, *in his official
capacity as Lakeview Ranger District Ranger*;
JEANNETTE WILSON, *in her official
capacity as Silver Lake Ranger District
Ranger*; TOM SCHULTZ, *in his official
capacity as Chief of the U.S. Forest Service*;
and BROOKE ROLLINS, *in her official
capacity as Secretary of Agriculture*,

    Defendants.

_____

Case No. 1:22-cv-01007-MC

OPINION AND ORDER

MCSHANE, Judge:

  On remand following appeal, Plaintiffs Oregon Wild, WildEarth Guardians, and GO Alliance bring this action for declaratory and injunctive relief against Defendant U.S. Forest Service and agency officials. Plaintiffs allege that Defendants violated the Administrative Procedure Act ("APA") and the National Environmental Policy Act ("NEPA") in promulgating the categorical exclusion ("CE") known as CE-6. Am. Compl. ¶¶ 17–19, ECF No. 60. Plaintiffs

challenge both the facial validity of CE-6 and its application to commercial logging operations for forest thinning. *Id.* Plaintiffs ask the Court to declare CE-6 unlawful, set it aside, and halt certain projects in the Fremont-Winema National Forest approved pursuant to it. *Id.* ¶¶ 21–22. Although this Court initially found Plaintiffs' challenges under NEPA and the APA to be barred by the applicable statute of limitations, the Ninth Circuit remanded for the Court "to apply *Corner Post*[1] in the first instance to determine whether this claim is time-barred." *Or. Wild v. U.S. Forest Serv.*, No. 23-35579, 2024 WL 4286965, at *3 (9th Cir. Sept. 25, 2024).

Because WildEarth and GO Alliance suffered injury from a final agency decision within six years from the filing of this action, their claims are not time-barred. Because Defendants failed to make the required findings that commercial thinning operations do not cause significant environmental effects when Defendants promulgated CE-6, Plaintiffs' Motion for Summary Judgment (ECF No. 68) is GRANTED and Defendants' Cross-Motion for Summary Judgment (ECF No. 72) is DENIED. As set forth in this Order, the Court SETS ASIDE CE-6.

## BACKGROUND

### I.   NEPA and CE-6

NEPA "requires that federal agencies perform environmental analysis before taking any 'major Federal actions significantly affecting the quality of the human environment.'" *Env't Prot. Info. Ctr. v. Carlson*, 968 F.3d 985, 987 (9th Cir. 2020) ("*EPIC*") (quoting *Ctr. for Biological Diversity v. Salazar*, 706 F.3d 1085, 1094 (9th Cir. 2013)). Rather than dictating substantive results, NEPA establishes only procedural requirements to ensure that an agency carefully considers "detailed information concerning significant environmental impacts" in reaching its decision. *Id.* at 988 (quoting *Winter v. Nat. Res. Def.* Council, 555 U.S. 7, 23 (2008)). An agency

---

[1] *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799 (2024). *Corner Post* was decided after this Court found that Plaintiff's NEPA claim was time-barred. ECF No. 40, 45.

can comply with NEPA in three ways: by preparing an Environmental Impact Statement ("EIS"),

by preparing an Environmental Assessment ("EA"), or by applying a categorical exclusion ("CE").

*Id.* NEPA regulations on "agency procedures" require that CEs "shall be adopted only after an

opportunity for public review and after review by the [Council on Environmental Quality] for

conformity with [NEPA] and these regulations." 40 C.F.R. § 1507.3(a) (1978).[2]

An EIS is required for all "major Federal actions significantly affecting the quality of the

human environment." 42 U.S.C. § 4332(C). If the significance of the effects of a proposed action

is unknown, the agency instead prepares an EA to determine the extent, if any, of those effects.

40 C.F.R. § 1508.9. The use of a CE is only permitted for "actions which do not individually or

cumulatively have a significant effect on the human environment and which have been found to

have no such effect." *EPIC*, 968 F.3d at 988 (quoting 40 C.F.R. § 1508.4).

The categorical exclusion at issue in this case, CE-6, was promulgated in 1992. Pol'y A.R.

("PAR") 3192–95. As codified, CE-6 allows for:

> [t]imber stand and/or wildlife habitat improvement activities that do not include the
> use of herbicides or do not require more than 1 mile of low standard road
> construction. Examples include, but are not limited to:
>
>> (i) Girdling trees to create snags;
>> (ii) Thinning or brush control to improve growth or to reduce fire hazard
>> including the opening of an existing road to a dense timber stand;
>> (iii) Prescribed burning to control understory hardwoods in stands of
>> southern pine; and
>> (iv) Prescribed burning to reduce natural fuel build-up and improve plant
>> vigor.

36 C.F.R. § 220.6(e)(6).[3]

---

[2] The regulations of the Council on Environmental Quality were rescinded as of April 11, 2025. *See* 90 Fed. Reg. 10,610 (Feb. 25, 2025). The Forest Service promulgated CE-6 in 1992, under the 1978 version of the regulations. The Court refers to the 1978 version of the regulations for background purposes.
[3] An interim final rule moved CE-6 from 36 C.F.R. § 220.6(e)(6) to 7 C.F.R. § 1b.4(d)(30). 90 Fed. Reg. 29,632, 29,643, 29,657 (July 3, 2025). The Court refers to 36 C.F.R. § 220.6 consistent with the parties' briefing.

II.   **The Projects**

In December 2021 and May 2022, the Forest Service approved the South Warner Project, Baby Bear Project, and Bear Wallow Project (the "Projects"), located in the Fremont-Winema National Forest (the "Forest"), under CE-6. S. Warner A.R. ("SWAR") 12,097–111; Bear Wallow A.R. ("BWAR") 2,897–919; Baby Bear A.R. ("BBAR") 706.

The South Warner Project encompasses 69,567 acres and purports to restore wildlife habitat. SWAR 12,097. The Forest Service identified several animal species in the area that would benefit from restoration activities. *Id.* They also expressed concern about overpopulation of conifer trees in the area, which contributed to the area's high risk for severe wildfires. *Id.* To achieve the Forest Service's goal of habitat restoration and address concerns regarding conifer overcrowding and wildfire risk, the Forest Service proposed several activities, including small tree thinning, prescribed burning, juniper cutting, meadow enhancement, stream restoration, and commercial sale of merchantable forest products. SWAR 12,099–104. Of the 69,567 acres involved in South Warner, Defendants authorized 16,000 acres of commercial tree thinning. SWAR 12,100. No trees with diameter greater than or equal to 21 inches would be cut. Supp. A.R. ("SAR") 210.

The Baby Bear Project encompasses 4,774 acres and purports to improve forest stand and wildlife habitat. BWAR 2,897–98. The Forest Service found the project area had more than a sustainable amount of conifer trees and the area was "highly susceptible to insect and disease as well as wildfire." *See id.* Research suggested reducing canopy cover by 40% and creating a forest edge would provide a more suitable habitat for the mule deer. *Id.* To improve the wildlife habitat and increase forest resilience, the Forest Service proposed tree thinning and prescribed burning. *Id.* at 2,898. Of the Baby Bear Project's 4,774 acres, the Forest Service authorized up to 3,000 acres of commercial thinning. *Id.* at 2,898–99.

