**SCOTT E. BRADFORD, OSB #062824**
United States Attorney
District of Oregon
**SEAN E. MARTIN, OSB #054338**
Assistant United States Attorney
1000 S.W. Third Avenue, Suite 600
Portland, OR 97204-2902
sean.martin@usdoj.gov
Telephone: (503) 727-1010
     Attorneys for Defendants

# UNITED STATES DISTRICT COURT

# DISTRICT OF OREGON

| | |
|---|---|
| **OREGON WILD**; **WILDEARTH GUARDIANS**; and **GO ALLIANCE**,<br><br>    Plaintiffs,<br><br>v.<br><br>**UNITED STATES FOREST SERVICE**; **DONALD ASHCRAFT**; **JEANNETTE WILSON**; **TOM SCHULTZ**; and **BROOKE ROLLINS**,<br><br>    Defendants. | Case No. 1:22-cv-01007-MC<br><br>**DECLARATION OF JOSHUA WHITE IN SUPPORT OF DEFENDANTS' MOTION FOR RELIEF** |

I, Joshua White, pursuant to 28 U.S.C. § 1746, declare as follows:

1.   I am the Acting Director of Ecosystem Management Coordination in the Washington Office of the United States Department of Agriculture (USDA), U.S. Forest Service. I have held this position since January 2026 and have been employed by the U.S. Forest Service since June 2009. My permanent position is Forest Supervisor of the Colville National Forest, a role I have served in since June 2023.

2.   The Director of Ecosystem Management Coordination is responsible for developing and recommending national policy, procedures, coordination measures, technical administration, oversight of National Environmental Policy Act (NEPA) compliance, and training necessary to implement NEPA within the U.S. Forest Service (FSM 1950.41c).

3.   The Forest Service promulgated the categorical exclusion (CE) at 36 CFR 220.6(e)(6) in 1992 within the USFS NEPA Revised Policy and Procedures (31.2(6)). This CE was carried forward and included in the USFS NEPA Procedures (2008), which codified policy and procedures within regulation. The agency has implemented actions under this category for 33 years. The CE, previously located at 36 CFR 220.6(e)(6) and now at 7 CFR 1b.4(d)(30), covers timber stand and/or wildlife habitat improvement activities that do not include the use of herbicides or require more than one mile of low-standard road construction.

The Forest Service uses this CE to comply with NEPA for a broad range of activities to improve timber stands and habitat conditions across National Forest System (NFS) lands nationwide. For context, the Forest Service used CE-6 182 times in FY 2025 and 661 times over the past five years.

4. Timber stand improvement (TSI) refers to any treatment of trees designed to improve the quality, composition, structure, condition, health, and growth of a stand. TSI includes but is not limited to prescribed fire to reduce hazardous fuel loads, tree thinning to achieve more desirable vegetation conditions, brush control to manage vegetation near the forest floor and remove invasive species, and girdling (deadening trees while leaving them upright to serve as wildlife habitat).

5. Wildlife habitat improvement involves manipulating forest vegetation to enhance food, shelter, and diversity for game and non-game species. A few examples include creating a mix of vertical and horizontal cover (bedding, nesting, escape cover) as well as releasing mature oaks and hickory trees to increase the production of acorns and nuts, which are crucial for deer, turkey, and squirrels.

6. Activities authorized under this CE are typically non-commercial; however, commercial elements may be present. In many cases, the commercial viability of removed material reflects economic context rather than the inherent purpose or silvicultural nature of the treatment. Whether a project contains

Page 3      Declaration of Joshua White; *Oregon Wild, et al. v. United States Forest Service, et al.*, Case No. 1:22-cv-01007-MC

commercial elements is largely determined by local market conditions, available infrastructure, and regional industry practices. Methods for implementing projects include various types of contracts and agreements with a variety of organizations.

7. Since January 13, 2026, the Forest Service has been evaluating the impacts of the court's Opinion and Order, and I have summarized the agency's preliminary findings here. Given additional time, however, we could provide a more complete picture of the likely effects.

8. Approximately 90 current projects are in the NEPA process and would rely on CE-6 for NEPA compliance, and roughly 80% of these projects do not include commercial timber thinning activities. If CE-6 is vacated, all these projects would need to be redesigned to fit another categorical exclusion or undergo an environmental assessment (EA). EAs take roughly three times longer to complete than CEs.