The Bear Wallow Project encompasses 17,200 acres and purports to improve forest stand and wildlife habitat. BWAR 2,908–09. The project area is directly north of the Baby Bear Project area, with Baby Bear's northern border meeting a portion of Bear Wallow's southern border. BBAR 35. Like Baby Bear, the Forest Service found the Bear Wallow area has more conifer trees than ecologically sustainable. BWAR 2,908. Conifer encroachment left lodgepole pine stands highly susceptible to insects, disease, and wildfire, and also negatively impacted animal and tree species. *Id.* at 2,908–10. To improve wildlife habitat conditions and increase forest resilience, the Forest Service proposed thinning and prescribed burning. *Id.* at 2,909. Of the Bear Wallow Project's 17,200 acres, the Forest Service authorized up to 10,000 acres of commercial thinning. *Id.* at 2,909–11.

The Forest Service issued scoping notices for each project and Plaintiffs responded with comments, raising concerns regarding the scale of the projects and the Forest Service's authority to rely on a CE to approve them. SWAR 3,643–46, 3,656–759, 4,057–127; BBAR 127, 139–78, 684–98; BWAR 1,998, 2,395–420, 2,821–34. The Forest Service reviewed public comments and ultimately approved the Projects under CE-6. SWAR 12,107; BWAR 2903. Because the Forest Service approved the Projects under a CE, it did not prepare an EIS or EA for any of the Projects. Instead, the Forest Service evaluated the requirements for CE-6 and also determined that no extraordinary circumstances existed that precluded the use of a CE.[4]

---

[4] Resource conditions that should be considered in determining whether extraordinary circumstances related to a proposed action warrant further analysis and documentation in an EA or an EIS are:

    (i) Federally listed threatened or endangered species or designated critical habitat, species proposed for Federal listing or proposed critical habitat, or Forest Service sensitive species;
    (ii) Flood plains, wetlands, or municipal watersheds;
    (iii) Congressionally designated areas, such as wilderness, wilderness study areas, or national recreation areas;
    (iv) Inventoried roadless area or potential wilderness area;
    (v) Research natural areas;
    (vi) American Indians and Alaska Native religious or cultural sites; and
    (vii) Archaeological sites, or historic properties or areas.

36 C.F.R. § 220.6(b).

Plaintiffs now challenge the validity of CE-6.

## **LEGAL STANDARD**

Judicial review of agency action is governed by the APA. 5 U.S.C. § 706. A reviewing court may set aside an agency's action if the action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "If an agency fails to consider an important aspect of a problem or offers an explanation for the decision that is contrary to the evidence, its action is arbitrary and capricious." *Or. Nat. Res. Council Fund v. Goodman*, 505 F.3d 884, 889 (9th Cir. 2007) (cleaned up). "An agency action is also arbitrary and capricious if the agency fails to articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Friends of Wild Swan, Inc. v. U.S. Fish & Wildlife Serv.*, 12 F. Supp. 2d 1121, 1131 (D. Or. 1997) (internal quotations omitted) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

When reviewing an agency action under the arbitrary and capricious standard, a court must consider whether the agency's decision was "based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971). While the court's "inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency." *Id.* That said, the court may not simply "rubber-stamp the agency decision as correct." *N. Spotted Owl (Strix Occidentalis Caurina) v. Hodel*, 716 F. Supp. 479, 482 (W.D. Wash. 1988) (internal quotations omitted) (quoting *Ethyl Corp. v. Env't Prot. Agency*, 541 F.2d 1, 34 (D.C. Cir. 1976), *cert. denied*, 426 U.S. 941 (1976)).

The parties have filed a Motion and Cross-Motion for Summary Judgment. Because this Court's review under the APA is limited to the administrative record, no facts are in dispute.

Therefore, the Court's role is "to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Occidental Eng'g Co. v. I.N.S.*, 753 F.2d 766, 769 (9th Cir. 1985).

## DISCUSSION

Plaintiffs bring two claims, both of which challenge the validity of CE-6. Though Plaintiffs cast one claim as an "as-applied" challenge and the other as a "facial" challenge, both claims challenge the Forest Service's promulgation of CE-6. *See generally* Am. Compl. ¶¶ 192–213. Plaintiffs argue Defendants erred when promulgating CE-6 by failing to make the required findings that commercial logging operations do not cause significant environmental effects.

## I.    Jurisdiction and Threshold Issues

### A.    Standing

The Court has an independent duty to ensure standing exists, irrespective of whether the parties challenge it. *Summers v. Earth Island Inst.,* 555 U.S. 488, 499 (2009). Plaintiffs are environmental organizations. Bloemers Decl. ¶ 5, ECF No. 68-1 (GO Alliance); Heiken Decl. ¶ 3, ECF No. 19 (Oregon Wild); Krupp Decl. ¶ 4, ECF No. 20 (WildEarth Guardians). An organization has standing to bring suit on behalf of its members when: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n,* 432 U.S. 333, 343 (1977). The Court finds the latter conditions are met and only the standing of individual members is at issue here.

To establish Article III standing, a plaintiff must show (1) an injury in fact, which is an injury that is concrete and particularized, and actual or imminent; (2) a causal connection between

the injury and the conduct; and (3) a likelihood that the injury will be redressed by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). In environmental cases, the injury-in-fact analysis for standing often centers on whether the plaintiff environmental organization, through its members, has a sufficient connection to an area that is alleged to suffer harm caused by the defendants' actions. *See Summers,* 555 U.S. at 493–96; *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 183–86 (2000) (*Laidlaw*) (holding an individual can establish injury in fact by showing a connection to the area of concern sufficient to render credible the contention that the person's future life will be less enjoyable if the area in question is environmentally degraded).

To show injury in fact, an environmental plaintiff must generally identify a "particular site" affected by the challenged action and provide evidence of a "specific and concrete" plan to visit the site. *Summers,* 555 U.S. at 495. An environmental plaintiff's "[r]epeated recreational use itself, accompanied by a credible allegation of desired future use, can be sufficient, even if relatively infrequent, to demonstrate that environmental degradation of the area is injurious to that person." *See Ecological Rts. Found. v. Pac. Lumber Co.*, 230 F.3d 1141, 1149–50 (9th Cir. 2000).