9. Examples of non-commercial activities that would be affected by a complete vacatur of CE-6 include prescribed burning to reduce severe wildfire risk; removal of conifers encroaching into aspen stands, meadows, and mountain mahogany groves in order to restore hydrologic function and biodiversity hotspots that are critical for elk, mule deer, pollinators, and birds; "culturing" Whitebark pine (a candidate species for ESA listing) to improve habitat and resilience; and juniper cutting to improve sage-steppe habitat and watershed function.

Page 4        Declaration of Joshua White; *Oregon Wild, et al. v. United States Forest Service, et al.*, Case No. 1:22-cv-01007-MC

10. The inability to implement these non-commercial activities efficiently, under CE-6, would result in unmitigated wildfire risk (with the unavailability of prescribed burning and small-tree thinning to reduce ladder fuels) and habitat degradation (with the unavailability of non-commercial treatments designed to reverse habitat decline). For example, if CE-6 is unavailable for non-commercial activities, conifer encroachment would continue to degrade mule deer summer range and migration corridors.

11. In the wake of the court's January 13, 2026 remedy order, initial analysis by the Forest Service indicates that approximately 20% of the 90 projects currently in development that rely on CE-6 include the sale of timber. For these projects, potential impacts in fiscal year 2026 indicate that new NEPA analysis would be required that could impact approximately 70 million board feet (MMBF) of timber volume. 70 MMBF is about the quantity that a medium to large lumber mill could process in a year, so the impact has national implications, with substantial local ecological and economic effects in California, Texas, and Oregon. The ecological and economic impact would be reduced effectiveness of wildfire risk reduction, further degradation of wildlife habitat due to wildfire or insect and disease outbreaks, and reduced flow of timber to local mills impacting jobs and other economic outputs.

Page 5    Declaration of Joshua White; *Oregon Wild, et al. v. United States Forest Service, et al.*, Case No. 1:22-cv-01007-MC

12. Vacating CE-6 in its entirety would disrupt other agencies' wildfire risk reduction efforts and other work to improve timber stand and habitat conditions, because multiple agencies (including the U.S. Bureau of Land Management and the Department of Homeland Security) have adopted the CE; increase paperwork and delays; and negatively affect local industries, important infrastructure, and communities. Treatments implemented through CE-6, including commercial thinning, reduce wildfire risk and improve ecosystem conditions both within and beyond treated acres. Without these treatments, the likelihood of habitat loss and timber stand degradation from wildfire and other natural threats will increase substantially. In addition, the loss of timber resources due to wildfire, disease, and insect outbreaks will also increase further harming local economies and wood processing facilities.

13. While other CE categories exist, only three directly address wildfire risk, and each has significant limitations. HFRA Section 605 (Wildfire Resilience) and Section 603 (Insect and Disease) CEs apply only to lands designated under HFRA Section 602, which is roughly 40% of NFS lands, and Infrastructure Investment and Jobs Act Section 40806 (Fuel Break CE) is limited to linear features, projects under 3,000 acres in specific locations such as wildland-urban interface, or designated treatment areas.

Page 6      Declaration of Joshua White; *Oregon Wild, et al. v. United States Forest Service, et al.*, Case No. 1:22-cv-01007-MC

14. The court's use of "final agency action" in its January 13, 2026 order has caused confusion on a national level at the U.S. Forest Service. It is unclear whether this term applies to project decisions signed after January 13, 2026 that rely on CE-6 or also future actions that implement decisions signed before January 13, 2026. Many NEPA decisions signed before January 13, 2026, relied on CE-6 and authorized work that remains to be implemented. Implementing this work requires contracts, agreements, or permits, and significant resources have already been invested in preparation. Without clarity, the agency cannot confidently guide personnel on whether previously authorized work may proceed, creating uncertainty and inefficiency.

Signed this 10th day of February 2026 in Colville, Washington.

**JOSHUA WHITE** Digitally signed by JOSHUA WHITE
Date: 2026.02.10 10:28:15 -08'00'

_____
Joshua White
Acting Director of Ecosystem Management Coordination