Defendants contest Plaintiff GO Alliance's standing to bring its facial challenge to CE-6. Defs.' Resp. 49–51. Ralph Bloemers, the Executive Director of Plaintiff GO Alliance, submitted two declarations.[5] Bloemers Decl.; Bloemers 2d Decl., ECF No. 77. Bloemers has worked on forest law and policy issues in Oregon, specifically related to wildfire, for over 24 years. Bloemers Decl. ¶¶ 3, 7–10. Mr. Bloemers visits Oregon's National Forests, including the Fremont-Winema Forest, to pursue professional and personal interests. *Id.* ¶¶ 10–11; Bloemers 2d Decl. ¶¶ 4–6. He has engaged in ongoing work and has made "recent" trips to the Forest and surrounding areas both

---

[5] The Court may consider Bloemers' supplemental declaration. *See, e.g.*, *WildEarth Guardians v. Jeffries*, 370 F. Supp. 3d 1208, 1229–30 (D. Or. 2019) (citing *Laidlaw*, 528 U.S. at 183).

for recreation and to work with communities affected by wildfire. Bloemers Decl. ¶¶ 11–17; Bloemers 2d Decl. ¶¶ 4–5, 13–14. Bloemers states he will return to the South Warner project area where CE-6 was used to allow commercial logging operations "over the next year to follow-up on my recent visits and continue my research." Bloemers 2d Decl. ¶¶ 13–15.

GO Alliance has standing here. First, the aesthetic injury described by Bloemers is cognizable. *See Nat'l Audubon Soc'y v. Davis*, 307 F.3d 835, 849 (9th Cir. 2002), *as amended on denial of reh'g*, 312 F.3d 416 (9th Cir. 2002). Bloemers has made repeated trips to the South Warner area and other parts of the Forest as part of his efforts to document through photo and video the impact of wildfires and wildfire suppression efforts, as well as for recreation. Bloemers 2d Decl. ¶¶ 5–6, 13–15; Bloemers Decl. ¶¶ 12–14. Given his well-established interests in the area, Bloemers' plans to continue his visits "either later this year or next year" are sufficiently credible to support standing. Bloemers 2d Decl. ¶¶ 13–15; *see Ecological Rights Found.*, 230 F.3d at 1149–50. His prospective plans are also sufficiently close in time and concrete to support standing. *Compare Ecological Rights Found.*, 230 F.3d at 1150 ("An individual who visits Yosemite National Park once a year to hike or rock climb and regards that visit as the highlight of his year is not precluded from litigating to protect the environmental quality of Yosemite Valley simply because he cannot visit more often."), *with Lujan,* 504 U.S. at 564 ("Such 'some day' intentions— without any description of concrete plans, or indeed even any specification of *when* the some day will be—do not support a finding of the 'actual or imminent' injury that our cases require." (emphasis in original)). Plaintiffs have established GO Alliance's members "use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity." *Laidlaw*, 528 U.S. at 183 (quoting *Sierra Club*, 405 U.S. at 735). Finally, because a plaintiff need only establish an interest in a single location to have standing to challenge

an agency action affecting multiple locations, GO Alliance has standing to challenge CE-6.[6] *Sierra Forest Legacy v. Sherman*, 646 F.3d 1161, 1179–80 (9th Cir. 2011).

The Court finds that the remaining Plaintiffs have established standing as well. *Summers*, 555 U.S. at 499. The declarations submitted by members of Oregon Wild and WildEarth similarly show an interest in the affected areas, together with sufficiently concrete plans to visit in the near future. They adequately establish an injury in fact by alleging harm if the Projects proceed. Heiken Decl. ¶¶ 21–24; Krupp Decl. ¶¶ 13–15; *see Ecological Rights Found.*, 230 F.3d at 1149–50; *see also Bd. of Nat. Res. of State of Was. v. Brown*, 992 F.2d 937, 942 (9th Cir. 1993) ("[i]f any [plaintiff] has standing, we may reach the merits"). Oregon Wild and WildEarth also meet the causation and redressability requirements for standing.

## B. **Timeliness**

Claims brought under the APA must be filed "within six years after the right of action first accrues." 28 U.S.C. § 2401(a) (Section 2401(a)). As explained in *Corner Post*, "[a] claim accrues when the plaintiff has the right to assert it in court—and in the case of the APA, that is when the plaintiff is injured by final agency action." *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 804, 813 (2024). The injury inquiry is "plaintiff specific," looking to when "this particular plaintiff . . . has a complete and present cause of action." *Id.* at 817 (internal quotations omitted) (quoting *Green v. Brennan*, 578 U.S. 547, 554 (2016)). In *Corner Post*, the plaintiff business, Corner Post, brought a facial challenge to a rule that had been finalized before Corner Post itself had been formed and more than six years before the filing of the lawsuit. *Id.* at 806, 811–813. The Supreme Court reasoned that Corner Post could only have been injured by the

---

[6] While Defendants do not argue Plaintiffs failed to adequately allege causation or redressability, the Court finds GO Alliance's cognizable injuries are causally connected to the validity of CE-6 because Defendants' reliance on CE-6 to approve the South Warner project was a but-for cause of GO Alliance's asserted injury. Further, a favorable decision here also would redress GO Alliance's asserted injuries.

challenged rule, at the earliest, when it was first formed. *Id.* at 811–13. Because it sued within six

years of that injury, its claims were not time-barred. *Id.* In so ruling, the Supreme Court "rejected"

the possibility that a "limitations period commences at a time when the plaintiff could not yet file

suit" as "inconsistent with basic limitations principles." *Id.* at 811 (internal alterations omitted)

(*quoting Bay Area Laundry & Dry Cleaning Pension Tr. Fund v. Ferbar Corp. of Cal.*, 522 U.S.

192, 200 (1997)). It also emphasized that Section 2401(a) is a "plaintiff-centric accrual rule" that

"vindicates the APA's 'basic presumption' that anyone injured by agency action should have

access to judicial review." *Id.* at 824.

The Court considers the timeliness of the claims raised by each plaintiff.

## 1. <u>Oregon Wild</u>

Defendants argue Oregon Wild's claim is untimely because it accrued in 2006 when the

Forest Service initiated the Jack Creek and Rock Creek Meadows Project. Defs.' Cross Mot. 22.

Defendants argue because the Forest Service approved this project pursuant to CE-6, and Oregon

Wild participated in the NEPA process leading to the decision, Oregon Wild was "injured" by the

use of CE-6 to approve commercial thinning in 2006. *Id.* at 22–23; SAR 169–173, 222.

In response, Plaintiffs assert because the Forest Service approved the 2006 project solely

under CE-10 and not under CE-6, Oregon Wild could not challenge the agency action as it applies

to CE-6. *Id.* Pls.' Reply 4–6; SAR 217–18, 221–22. But the Jack Creek and Rock Creek Meadows

Project was announced under both CE-6 and CE-10. SAR 222 (Legal Notice of Decision, dated

Feb. 6, 2006). The Decision provided for removal of "dead lodgepole pines" and for thinning of

"overstocked green trees." SAR 169–70 (Decision, dated Jan. 30, 2006). The Forest Service

authorized the removal of dead lodgepole pines under CE-10 and the cutting of lodgepole pine

encroachment under CE-6. *Id.* at 171. The Forest Service also authorized thinning of overstocked

green trees through a combination of commercial and non-commercial thinning under CE-6 and CE-10. *Id.* at 170–71. Oregon Wild's predecessor, the Oregon Natural Resource Council ("ONRC") participated in the Decision by submitting comments during the 30-day comment period for the project. Heiken 3d Decl. ¶¶ 3, 7, ECF No. 79.

Because a cause of action "accrues when the plaintiff . . . . suffers an injury from final agency action," Oregon Wild's claims here accrued in 2006. *See Corner Post*, 603 U.S. at 809 (quoting *Bay Area Laundry*, 522 U.S. at 201). Oregon Wild participated in the decision-making process in 2006 and was on notice at that time of the potential use of CE-6 for commercial thinning. SAR 174 (ONRC's comments appended to Decision); *see Havasu Water Co. v. U.S. Dep't of Interior*, 2024 WL 4404956, at *7 (E.D. Cal. Aug. 27, 2024) (applying *Corner Post* and finding "when the accrual period for Plaintiff's APA claims began depends on when it knew, or should have known, of the alleged [failure] such that it could have filed suit and obtained relief"); *Walker v. Burgum*, 2025 WL 2084924, at *5 & n.11 (N.D. Cal. July 23, 2025) (applying *Corner Post* and finding agency announcement of decision, or publication of decision in Federal Register, each sufficient to provide notice to parties that had been involved in relevant agency proceedings, starting limitations clock). Comments submitted by ONRC and agency responses do not contradict that commercial thinning was approved at least in part under CE-6.[7] *See* SAR 174. Oregon Wild (through its predecessor) could have sued then for the relief it now seeks. Pls.' Reply 8–9; Defs.'

---

[7] The Forest Service responded to ONRC's comments, stating "merchantable dead trees would be offered commercially. Estimates indicate approximately 60–70% of the dead trees would be merchantable as firewood or chips. Recently dead trees may be suitably sound to be sold for sawlogs or house logs." SAR 174. This does not indicate that the only "commercial material" would come from dead trees or that there would be no commercial thinning of green trees, which the Decision authorized under CE-6; ONRC had asked specifically about "down logs," and as later comment responses indicate, the Forest Service was still contemplating cutting green trees. *See id.*; Pls.' Reply 5–6. Though earlier stages of the Decision referred only to CE-10, the administrative record shows the Forest Service also relied on CE-6 when the comment period began and when the action was finalized in 2006 following ONRC's participation. SAR 218 (Proposed Action, dated 2005); *id.* at 221 (Notice of Comment Opportunity, dated 2005); *id.* at 222 (Notice of Decision).

Cross Reply 16; *see, e.g.*, *Forest Conservation Council v. U.S. Forest Serv.*, 2003 WL 23281957, at *4 (D. Ariz. July 9, 2003) (enjoining commercial logging purportedly authorized using CE-6), *aff'd*, 110 Fed. App'x 26 (9th Cir. 2004). Oregon Wild's current claim therefore accrued in 2006 and is time barred.[8] § 2401(a); *see Corner Post*, 603 U.S. at 811.

### 2. **WildEarth**

Defendants argue WildEarth's claim accrued in January 2014, when the Forest Service authorized the Cordovas Project, targeting thousands of acres for restoration efforts and involving commercial thinning under CE-6 in the Santa Fe National Forest in New Mexico. Defs.' Cross Mot. 23–24; PAR 3534-36. Because the project occurred near WildEarth's headquarters in Santa Fe, Arizona, and because the statute of limitations is "strictly construed" in the government's favor, Defendants conclude WildEarth was injured by the Forest Service's action in January 2014.

The Court cannot conclude WildEarth's claim accrued in 2014. Defendants point to the Cordovas project as "a stone's throw from" WildEarth's offices and conclude WildEarth should have known of the action. Yet Defendants proffer no evidence of notice other than mere proximity. Defs.' Cross Mot. 23; *cf. WildEarth Guardians v. U.S. Dep't of Just.*, 181 F. Supp. 3d 651, 671 (D. Ariz. 2015) (rejecting government defendant's proposed accrual date based on "assert[ion] that [WildEarth and others] are 'litigation-savvy' environmental groups so they should have known" at least as early as when a different environmental group complained of the policy at issue). And

---

[8] Defendants suggest that additional declarations submitted by Plaintiffs should not be considered because the APA contemplates that judicial review is based exclusively on the record compiled by the agency. Defs.' Cross Reply 6–7; *Fla. Power & Light v. Lorion*, 470 U.S. 729, 743–44 (1985). The Court is not persuaded that this proposition necessarily dictates how courts assess the timeliness of challenges to agency action. Nevertheless, these declarations would not change the Court's conclusion. The declarations speak to what could have been revealed in litigation over the use of CE-6 in the Jack Creek and Rock Creek Meadows Project to approve commercial thinning. *See generally* Heiken 3d Decl.; Goodwin Am. Decl.; ECF No. 80. Plaintiffs point to the declarations to argue the Forest Service ultimately had not authorized "commercial activities under CE-6, [and] Oregon Wild [did not] have any reason to believe that it would." Pls.' Cross Reply 6. Such showings, even if true, do not change the determination that Oregon Wild could have sued then for the relief it now seeks; the additional submitted evidence only invites speculation over the potential outcome of such an action, it does not refute the existence of a claim, and therefore injury.

while Defendants provide a link to a Forest Service website that describes the project, they concede no notice of the action was published in the Federal Register or received by WildEarth. Defs.' Cross Mot. 23 n.7; *see Shiny Rock Min. Corp. v. United States*, 906 F.2d 1362, 1364–65 (9th Cir. 1990) (holding publication in Federal Register provides "legally sufficient notice to all interested or affected persons regardless of actual knowledge or hardship resulting from ignorance"); *see also Walker*, 2025 WL 2084924, at *5 & n.11. Finally, Defendants cannot establish WildEarth could even have sued in response to the Forest Service action. *See Corner Post*, 603 U.S. at 809; *see also Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 886–89 (1990) (use of lands "in the vicinity" of affected area does not confer standing). WildEarth's claim is timely.

### 3. GO Alliance

Defendants do not contest the timeliness of GO Alliance's claim. GO Alliance's claim mirrors the claim considered in *Corner Post*. Because GO Alliance was founded (2020) within the six years preceding the filing of the case (2022), and GO Alliance was only injured by the agency action at the earliest at the time of its founding, its claims are not time-barred. *See Corner Post*, 603 U.S. at 810–13.

### C. Administrative Exhaustion and Waiver

Defendants assert Plaintiffs Oregon Wild and WildEarth have waived their claims. A plaintiff generally waives arguments not raised during the administrative process. *See Dep't of Transp. v. Pub. Citizen,* 541 U.S. 752, 763–65 (2004). A plaintiff challenging an agency's compliance with NEPA therefore "must structure their participation so that it alerts the agency to the [plaintiff's] position and contentions, in order to allow the agency to give the issue meaningful consideration." *Id.* at 764 (internal alterations and quotations omitted). The purpose of the exhaustion requirement is to permit administrative agencies to utilize their expertise, correct any

mistakes, and avoid unnecessary judicial intervention in the process. *Buckingham v. Sec'y of U.S. Dep't of Agric.,* 603 F.3d 1073, 1080 (9th Cir. 2010). In NEPA cases, "the agency bears the primary responsibility to ensure that it complies with NEPA." *Pub. Citizen,* 541 U.S. at 765. There is no bright-line standard for administrative issue exhaustion and the Ninth Circuit has held the requirement should be interpreted broadly. *See Nat'l Parks & Conservation Ass'n v. Bureau of Land Mgmt.*, 606 F.3d 1058, 1065 (9th Cir. 2010). A claimant need not raise an issue using precise legal formulations, as long as enough clarity is provided that the decisionmaker understands the issue raised. *Native Ecosystems Council v. Dombeck,* 304 F.3d 886, 899 (9th Cir. 2002). "Alerting the agency in general terms will be enough if the agency has been given 'a chance to bring its expertise to bear to resolve [the] claim.'" *Lands Council v. McNair*, 629 F.3d 1070, 1076 (9th Cir. 2010) (quoting *Native Ecosystems Council*, 304 F.3d at 900)).

During the administrative process, Oregon Wild commented that based on the scoping notices, the Projects were "far too large and impactful to go unanalyzed in a Categorical Exclusion" and were "virtually indistinguishable from many other projects that were analyzed in EAs and EISs." SWAR 4,058; BWAR 2,396; *see also* BBAR 139 ("This project is too big for a CE. The [Forest Service] should use NEPA to facilitate public involvement, develop and consider mitigating alternatives, and environmental consequences and trade-offs."). Oregon Wild also alerted the Forest Service that "[a] federal court in California ruled that . . . . [a]ny commercial logging above those thresholds, even if it is for another purpose, should not be eligible for the CE." SWAR 4,066; BWAR 2,395. WildEarth's comments included a "focus on the fact that the Forest Service cannot, by law, approve a project of this potential size . . . and scope, and this poorly-defined, using its CE authority. The Forest Service proposal appears to be both a 'black box' and a 'blank check.'" SWAR 8,701; BWAR 2,821; BBAR 684. On the purpose of CEs,

WildEarth noted, "in 1992 when 36 C.F.R. § 220.6(e)(6) was promulgated for 'timber stand improvement' projects, the Forest Service did not intend for the categorical exclusion to apply to commercial thinning." BWAR 2,827; BBAR 690; *see also* SWAR 8,708–10 ("The Forest Service Fails To Demonstrate That It May Utilize A Categorical Exclusion For These Projects.").

Defendants' argument for waiver turns on a distinction without a difference. Defendants state, "Plaintiffs did raise their issue that the three projects did not fit within CE-6, but did not raise the distinct issue that CE-6 was illegally established in 1992 and could not be relied on for the three projects." Defs.' Cross Mot. 27; Defs.' Cross Reply 14–15. Though Defendants distinguish the issues, there is significant overlap between assertions in support of a claim that the Projects do not fit CE-6 and assertions in support of a claim that CE-6 is itself invalid. Plaintiffs' comments fall squarely within that overlap. Plaintiffs argued before the Forest Service that the Projects had to be analyzed through an EA or EIS—in other words, not approved via CE. Pls.' Reply 9–10; Pls.' Mot. 20. Given that the Projects were ultimately approved via CE, Plaintiffs' comments necessarily implicate the validity of that CE. Because a plaintiff need not provide precise legal formulations in comments before the agency as a prerequisite for later asserting those claims, Plaintiffs' comments sufficiently raised the issue of the legality of CE-6 and they have not waived their claims. *See Native Ecosystems Council*, 304 F.3d at 899; *Or. Nat. Desert Ass'n v. McDaniel*, 751 F. Supp. 2d 1151, 1161–63 (D. Or. 2011) (citing *Lands Council*, 629 F.3d at 1075) (collecting cases, and stating exhaustion requirement is met so long as plaintiff's comments are not "completely attenuated from the legal authority").

## D. **Laches**

Defendants also assert Plaintiffs Oregon Wild and WildEarth's claims are barred by laches. Laches is an equitable defense that limits the time when a party may bring suit. *See Jarrow*

*Formulas, Inc. v. Nutrition Now, Inc.,* 304 F.3d 829, 835 (9th Cir. 2002). Whether laches applies depends on the particular facts and circumstances of each case and subject to a court's discretion. *Ocean Advocs. v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 862 (9th Cir. 2005). To establish laches, a party must demonstrate (1) the opposing party lacked diligence in pursuing its claim; and (2) that prejudice resulted from that lack of diligence. *Save the Peaks Coal. v. U.S. Forest Serv.*, 669 F.3d 1025, 1031 (9th Cir. 2012). Laches is strongly disfavored in environmental cases. *Coal. for Canyon Pres. v. Bowers*, 632 F.2d 774, 779 (9th Cir. 1980).

Laches is not appropriate here because Defendants have not shown prejudice. At the core of Defendants' argument is that the use of CE-6 for commercial thinning is long established and defending against litigation that upsets agency priorities is a burden and will impact future projects. First, a lengthy, unexcused delay that does not result in prejudice is not a sufficient basis for laches to apply. *See Grand Canyon Trust,* 391 F.3d at 988. Second, the burden posed by having to defend against litigation, potentially upsetting agency priorities, is not sufficient prejudice for the application of the doctrine of laches, especially in the environmental context. *See Save the Peaks Coal.*, 669 F.3d at 1034 (citing *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1381–82 (9th Cir. 1998), *Shouse v. Pierce County,* 559 F.2d 1142, 1147 (9th Cir. 1977) (per curiam)). Third, "[p]rejudice in environmental actions is measured by 'what Congress defines as prejudice. The primary concern is whether the harm that Congress sought to prevent . . . is now irreversible.'" *Neighbors of Cuddy Mountain,* 137 F.3d at 1382 (quoting *Apache Survival Coal. v. United States*, 21 F.3d 895, 912 (9th Cir. 1994)) (alterations in original). Accordingly, two relevant factors are "the money spent on a project and the extent to which a project has progressed so far that 'the harm [plaintiffs] fear' has already occurred." *Id.* Defendants state the Forest Service has

engaged in commercial thinning in the past but make no representations as to either factor. Defs.'
Cross Reply 16–17. Defendants have not shown prejudice justifying laches here.

In addition, though they are separate doctrines, laches is generally not appropriate where
statutory limitations periods apply. *SCA Hygiene Prods. Aktiebolag v. First Quality Baby Prods.,
LLC*, 580 U.S. 328, 331 (2017) (quoting *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663,
679 (2014)) ("Laches, we explained, cannot be invoked to bar legal relief in the face of a statute
of limitations enacted by Congress." (cleaned up)). Applying laches in this case would also conflict
with the Supreme Court's overarching view expressed in *Corner Post* regarding plaintiffs' ability
to challenge agency actions; considering Section 2401(a), the Supreme Court stated, "a federal
regulation that makes it six years without being contested does not enter a promised land free from
legal challenge." *Corner Post*, 603 U.S. at 823 (quoting *Herr v. U.S. Forest Serv.*, 803 F.3d 809,
821 (6th Cir. 2015)).

## II.  Merits

Plaintiffs challenge the validity of CE-6, arguing that in promulgating CE-6, the Forest
Service did not meet the requirements of NEPA and the APA when it failed to analyze impacts of
commercial thinning up to and beyond the acreage of the Projects. Pls.' Reply 20; Pls.' Mot. 23.
The language of CE-6 does not limit the size of commercial thinning projects that otherwise meet
the requirements of the CE, meaning it could enable commercial thinning and associated activities
on the full 16,000 acres of the South Warner Project. Pls.' Mot. 23, 28. Plaintiffs argue the Forest
Service was required to demonstrate such qualifying projects, not limited by acreage, would not
have significant impacts before promulgating CE-6 and categorically excluding such projects from
further environmental review. *Id.*

Defendants argue Plaintiffs have not shown the Forest Service was required to evaluate the impact of the specific activity of commercial logging. Defs.' Cross Reply 26–27 (characterizing Plaintiffs' claims as imposing "phantom" procedural duty to specifically evaluate "commercial logging" in promulgating CE-6); Defs.' Cross Mot. 32. Defendants emphasize the Forest Service followed the appropriate procedural requirements in creating CE-6. Defs.' Cross Reply 30–31; Defs.' Cross Mot. 36. Defendants further assert CE-6 is "a timber stand and wildlife habitat improvement measure with built-in conditions and limits," and not about commercial logging. Defs.' Cross Reply at 27–28. Accordingly, Defendants conclude it was "rational, and no NEPA violation, for the Forest Service in promulgating CE-6 to not myopically focus on the generic effects of a certain sub-action in a vacuum." Defs.' Cross Reply 28–29.

## A. **Applicable Law**

When an agency decides to create a CE to allow actions to proceed without an EA or EIS, the agency must adequately explain its decision. *See Sierra Club v. Bosworth*, 510 F.3d 1016, 1026 (9th Cir. 2007) (quoting *Jones v. Gordon*, 792 F.2d 821, 828 (9th Cir. 1986)). A reviewing court upholds agency action taken under NEPA unless it finds the action was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. *Id.* at 1018, 1026; *Ctr. for Env't L. & Pol'y v. U.S. Bureau of Reclamation*, 655 F.3d 1000, 1005 (9th Cir. 2011) (quoting 5 U.S.C. § 706(2)(A)); Defs.' Cross Mot. 30. To determine whether agency action was arbitrary or capricious, a court considers "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Marsh v. Or. Nat. Res. Council,* 490 U.S. 360, 378 (1989) (seeking "reasoned decision" in review of agency action); *see Bosworth*, 510 F.3d at 1024 (citing *Heartwood, Inc. v. U.S. Forest Serv.,* 230 F.3d 947, 953 (7th Cir. 2000), *Cellular Phone Taskforce v. F.C.C.,* 205 F.3d 82, 93–94 (2d Cir. 2000)). A court does not examine

whether it would have made the same decision. *See Marsh,* 490 U.S. at 377. To uphold the agency's decision, a court must find the agency's record contained adequate evidence to support its expert opinions and decisions, as well as the evidence the agency stated it relied upon in reaching its decisions. *State Farm,* 463 U.S. at 43. A court does not rely on the agency's bare assertions of its expertise. *Marsh*, 490 U.S. at 378.

The Court is also informed by the Supreme Court's guidance in *Seven Cnty. Infrastructure Coal. v. Eagle County*, 605 U.S. 168 (2025). There, in considering judicial review of an EIS for a particular project, the Supreme Court held courts must afford "substantial deference" to an agency's final determinations, as well as its decisions regarding the level of detail and scope of environmental analysis to provide in its NEPA-mandated documentation. *See id.* at 180–83. The Supreme Court emphasized "NEPA does not require the agency to weigh environmental consequences in any particular way." *Id.* at 173. *Seven County* nevertheless maintains that agency action must be "reasonable and reasonably explained." *Id.* at 180. Courts "should defer to agencies' decisions about where to draw the line" in the scope of an analysis within a "broad zone of reasonableness," but only if the analysis presents reasoned determinations consistent with what NEPA mandates the agency must consider. *See id.* at 182–83 (holding in context of an EIS, "[s]o long as the EIS addresses environmental effects from the project at issue [as required by NEPA], courts should defer to agencies' decisions about where to draw the line" (citing *Pub. Citizen*, 541 U.S. at 767)). *Seven County* does not grant an agency discretion to forgo NEPA requirements, nor does it displace arbitrary and capricious review. *See* 605 U.S. at 181–83; *Cascadia Wildlands v. U.S. Bureau of Land Mgmt.*, 153 F.4th 869, 903 (9th Cir. 2025). Accordingly, though mindful of this deferential standard, this Court cannot conclude the Supreme Court has overruled *Bosworth*'s essential holding that an agency must provide a reasoned decision why a CE only

authorizes actions with insignificant environmental effects when it promulgates the CE. *Seven Cnty.*, 605 U.S. at 180; *Bosworth*, 510 F.3d at 1026, 1030 (quoting *Marsh,* 490 U.S. at 378) ("[B]ecause the Forest Service failed to demonstrate that it made a 'reasoned decision' to promulgate the Fuels CE based on all the relevant factors and information, its promulgation of the Fuels CE was arbitrary and capricious.").

In addition, contrary to Defendants' suggestion, the intervening repeal of CEQ regulations, 90 Fed. Reg. 10,610–16 (Feb. 25, 2025), does not absolve the Forest Service of an obligation to "reasonably explain[]" its actions. *Seven Cnty.*, 605 U.S. at 180. *Bosworth* held that in issuing a CE, the Forest Service "must document that the action to be undertaken is insignificant because the threshold question in a NEPA case is whether a proposed project will significantly affect the environment, thereby triggering the requirement for an EIS." *See Bosworth*, 510 F.3d at 1027 (internal quotations omitted) (quoting *Blue Mountains Biodiversity Project v. Blackwood,* 161 F.3d 1208, 1212 (9th Cir. 1998)). A CE allows an agency to forgo environmental analysis when approving a project the agency determines fits a CE in the future, and accordingly, the agency must comply with NEPA's "hard look" requirement at the time of issuing the CE, which triggers arbitrary and capricious review. *See id.* at 1027–30; *Cascadia Wildlands*, 153 F.4th at 902–03. The "relevant factors" of an agency decision are no longer defined by CEQ regulations, and their scope is subject to agency discretion within a "broad zone of reasonableness," but the necessity of a "reasoned decision" remains. *Seven Cnty.*, 605 U.S. at 182–83; *Bosworth*, 510 F.3d at 1027. To hold otherwise would be to "adopt a view of [CEs] that will swallow the protections of NEPA." *Friends of Inyo v. U.S. Forest Serv.*, 103 F.4th 543, 557 (9th Cir. 2024).

/ / /

/ / /

21 – OPINION AND ORDER

**B.** <u>**Analysis**</u>

As an initial matter, Defendants take issue with the fact Plaintiffs do not challenge project-specific extraordinary circumstances review. Defs.' Cross Mot. 39–40; Pls.' Reply 19–20. But the Forest Service cannot promulgate a CE that applies to projects of unknown impact anticipating the safety valve of extraordinary circumstances review to justify the CE on a project-by-project basis after the fact.[9] *See Safari Club Int'l v. Haaland*, 31 F.4th 1157, 1179 (9th Cir. 2022) ("By definition, CEs are categories of actions that have been predetermined not to involve significant environmental impacts[.]" (quoting *Nat'l Tr. for Historic Pres. v. Dole*, 828 F.2d 776, 781 (D.C. Cir. 1987))); *Bosworth*, 510 F.3d at 1028 ("As the Sierra Club points out, if assessing the cumulative impacts of the Fuels CE as a whole is impractical, then use of the categorical exclusion mechanism was improper."). As such, the comprehensiveness or procedural compliance of the Forest Service's approval of the Projects is not dispositive of the validity of CE-6. Defendants also point to *Heartwood, Inc. v. U.S. Forest Serv.*, 230 F.3d 947 (7th Cir. 2000), to suggest the promulgation of CEs does not require NEPA compliance. Defs.' Cross Mot. 38–39. *Heartwood* held the Forest Service did not violate NEPA or the APA when it declined to conduct an EA or EIS prior to issuing a CE. 230 F.3d at 955. However, even if the specific exercise of an EA or EIS is not required to issue a CE, *Heartwood* nowhere suggests the Forest Service is excused from APA compliance or may otherwise circumvent NEPA when it promulgates a CE. *See* 230 F.3d at 950–51; *see also Friends of Inyo*, 103 F.4th at 557. Indeed, the Seventh Circuit did not disturb the district court's finding below that the CE at issue was itself arbitrary and capricious in violation of the APA. *Heartwood, Inc. v. U.S. Forest Serv.*, 73 F. Supp. 2d 962, 975–77 (S.D. Ill. 1999) (Claim III); *see also* Pls.' Reply 23–24.

---

[9] CEQ regulations stated agencies "shall provide for extraordinary circumstances in which a normally excluded action may have a significant environmental effect," 40 C.F.R. § 1508.4, in which case an EIS or an EA would be required.

Based on the record before the Court, the Forest Service's decision to promulgate CE-6 as allowing unlimited commercial thinning was arbitrary and capricious because Defendants fall short of establishing the Forest Service undertook a reasoned decision. Agency documents Defendants point to conclude the timber stand and wildlife habitat improvement activities CE-6 covers would not have significant environmental effects individually or cumulatively, and that CE-6 provided for extraordinary circumstances review. Defs.' Cross Mot. 34–35; PAR 3,168–69 (57 Fed. Reg. 43,183–84 (Sept. 18, 1992)); SAR 9–10 (56 Fed. Reg. 19,720–21 (Apr. 29, 1991)). The Forest Service explained CE-6 was based on "[e]xperience in applying agency NEPA procedures and project monitoring," concluding exempted activities had "little potential for soil movement, loss of soil productivity, water and air degradation or impact on sensitive resource values." SAR 9–10.

However, Defendants do not identify the evidence to which the Forest Service applied its expertise. While the agency materials to which Defendants direct the Court refer generally to agency findings, they do not describe the subject of the findings or how the findings relate to the actions to be excluded under CE-6. They instead provide only conclusory statements that merely recite the definition of a CE. *Safari Club Int'l*, 31 F.4th at 1179; *Bosworth*, 510 F.3d at 1028. This is inadequate; though an agency's decision that implicates its substantive expertise deserves deference, an agency's bare assertion that its decision is informed by its experience and expertise is not a substitute for explaining the basis of its decision. *See Cascadia*, 153 F.4th at 903–04; *Bosworth*, 510 F.3d at 1028–29. *Bosworth* identified multiple forms of information that could support the requisite findings, and, in light of *Seven County*, the Court would defer to the Forest Service's choice of proof, but it must offer some proof. *See Bosworth*, 510 F.3d at 1028–30 (chronicling lack of "hard data" to support "conclusory statements that there would be no

significant impact"); *cf. Colo. Wild v. U.S. Forest Serv.*, 435 F.3d 1204, 1220 (10th Cir. 2006) (reciting bases for Forest Service's decision to impose acreage limitation for CE-13, including findings from "154 timber harvest projects" that were published in the Federal Register, and finding decision not arbitrary or capricious). A court "cannot defer to a void." *Or. Nat. Desert Ass'n v. Bureau of Land Mgmt.*, 625 F.3d 1092, 1121 (9th Cir. 2010).

Because the record before the Court does not show the Forest Service considered the impact of thinning at any scale, commercial or otherwise, the Court cannot conclude the Forest Service engaged in a "reasoned decision" regarding environmental impacts of the actions authorized by CE-6. *Bosworth*, 510 F.3d at 1028 ("an impacts analysis . . . is of critical importance in a situation . . . where the categorical exclusion is nationwide in scope and has the potential to impact a large number of acres"); *State Farm*, 463 U.S. at 43. The plain language of CE-6 covers commercial thinning for timber stand or wildlife habitat improvement purposes subject to CE-6's limitations. *Mountain Cmtys. for Fire Safety v. Elliott*, 25 F.4th 667, 675 (9th Cir. 2022). It is therefore not "micromanag[ing] or unduly scrutiniz[ing] the agency's assessment as to the level of detail to provide" in this case to require that the Forest Service, in promulgating a CE, consider the impact of an activity plainly anticipated by the CE.[10] *Cascadia*, 153 F.4th at 903. Accordingly, the Forest Service's promulgation of CE-6 was arbitrary and capricious.

## III.    Remedy

When an administrative rule is promulgated in violation of the APA, the regulation is invalid and vacatur is an appropriate remedy. 5 U.S.C. § 706(2)(A); *All. for Wild Rockies v. U.S.*

---

[10] *Seven County* commands, so long as an agency "addresses environmental effects from the project at issue, courts should defer to [its] decisions about where to draw the line—including (i) how far to go in considering indirect environmental effects from the project at hand and (ii) whether to analyze environmental effects from other projects separate in time or place from the project at hand." 605 U.S. at 182. Here, the Forest Service did not address environmental impacts directly implicated by the CE with a "reasoned and detailed" explanation—the Court does not base its holding on failure to consider indirect or separate impacts, or any other factor formerly mandated by the CEQ. *Id.* at 1512–13.

*Forest Serv.*, 907 F.3d 1105, 1121–22 (9th Cir. 2018). Vacatur may be complete, partial, or excused in limited cases. *Monsanto v. Geertson Seed Farms*, 561 U.S. 139, 165–66 (2010); *Cal. Cmtys. Against Toxics v. EPA*, 688 F.3d 989, 992–94 (9th Cir. 2012) (per curiam). "Whether agency action should be vacated depends on how serious the agency's errors are and the disruptive consequences of an interim change that may itself be changed." *Cal. Cmtys. Against Toxics*, 688 F.3d at 992 (internal quotations omitted) (quoting *Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993)). A court will "look to whether the agency would likely be able to offer better reasoning or whether by complying with procedural rules, it could adopt the same rule on remand, or whether such fundamental flaws in the agency's decision make it unlikely that the same rule would be adopted on remand." *Nat'l Fam. Farm Coal. v. U.S. Env't Prot. Agency*, 966 F.3d 893, 929 (9th Cir. 2020) (internal quotations omitted) (quoting *Pollinator Stewardship Council v. EPA*, 806 F.3d 520, 532 (9th Cir. 2015)). The Supreme Court's recent consideration of nationwide injunctions does not affect federal courts' authority to "set aside" unlawful agency action under the APA. *Trump v. CASA, Inc.,* 606 U.S. 831, 847 n.10 (2025) (noting vacatur under APA raises "distinct question" from injunctive relief at issue).

The Forest Service's error in promulgating CE-6 is serious enough to justify vacatur. CE-6 is facially invalid because the Forest Service did not comply with the APA in promulgating it; the Forest Service did not support its decision that allowing commercial thinning with no acreage cap would have only insignificant effects on the environment. Leaving CE-6 in place would allow the Forest Service to continue to approve commercial thinning at any scale as a part of qualifying projects by way of a CE that was illegally promulgated. Vacatur is therefore appropriate. *See All. for Wild Rockies*, 907 F.3d at 1121; *Ctr. for Biological Diversity v. Burgum*, --- F. Supp. 3d ---, 2025 WL 2781718, at *22 (D. Or. Sept. 29, 2025); *see also Bosworth*,

510 F.3d at 1033 ("[A]llowing a potentially environmentally damaging program to proceed without an adequate record of decision runs contrary to the mandate of NEPA.").

It is also unlikely the Forest Service could adopt the same rule on remand. A CE that authorizes a certain activity, which affects the environment, on an unlimited scale, is highly unlikely to authorize only activities that have no significant environmental impacts.[11] The Forest Service's error here was as much a failure to put forth a reason as it was an error of reasoning. The Court is therefore also unwilling to find Defendants can overcome vacatur based on asserted potential negative environmental impacts of setting aside CE-6 where, as here, the Forest Service's error involved the failure to explain and consider environmental effects when promulgating CE-6. Brief of Amicus Curae Am. Forest Res. Council 17–18, ECF No. 74-1; *All. for Wild Rockies*, 907 F.3d at 1121–22. Further, setting aside CE-6 does not leave the Forest Service without alternatives to address wildfire risk; it may rely on other methods approved through other CEs, or it may prepare an EA or EIS to approve the same kind of commercial thinning once more.

In addition, vacatur of CE-6 is appropriate here as the Court does not seek to intrude upon the Forest Service's substantive expertise to make a substantive decision regarding the content of CE-6. The Court is not prepared to rule that a project affecting between 3,000 and 16,000 acres, for instance, risks significant impacts on the environment.[12] Pls.' Mot. 33; *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 681 (9th Cir. 2021) (quoting *Harmon v. Thornburgh*, 878 F.2d 484, 494 (D.C. Cir. 1989)) ("Our 'typical response is to vacate the rule and remand to the agency';

---

[11] *Cf. Heartwood*, 73 F. Supp. 2d at 974–77, 980 (finding proposed CE that excluded timber harvests removing up to 250,000 board feet of merchantable wood products and up to 1,000,000 board feet of salvaged merchantable wood products, representing "ten-fold increase in the board feet limit for salvage and [] 2 ½ times increase in the harvest limit for live trees," violated the APA as a "classic example of an arbitrary decision," declaring CE "null and void").
[12] On appeal in this case, the Ninth Circuit declined to "read into" CE-6 any implied "size or acreage limitation." *Or. Wild v. U.S. Forest Serv.*, 2024 WL 4286965, at *2. The reviewing court stated the "broader purpose of NEPA and the general definition of CEs" did not "authorize [it] to rewrite CE-6 to add an undefined size or acreage limitation." *Id.*

we 'ordinarily do not attempt, even with the assistance of agency counsel, to fashion a valid regulation from the remnants of the old rule.'") It is for Defendants to adequately support a determination of no significant impacts in promulgating CE-6, determine that an acreage cap or other limit is necessary and set one, or abandon the rule entirely. Accordingly, the proper remedy under the APA is to set aside CE-6.

In exercising its equitable powers to set aside CE-6, the Court nevertheless recognizes and balances the fact CE-6 was originally promulgated in 1992, and that the Projects in this case may have active contracts for sale of thinned timber. *See Pit River Tribe v. U.S. Forest Serv.*, 615 F.3d 1069, 1081 (9th Cir. 2010) (citing *Bosworth*, 510 F.3d at 1033–34). Accordingly, the Court sets aside CE-6 as to all future Forest Service actions that are not final agency actions as of the date of this Order.

Further, the Court sets aside the approvals of the South Warner Project, Baby Bear Project, and Bear Wallow Project. Approval of the Projects relied on CE-6. Existing contracts regarding the sale of commercially thinned timber from the Projects are not affected by this Order.[13] This Order does not prevent Defendants from completing an EA or EIS, or relying on a different CE, to support resuming the Projects. Other Forest Service actions that are in progress or completed are unaffected by this Order.

## **CONCLUSION**

For the foregoing reasons, Plaintiffs' Motion for Summary Judgment (ECF No. 68) is GRANTED and Defendants' Cross-Motion for Summary Judgment (ECF No. 72) is DENIED. The Court REMANDS and SETS ASIDE CE-6 consistent with this Order.[14] In particular,

---

[13] At the hearing on the parties' motions held on December 15, 2025, Plaintiffs stipulated that current contracts would not be impacted by the Court's ruling.
[14] Codified at 7 C.F.R. § 1b.4(d)(30) (2025), formerly 36 C.F.R. § 220.6(e)(6) (2019).

Defendants may not rely on CE-6 to approve Forest Service actions that are not final agency actions as of the date of this Order. The Court SETS ASIDE the approvals of the South Warner Project, Baby Bear Project, and Bear Wallow Project consistent with this Order.

IT IS SO ORDERED.

DATED this 13th day of January 2026.

_____/s/ Michael McShane_____
**Michael J. McShane**
**United States District Judge**